IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

ELI LILLY AND COMPANY,

Plaintiff,

v.

DRUGPLACE, INC. (FL); DRUGPLACE, INC. (TN); COMMUNITY HEALTH INITIATIVE, INC.; NAKORN WHOLESALERS LLC; GALAXY MED, LLC d/b/a GALAXY PHARMACY; BRIGHTLINE WHOLESALE LLC; KEVIN SINGER; PAUL LEIGHT; READUS SMITH; JERRY MAYNARD SR.; JERRY MAYNARD JR.; MISHA MAYNARD; EDGAR ENRIQUEZ; LANE MAZEI; DANIELLE GISCOMBE,

Defendants.

Case No. 26-cv-23516-MORENO/ D'ANGELO

**DEFENDANT MISHA MAYNARD'S ANSWER AND AFFIRMATIVE DEFENSES TO COMPLAINT**

Defendant Misha Maynard ("Maynard"), pursuant to Rules 8 and 10 of the Federal Rules of Civil Procedure and the Order Granting Stipulation and Joint Motion for Preliminary Injunction as to Misha Maynard [ECF No. 71], hereby files her Answer and Affirmative Defenses to Plaintiff Eli Lilly and Company ("Plaintiff")'s Complaint ("Complaint"), and states as follows:

**ANSWER**

**INTRODUCTION**

1. Plaintiff Eli Lilly and Company ("Lilly") is one of the nation's leading pharmaceutical companies. It brings this action to stop an ongoing rebate fraud scheme that has already stolen hundreds of millions of dollars from Lilly.

**<u>ANSWER:</u> Maynard admits that Plaintiff purports to bring an action to stop an ongoing rebate fraud scheme but denies any and all wrongdoing and liability. With respect to the remaining allegations in Paragraph 1, Maynard lacks knowledge or information sufficient to form a belief as to the truth of those allegations and therefore denies same.**

2. Defendants are a group of interrelated entities and individuals that operate under the guise of a massive "prescription cost share program" for members of the Church of God in Christ ("Church" or "COGIC"), a Pentecostal church denomination. Defendants include entities that hold themselves out as the church-affiliated payer, the pharmacy benefits manager ("PBM"), and the exclusive pharmacy for individuals participating in this program. Despite playing these distinct roles, these entities share overlapping ownership, control, and addresses. Their owners and principals, also named as Defendants, have previously been implicated in a lengthy string of healthcare fraud schemes.

**<u>ANSWER:</u> Maynard denies any affiliation with or participation in a group of interrelated entities and individuals that operate under the guise of a massive "prescription cost share program" for members of the Church of God in Christ, and otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 2 and therefore denies same.**

3. In their present scheme, Defendants purchase enormous quantities of TRULICITY® (hereinafter, "Trulicity"), a Lilly prescription medication, through a pharmacy run by Defendants DrugPlace, Inc., located in Florida ("DrugPlace FL"), and DrugPlace, Inc., located in Tennessee ("DrugPlace TN") (together, "DrugPlace"). After purchasing the medication, Defendants seek rebates from Lilly for purported utilization of the medication, filtering the rebate claims through a series of intermediaries. In doing so, Defendants represent that the medication has been dispensed

to patients—a necessary condition to qualify for rebates. Each year, Defendants purport to fill and process tens of thousands of Trulicity prescriptions for Church members, and cause Lilly to pay rebates for that massive purported utilization.

**ANSWER: Maynard denies the allegations in Paragraph 3.**

4. But Defendants do not dispense to patients anything near the volume of Trulicity that they claim. The vast majority of the prescriptions, dispenses, utilization, and patients identified in these rebate submissions are fictional. Instead, Defendants resell this medication to pharmaceutical wholesalers on the secondary market. Defendants then falsely represent to Lilly, through intermediaries, that the resold Trulicity has been dispensed to patients in order to fraudulently cause Lilly to pay rebates.

**ANSWER: Maynard denies the allegations in Paragraph 4.**

5. Defendants' "cost share program" is a sham. Defendants—who claim to provide prescription drug coverage for a Church with more than a million members—actually operate out of a nondescript two-room office. The data they provide to support the rebate claims show highly anomalous prescription and utilization trends antithetical to a legitimate patient population, and the prescription-level data are unsupported by basic verifying information. Lilly's investigation also revealed that the program documents that supposedly govern the prescription cost sharing program are incomplete and inconsistent with industry standards.

**ANSWER: Maynard denies the allegations in Paragraph 5 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme, including any "cost share program." Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 5 and therefore denies same.**

6. Moreover, the economics behind the purported cost share program do not add up. Apart from a copay on each prescription filled, program members supposedly pay no premiums or other periodic contributions that would cover the total cost of their medication needs.[1] Rather, coverage is allegedly funded by unspecified charitable donations and federal grants. But the Church's reported charitable receipts are just a tiny fraction of the cost of the Trulicity that Defendants purchase each year. And although federal grants are a matter of public record, there are no records indicating that the federal government has ever provided a grant to DrugPlace or to Defendant Community Health Initiative, Inc. ("Community Health"), which allegedly administers the Church's prescription cost share program.[1]

**<u>ANSWER:</u> Maynard denies the allegations in Paragraph 6 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme, including any "cost share program." Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 6 and therefore denies same.**

7. At bottom, the prescription cost share program, and Defendants' entire businesses, are fronts for their fraudulent rebate scheme. Through this scheme, Defendants have defrauded Lilly out of more than $200 million. Defendants are similarly defrauding other pharmaceutical manufacturers as well.

**<u>ANSWER:</u> Maynard denies the allegations in Paragraph 7 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme, including any**

---

[1] Throughout this Complaint, in describing Defendants' health care sharing programs, Lilly uses "members" for ease of reference to describe individuals whom Defendants claim are members of those programs. Lilly does not concede that these purported members in fact exist or participated in those programs.

**"cost share program." Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 7 and therefore denies same.**

8. Prior to the current iteration of Defendants' scheme, Lilly had a direct contractual relationship with DrugPlace. Lilly ultimately ended that business relationship after identifying significant concerns with DrugPlace's prescription-level and rebate data. But that did not deter Defendants from seeking other ways of stealing from Lilly—far from it. Instead, they began providing fabricated dispense and utilization data to support rebate claims submitted to Lilly through a multi-step chain of intermediaries, which obscured their identities and helped the rebate claims evade detection. All the while, the volume of Defendants' fraudulent claims skyrocketed.

**<u>ANSWER:</u> Maynard denies the allegations in Paragraph 8 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 8 and therefore denies same.**

9. Defendants were able to conceal their rebate fraud scheme for years by submitting claims through intermediaries, which obscured the source of the claims, and by repeatedly pivoting to different intermediaries. Only by identifying and examining the anomalies in Defendants' rebate data, initiating an extensive investigation, obtaining slapdash putative "program documentation" from Defendants, conducting surveillance of Defendant's resale activities, and obtaining records of Defendants' resale of medication on the secondary market, was Lilly was able to piece together the nature and scope of Defendants' fraud.

**<u>ANSWER:</u> Maynard denies the allegations in Paragraph 9 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks**

**knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 9 and therefore denies same.**

10. Most recently, Lilly has caught Defendants forming a web of new legal entities to replicate the scheme across the country. These include a Texas-based pharmacy, Galaxy Med, LLC (d/b/a Galaxy Pharmacy) ("Galaxy"), which serves the same exact role for a ***different*** purported religiously affiliated prescription cost share program. As with DrugPlace, fraudulent rebate claims are submitted to Lilly based on Galaxy data representing that Galaxy has dispensed Trulicity to program members. In fact, those prescriptions are fictional and the medicine instead has been resold on the secondary market.

**ANSWER: Maynard denies the allegations in Paragraph 10 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 10 and therefore denies same.**

11. Without this Court's intervention, Defendants' fraud will continue to grow at Lilly's expense, leaving lasting damage to Lilly's relationships with its business counterparties involved in the rebate program and draining resources from Lilly's development of critical medications. Lilly seeks injunctive relief to put a stop to this expanding fraudulent scheme, and to obtain damages for the harm Defendants' scheme has inflicted.

**ANSWER: Maynard denies the allegations in Paragraph 11 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 11 and therefore denies same.**

## PARTIES

**I. Plaintiff**

12. Lilly is a public corporation organized under the laws of the State of Indiana, with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285. Lilly discovers, develops, manufactures, and markets innovative medicines. Throughout its 150- year history, Lilly has worked to address some of the most pressing challenges facing humanity, including infectious disease, diabetes, depression, cancer, obesity, and Alzheimer's disease. Last year, more than 55 million people used Lilly's medicines.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 12 and therefore denies same.**

**II. Defendants**

13. Defendants are an interconnected group of individuals and entities with common ownership and shared addresses—including pharmacies, pharmaceutical wholesalers, and prescription drug programs—that work together to devise and perpetuate healthcare fraud schemes.

**ANSWER: Maynard denies the allegations in Paragraph 13 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 13 and therefore denies same.**

**A. DrugPlace**

14. DrugPlace, Inc. (FL) is a business corporation organized under the laws of the State of Florida with an address of 3900 SW 30th Avenue in Fort Lauderdale, Florida. It is therefore a citizen of Florida.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 14 and therefore denies same.**

15. DrugPlace, Inc. (TN) is separately organized under the laws of the State of Tennessee. It is located at 617 Airpark Center Drive, Nashville, Tennessee and maintains a mailing address at 3900 SW 30th Ave, Fort Lauderdale, Florida, in this District. It is therefore a citizen of Tennessee and Florida.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 15 and therefore denies same.**

16. DrugPlace Inc. (FL) and DrugPlace Inc. (TN) operate as one company, with the Fort Lauderdale, Florida location serving as its corporate headquarters and the Nashville, Tennessee location serving as its current distribution center. The company operated by the two corporations is referred to as "DrugPlace." DrugPlace purports to be a mail-order pharmacy and PBM for a prescription cost share program operated by Defendant Community Health. Until April 2026, DrugPlace maintained a National Provider Identifier ("NPI") as a Community/Retail Pharmacy.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16 and therefore denies same.**

17. In April 2026, after learning that Lilly was investigating its fraudulent rebate activity, DrugPlace closed its pharmacy in Nashville and began to liquidate its assets and equipment.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17 and therefore denies same.**

**B. Community Health**

18. Community Health is a business corporation organized under the laws of the State of Tennessee with its principal place of business at 617 Airpark Center Drive in Nashville, Tennessee (the same address as DrugPlace Inc. (TN)). Community Health is therefore a citizen of Tennessee.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18 and therefore denies same.**

19. Community Health purports to be an affiliate of the Church, which describes itself as a Pentecostal denomination with millions of adherents, and sometimes does business under the name "COGIC Department of Health." Community Health purports to be responsible for recruiting patients and administering the Church's prescription cost share program. Community Health was originally formed as ReadyHealthcare Services Corporation and was originally located at 4300 Clarksville Pike, Nashville, Tennessee. Community Health maintains no independent website or internet presence, besides a reference on DrugPlace's website and historical references on the COGIC Department of Health website. Community Health, under its former name ReadyHealthcare Services Corporation, is the owner of registered trademarks for "DrugPlace" and "COGIC Department of Health." Additionally, DrugPlace's "formularies" are printed on COGIC Department of Health letterhead and purport to be approved by the COGIC Department of Health.

**ANSWER: Maynard admits only that she used to work for Ready Healthcare, which later became Community Health Initiative. She was fired by that entity on or about March 2013. Otherwise, Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19 and therefore denies same.**

**C. Nakorn**

20. Defendant Nakorn Wholesalers, LLC ("Nakorn") is a limited liability company organized under the laws of the State of Tennessee. Its sole member is Defendant Kevin Singer, a Florida resident. Therefore, Nakorn is a citizen of Florida. Nakorn's principal place of business is 1400 Donelson Pike, Suite A16, Nashville, Tennessee, which was also DrugPlace's address until March 2017, when Nakorn was formed. Nakorn's corporate registration lists DrugPlace's Florida address, 3900 SW 30th Ave, Fort Lauderdale, Florida, as Nakorn's own mailing address, and that address serves as Nakorn's corporate headquarters.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 20 and therefore denies same.**

21. Nakorn purports to be a wholesaler of pharmaceutical products and maintained wholesaler licenses in Arizona, Kentucky, Pennsylvania, and Tennessee, though none of those licenses are currently valid. Like DrugPlace, Nakorn submitted a request to close its facility with the Tennessee Department of Health and to surrender its wholesaler license with the Kentucky Board of Pharmacy in January 2026, evidently after Defendants were made aware of Lilly's fraud investigation. Defendant Edgar Enriquez is the General Manager of Nakorn and listed as the contact on Nakorn's Tennessee Department of Health facility license.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 21 and therefore denies same.**

**D. Galaxy**

22. Defendant Galaxy is a limited liability company organized under the laws of the State of Texas with its principal place of business at 6655 Travis Street, Suite 120, Houston, Texas. Its sole member is Defendant Lane Mazei, a Florida resident. Therefore, Galaxy is a citizen of Florida.

Galaxy's corporate registration also lists DrugPlace's former Florida address, 1930 Harrison Street, Suite 605, Hollywood, Florida, as Galaxy's own address, and that address serves as Galaxy's corporate headquarters.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 22 and therefore denies same.**

23. Galaxy purports to be a mail-order pharmacy for a prescription cost share program operated by the Texas Chapter of the National Hispanic Christian Leadership Conference. Until around March 2026, Galaxy maintained an NPI code as a Community Pharmacy. Defendant Lane Mazei is listed as the manager, director, officer of record, and registered agent for Galaxy.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 23 and therefore denies same.**

**E. Brightline**

24. Defendant Brightline Wholesale LLC ("Brightline") is a limited liability company organized under the laws of the State of Texas with its principal place of business at 1224 North Post Oak Road, Suite 130, Houston, Texas. Its sole member is Defendant Lane Mazei, a Florida resident. Therefore, Brightline is a citizen of Florida. Brightline's corporate registration also lists DrugPlace's address, 1930 Harrison Street, Suite 605, Hollywood, Florida, as Brightline's own address, and that address serves as Brightline's corporate headquarters.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 24 and therefore denies same.**

25. Brightline purports to be a wholesaler of pharmaceutical products and has previously maintained wholesaler licenses in Alabama, Texas, Tennessee, and Kentucky, though none of those licenses are currently valid. Defendant Lane Mazei filed the corporate registration for

Brightline. Defendant Danielle Giscombe describes herself as Brightline's Pharmaceutical Wholesale Manager and also is listed as a contact on Galaxy's Texas pharmacy license.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 25 and therefore denies same.**

26. Defendants DrugPlace, Community Health, Nakorn, Galaxy, and Brightline are collectively referred to as the "DrugPlace Entities."

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26 and therefore denies same.**

**F. Individual Defendants**

27. Defendant Paul Joshua Leight is a Florida citizen residing in Aventura, Florida. Leight is a co-owner and the President of DrugPlace and an investor in Galaxy. He has been affiliated with numerous corporations, including non-defendant entities associated with the 1400 Donelson Pike address in Nashville, Tennessee (where Nakorn is located) and the 1930 Harrison Street address in Hollywood, Florida (DrugPlace's former address, and Galaxy and Brightline's mailing address).

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27 and therefore denies same.**

28. Defendant Kevin Michael Singer is a Florida citizen residing in Fort Lauderdale, Florida. Singer is Leight's business partner. Singer is a co-owner and the Vice President, Secretary, and Director of DrugPlace. He is also the owner of Nakorn, for which he submitted applications for wholesaler licenses with various state licensing authorities, and an investor in Galaxy. He has been affiliated with numerous corporations, including non-defendant entities associated with the 1400 Donelson Pike address in Nashville, Tennessee (where Nakorn is located) and the 1930

Harrison Street address in Hollywood, Florida (DrugPlace's former address, and Galaxy and Brightline's mailing address).

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28 and therefore denies same.**

29. Additionally, Defendants Singer and Leight jointly own a limited liability company that owns the 3900 SW 30th Ave address in Fort Lauderdale, Florida and the 3900 SW 30th Ave address in Fort Lauderdale, Florida (DrugPlace FL's current address and DrugPlace TN and Nakorn's mailing address). Leight and Singer also co-own dozens of other business enterprises, including at least seven that were formed since February 2025. As alleged below, like Leight, Singer has repeatedly been implicated in healthcare fraud and diversion schemes. Leight and Singer personally supervised, participated in, conspired to participate in, and benefited from the fraudulent scheme described below.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29 and therefore denies same.**

30. Defendant Readus C. Smith III is a Florida citizen residing in Jacksonville, Florida. Smith is the Secretary General of Health and Business for the Church. He is also the CEO and registered agent for Defendant Community Health, and has been affiliated with Leight and Singer's non-defendant companies, including several associated with the 617 Airpark Center Drive address in Nashville, Tennessee (where DrugPlace TN and Community Health are located).

**ANSWER: Maynard admits only that Readus Smith was her supervisor when she worked for Ready Healthcare, which later became Community Health Initiative. Otherwise, Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 30 and therefore denies same.**

31. Smith is also the President for National Partnerships, U.S., at Wellvana, a "value-based" healthcare provider that recruits physicians. Smith leads the Wellvana Interfaith Network, which launched a "partnership" with the Church in 2024 to recruit physicians to provide healthcare services to Church members and other religious communities, particularly in connection with chronic diseases such as diabetes. Smith personally supervised, participated in, conspired to participate in, and benefited from the fraudulent scheme described below.

**ANSWER: Maynard admits only that on or about 2024 when Maynard attended a COGIC National meeting, Readus Smith served in a leadership role with Wellvana, and Wellvana launched an interfaith partnership with the Church of God in Christ in 2024 focused on physician recruitment and chronic-disease support. Otherwise, Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 31 and therefore denies same.**

32. Defendant Jerry Maynard, Sr. is a Tennessee citizen residing in Ashland City, Tennessee. He is a Church bishop and businessman in the Nashville area. He also promoted Community Health to members of the Church. As alleged below, Maynard has previously been implicated in a healthcare fraud scheme involving pharmacies owned by Leight and Singer. In his role at the Church, Mr. Maynard supervised, participated in, conspired to participate in, and benefited from the fraudulent scheme described below.

**ANSWER: Maynard admits only that: Jerry Maynard Sr. is a Tennessee citizen residing in Ashland, Tennessee; he is a Church bishop and a businessman in the Nashville area; and back in the early 2000's, he promoted Community Health to members of the Church. Otherwise, Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 32 and therefore denies same.**

33. Defendant Jerry Maynard, Jr. is a Tennessee citizen residing in Nashville, Tennessee. He is a Church pastor, businessman, politician, and attorney in the Nashville area, and Defendant Jerry Maynard, Sr.'s son. He registered the trademarks for DrugPlace, Ready Healthcare Services (the legal predecessor to Community Health), and COGIC Department of Health. He also served as the Chairman of the Board for Community Health. In his role at Community Health and as an agent for DrugPlace, Mr. Maynard supervised, participated in, conspired to participate in, and benefited from the fraudulent scheme described below.

**ANSWER: Maynard admits only that: Jerry Maynard, Jr. is a Tennessee citizen residing in Nashville, Tennessee; he is a Church pastor, businessman, and politician (not a licensed attorney) in the Nashville area; and he is Jerry Maynard, Sr.'s son. Otherwise, Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 33 and therefore denies same.**

34. Defendant Misha Maynard is a Tennessee citizen residing in Watertown, Tennessee. She is the Vice President of Operations for Community Health, a Church pastor, and Defendant Jerry Maynard Sr.'s daughter and Defendant Jerry Maynard Jr.'s sister. In her roles at Community Health and the Church, Ms. Maynard supervised, participated in, conspired to participate in, and benefited from the fraudulent scheme described below.

**ANSWER: Maynard admits only that she: is a Tennessee citizen residing in Watertown, Tennessee; is a Church pastor of operations, which is different than a Church pastor, with no authority to do things at the Church without asking for permission; is Jerry Maynard, Sr.'s daughter and Jerry Maynard, Jr.'s sister; and once worked for Ready Healthcare, which later became Community Health Initiative, from which she was fired on or about March 2013. Maynard denies the remaining allegations contained in Paragraph 34.**

35. Defendant Edgar Enriquez is a Tennessee citizen residing in Brentwood, Tennessee. He is the General Manager of Nakorn, and in that capacity, signed inspection reports conducted by the Tennessee Department of Health Board of Pharmacy. He is also listed as a contact for Community Health and other entities that share DrugPlace's mailing address, and is affiliated with Leight, Singer, and Smith. In these roles, Enriquez supervised, participated in, conspired to participate in, and benefited from the fraudulent scheme described below.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 35 and therefore denies same.**

36. Defendant Lane ("Po") Jeremy Mazei is a Florida citizen residing in Fort Lauderdale, Florida. Mazei is the Manager and registered agent of Galaxy as well as the Manager and Organizer and registered agent of Brightline. Mazei has numerous connections to Defendants Leight and Singer, including shared Florida addresses for Galaxy, Brightline, and other ventures. Additionally, Leight and Singer lent money to Galaxy in 2021 through their company Funding Source International LLC. In these roles, Mazei supervised, participated in, conspired to participate in, and benefited from the fraudulent scheme described below.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 36 and therefore denies same.**

37. Defendant Danielle Giscombe is a Texas citizen residing in Humble, Texas. She is the Pharmaceutical Wholesale Manager at Brightline, and a registered pharmacy technician at Galaxy. In these roles, Giscombe supervised, participated in, conspired to participate in, and benefited from the fraudulent scheme described below.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 37 and therefore denies same.**

38. Defendants Leight, Singer, Smith, Jerry Maynard Sr., Jerry Maynard Jr., Misha Maynard, Enriquez, Mazei, and Giscombe are referred to herein collectively as the "DrugPlace Officers," and together with the DrugPlace Entities, as the "DrugPlace Conspiracy."

**ANSWER: Maynard denies the allegations in Paragraph 38 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme, including any "conspiracy." Otherwise, Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 38 and therefore denies same.**

## JURISDICTION AND VENUE

39. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

**ANSWER: Maynard admits that the Court has jurisdiction over the claims in this action, but Maynard denies any and all wrongdoing and liability.**

40. Lilly is a citizen of the state of Indiana and of no other state. Defendants are citizens of Florida, Tennessee, and Texas. No Defendant is a citizen of Indiana.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 40 and therefore denies same.**

41. The amount of damages at issue exceeds $75,000, exclusive of interest and costs.

**ANSWER: Maynard admits that the action purports to seek damages exceeding $75,000, exclusive of interest and costs, but Maynard denies any and all wrongdoing or liability.**

42. The Court has personal jurisdiction over all Defendants. As alleged below, the owners and principals of the DrugPlace Entities—i.e., Defendants Singer, Leight, Smith, and Mazei—are residents of Florida and conduct fraudulent activities in this State. These Florida-based activities

are conducted on behalf of and as agents of the DrugPlace Entities (DrugPlace, Community Health, Nakorn, Galaxy, and Brightline). Further, DrugPlace, Nakorn, Galaxy, and Brightline are all headquartered in Florida. All Defendants, including Community Health, Tennessee residents Jerry Maynard Sr., Jerry Maynard Jr., Misha Maynard, and Enriquez, and Texas resident Giscombe, personally participate in and conspire in the fraudulent activities at issue in Florida and through businesses operating in Florida.

**ANSWER: Maynard admits only that the Court has personal jurisdiction over her with respect to this action, but otherwise Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in Paragraph 42 and therefore denies same. Further, Maynard denies any and all wrongdoing or liability.**

43. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(a) in that a substantial part of the events or omissions giving rise to the claims occurred in this district; at least one Defendants resides, is found, or transacts business in this District; and Defendants are subject to personal jurisdiction in this District.

**ANSWER: Maynard admits that venue is proper in this Court, but otherwise Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in Paragraph 43 and therefore denies same. Further, Maynard denies any and all wrongdoing or liability.**

## FACTS COMMON TO ALL CLAIMS

### I. Trulicity and Rebates

#### A. Lilly's Trulicity Medication

44. People with type 2 diabetes have difficulty using or making enough insulin, which regulates blood sugar. This can put them at risk of severe health complications, including heart damage, chronic kidney disease, nerve damage, and eye damage.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 44 and therefore denies same.**

45. For over a decade, millions of people with type 2 diabetes have made Lilly's injectable prescription medicine Trulicity (dulaglutide) a vital part of their treatment journey. Trulicity mimics the effects of the natural hormone GLP-1 to stimulate insulin secretion, among other effects. When used in conjunction with diet and exercise, Trulicity is indicated to improve glycemic control in adult patients and pediatric patients ten years of age and older with type 2 diabetes. Trulicity also is indicated to reduce the risk of major cardiovascular events (stroke, myocardial infarction, or death) in adults with type 2 diabetes who have established cardiovascular disease or multiple cardiovascular risk factors.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 45 and therefore denies same.**

46. Trulicity is a long-term treatment. It must be taken continuously to effectively control blood sugar on an ongoing basis and facilitate the body's natural release of insulin during and after meals.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 46 and therefore denies same.**

47. The supply period of each prescription for Trulicity varies, often depending on the prescribing physician's judgment and the terms of the patient's insurance and pharmacy benefit plan. Trulicity is commonly dispensed to patients in a 30-day supply or a 90-day supply. A 30-day

supply consists of one box containing four single-use injectable pens. Each injectable pen contains 0.5 milliliters ("mL") of liquid solution, so each Trulicity box of four pens consists of a total of 2 mL, or units, of solution. Trulicity is offered in 0.75 mg, 1.5 mg, 3 mg, and 4.5 mg doses, with dosing dependent on each patient's individual need for adequate glycemic control.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 47 and therefore denies same.**

**B. Prescription Drug Benefits and Manufacturer Rebates**

48. As with many other prescription medicines, most Trulicity dispensed in the United States is covered by private insurance, such as employers or commercial health insurers, or by government health insurance programs such as Medicare or Medicaid. Trulicity is typically covered by insurers under what is known as a pharmacy benefit plan.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 48 and therefore denies same.**

49. Typically, when a prescription medicine is dispensed by the pharmacy to a patient, some of the cost of the medicine is covered by the pharmacy benefit plan (once the patient's deductible is met), and the patient is responsible for the remainder, paid through a copay or coinsurance. To participate in a commercial pharmacy benefit plan, patients (or their employers) typically pay premiums, which are usually assessed on a monthly basis and do not vary according to an individual patient's medicine usage or other health expenditures. Alternatively, employers may self-fund pharmacy benefit plans for their employees, covering some or (less frequently) all of the costs as a business expense. In both instances, members covered by the insurance plan who pay premiums are entitled to coverage of their prescription drugs based on the terms of the coverage agreement with the insurer.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 49 and therefore denies same.**

50. A health care sharing program is a non-profit, community-based, and often faith-based alternative to a traditional insurance plan. As relevant here, to cover the costs of their members' prescription medicine needs, health care sharing programs require members to pay monthly contributions, which are akin to premiums. These contributions are used to pay some of the cost of each member's prescription medicine, with the remainder paid by each member through a co-pay (or "co-share").

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 50 and therefore denies same.**

51. Many insurers contract with pharmacy benefit managers ("PBMs") to manage and administer the pharmacy benefit of their health plans. In that role, the PBM often manages the drug formulary, which is a list of medications covered by the insurer's health plan. The PBM also separately contracts with pharmacies to manage reimbursement for medicines dispensed by the pharmacy to patients of the PBM's client health insurance plans.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 51 and therefore denies same.**

52. In addition, PBMs contract directly or indirectly with most major manufacturers of name-brand drugs, and the terms of such agreements generally include rebates on drugs dispensed to patients of the PBM's client health insurance plans.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 52 and therefore denies same.**

53. After a prescription for a rebate-eligible drug is dispensed to a patient, and the pharmacy is reimbursed by the patient's health insurer or its PBM for the cost of the medicine, the PBM submits a rebate claim to the manufacturer in connection with utilization of that dispensed prescription, and the manufacturer pays that rebate to the PBM.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 53 and therefore denies same.**

54. Typically, rebates are conditioned on the manufacturer's medicine being placed in a specified position on the applicable drug formulary, thereby increasing patient access to that medicine. The amounts of these rebates are negotiated between the PBMs and the manufacturer. The size of the rebates specified in contracts between manufacturers and PBMs can vary significantly depending on the circumstances.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 54 and therefore denies same.**

55. After receiving these rebates from a drug manufacturer, PBMs may (or may not) share a portion of these rebates with their payer or health plan clients. Each PBM has separate contracts with its clients that specify whether and how these rebate payments from manufacturers will be shared between the PBM and the client. Manufacturers typically do not have visibility into or knowledge of the terms of PBMs' agreements with their clients. The payment terms under these agreements may vary widely.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 55 and therefore denies same.**

56. PBMs may consolidate claims for medicines dispensed to patients of a variety of participating plans for submission to manufacturers. PBMs may also submit rebate claims to

manufacturers through one or more layers of intermediaries, including other PBMs and entities known as "rebate aggregators."

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 56 and therefore denies same.**

57. A rebate aggregator contracts with multiple entities (such as PBMs or health plans) and submits rebate claims for utilization of dispensed medication to other PBMs, who in turn submit the rebate claims to the drug manufacturers with whom they contract for rebates (as discussed above). Similar to a PBM, the aggregator has at least two sets of contracts: one set with the PBMs through which it routes rebate claims, specifying the rebate payments that the PBM will make to the aggregator, and a second set with its client PBMs or health plans, specifying any payments that the aggregator may make to them.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 57 and therefore denies same.**

58. Manufacturers review the rebate submissions and pay the rebates back to the submitting PBM, in accordance with the terms of their contracts with the PBMs. Under these contracts, manufacturers typically do not have primary responsibility for verifying the authenticity of every rebate claim (but do retain the final right to determine if a claim is payable). Instead, these contracts typically require the PBM to review and analyze the claims adjudication data to determine eligibility for rebates before the claims are submitted to manufacturers. Manufacturers rely on the accuracy of the information submitted by the pharmacy to the PBM, and on the PBM's subsequent review of claim-level data and other information furnished to the PBM by the pharmacy through the client health insurance plan, to ensure the claims are rebate-eligible.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 58 and therefore denies same.**

59. Manufacturers' reliance on plan and PBM representations is consistent with widely accepted industry norms and is necessary for timely and efficient administration of rebate programs. Manufacturers review submissions for contractual conformity rather than reconstructing primary data, which would be impractical given the millions of rebate claims they receive on a monthly or quarterly basis, and would be duplicative of work that is already required to be done at the plan and PBM level.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 59 and therefore denies same.**

60. This general practice is true of Lilly as well. Lilly generally does not have any contractual obligation to conduct the process for authenticating rebate claims. Rather, consistent with common industry practice, in processing rebate claims, Lilly relies on the claims data submitted by PBMs and rebate aggregators, which are the primary custodians of the underlying eligibility, utilization, and adjudication data that determine rebate eligibility. Those entities control the claims-processing infrastructure, and Lilly lacks independent access to patient- or claim-level information due to privacy, contractual, and operational constraints.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 60 and therefore denies same.**

61. In such an environment, when entering rebate agreements, it is Lilly's reasonable commercial practice—indeed, a necessity—to place responsibility for the review and accuracy of the data squarely on the parties that process and submit the data. This includes ensuring that rebate claims meet certain eligibility criteria specified in the contracts between manufacturers and PBMs.

Lilly compensates PBMs to administer the rebate-claims processing infrastructure, use the various sources of data to verify that claims meet the specified eligibility requirements, and submit only eligible claims (which must meet a number of conditions that Lilly does not have the ability to verify) to Lilly for payment. PBMs warrant the accuracy and completeness of submitted claims. After payment, Lilly reserves the right to audit and review the submitted claims to ensure that PBMs are complying with their contracts and, among other things, that Lilly is not paying more than it owes. In performing these reviews, Lilly uses certain data provided by PBMs, which reflects only a portion of the total data in the PBMs' possession regarding the rebate claims.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 61 and therefore denies same.**

62. One of the most fundamental claims-eligibility conditions in a typical contract between a manufacturer and PBM is that the medicine for which a rebate is sought must actually have been dispensed to the patient to whom it was prescribed and covered by the patient's health plan. Under its contracts with PBMs, Lilly pays rebates only for utilization of Lilly products dispensed to covered member patients. It does not pay rebates (for example) for a pharmacy's sale of medications to another pharmacy or to a pharmaceutical distributor. As a result, to be eligible for payment, a rebate claim being submitted to Lilly indicates that a medicine was utilized by a covered member patient.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 62 and therefore denies same.**

63. A PBM's rebate submission to a manufacturer typically follows a standard format set by the National Council for Prescription Drug Programs ("NCPDP"). That submission, transmitted electronically to the manufacturer on a monthly or quarterly basis, contains information about each

prescription dispense covered by a client health plan during the period. Some of that information originates from the dispensing pharmacy, including a unique identification number associated with the patient's prescription, the medicine dispensed to the patient, the date on which the medicine was dispensed to the patient, the quantity and number of days supplied, and the name and NPI of the dispensing pharmacy. The PBM's submission also contains other information sourced from the client health plan or the PBM itself.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 63 and therefore denies same.**

**II. The DrugPlace Conspiracy's Fraudulent Scheme**

64. DrugPlace and its affiliates and business partners have, over the course of years, knowingly caused the submission of hundreds of thousands of fraudulent rebate claims for Lilly medicines. Rather than dispense these medicines to patients, as Defendants represent in data underlying rebate submissions to Lilly, Defendants sell those medicines on the secondary market to other distributors or pharmacies. Defendants turn a significant profit on each unit of Trulicity they purchase, by collecting both a portion of the rebate payments and the net resale proceeds for each unit.

**<u>ANSWER:</u> Maynard denies the allegations in Paragraph 64 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 64 and therefore denies same.**

**A. Lilly Terminates Its Direct Relationship with DrugPlace in 2015 Over Serious Concerns About DrugPlace's Rebate Submissions**

65. From 2011 to 2015, Lilly had a direct contractual relationship with DrugPlace, which at the time acted as the PBM for Community Health, the prescription cost share program for

members of the Church. DrugPlace also purported to serve as the exclusive dispensing pharmacy for Community Health. DrugPlace, acting as PBM, submitted rebate claims and received rebates for medicines manufactured by Lilly.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 65 and therefore denies same.**

66. The medicines for which DrugPlace obtained rebates during this period included Humalog and Humulin, insulin medications used to treat diabetes, and Cialis, used to treat erectile dysfunction. By 2015, DrugPlace's volume of rebate claims was substantial, but not yet astronomical. At the time, DrugPlace was receiving rebates at a rate of about $6 million per year. The vast majority of those rebates were for Humalog and Humulin.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 66 and therefore denies same.**

67. The relationship between Lilly and DrugPlace was governed by a rebate agreement, under which Lilly paid rebates directly to DrugPlace, in its role as PBM for Community Health, conditioned on the placement of the Lilly medications on Community Health/DrugPlace's formulary. Lilly's agreement with DrugPlace required that covered medicines be dispensed to and utilized by patients and covered by a client health plan in order to be eligible for rebates.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 67 and therefore denies same.**

68. In August 2015, a drug wholesaler informed Lilly that it was terminating its relationship with DrugPlace's pharmacy business, because DrugPlace had violated the wholesaler's contractual "own use" requirements. This meant that DrugPlace's pharmacy business was not actually dispensing to patients the medication it purchased, but rather, was redistributing or reselling the

medication to other distributors or pharmacies. Because DrugPlace's pharmacy and PBM businesses were tightly linked, and medicines resold to distributors or pharmacies are not eligible for rebates, Lilly decided to initiate its own review and audit of rebate claims submitted by DrugPlace in its capacity as PBM, as the agreement between Lilly and DrugPlace expressly authorized Lilly to do.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 68 and therefore denies same.**

69. At the commencement of the review, Lilly informed DrugPlace through multiple phone calls with DrugPlace's then-Vice President, Defendant Kevin Singer, that Lilly was conducting an inquiry into DrugPlace's rebate submissions. In connection with the planned audit, Lilly requested that DrugPlace resubmit all contractually required data to validate the eligibility of its rebate submissions. DrugPlace responded by resubmitting data in aggregate form, rather than at a prescription level, even though the parties' agreement required DrugPlace to provide individualized, prescription-level data. The reason for this requirement is that, without prescription-level data, it is not possible to confirm whether individual rebate claims are contractually valid, or even whether they are authentic.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 69 and therefore denies same.**

70. Even the limited and insufficient data that Lilly received from DrugPlace over the course of the audit was highly concerning. Specifically, DrugPlace's aggregate data purporting to show the quantities of medication dispensed, days of supply prescribed, and number of refills were completely inconsistent with known prescribing practices for the medicines on DrugPlace's formulary.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 70 and therefore denies same.**

71. For example, DrugPlace's rebate data indicated that every single patient had been prescribed only a 30-day (rather than a 90-day) supply of Humalog or Humulin, without exception. This was unusual, as insulin is often prescribed in 90-day supplies to improve clinically appropriate adherence in chronic patients who require stable and consistent treatment. Thirty-day supplies are often prescribed during the initiation of a patient's treatment protocol, but most patients switch to 90-day supplies thereafter. This irregularity suggested that DrugPlace's data were fraudulent and did not correspond to real prescriptions.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 71 and therefore denies same.**

72. In addition, every single rebate claim was for a patient's ***initial*** fill of the medication or for their ***first*** refill. Not a single claim corresponded to even a second refill. Again, for insulin in particular, this made no sense: diabetes is a chronic condition, and patients with diabetes typically do not suddenly stop taking or filling their insulin prescriptions after a single refill. It was highly implausible for an entire patient base to consist of patients with diabetes filling their prescriptions for the first or second time, which is irreconcilable with known prescription trends for comparable, non-COGIC populations. This irregularity, too, suggested that DrugPlace's data were fraudulent and did not correspond to real prescriptions.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 72 and therefore denies same.**

73. Lilly shared these concerns, among others, with DrugPlace. Lilly notified DrugPlace that, due to the magnitude of aberrant rebate claims, it was disputing all of DrugPlace's Q2 2015

rebate submissions and would be suspending any future rebate payments until the dispute was resolved by a formal audit of DrugPlace.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 73 and therefore denies same.**

74. In October 2015, Lilly auditors requested an on-site audit of DrugPlace's corporate headquarters in Hollywood, Florida for two full days, to be followed by an audit of DrugPlace's distribution center in Nashville, Tennessee.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 74 and therefore denies same.**

75. Eventually, after weeks of negotiation, Singer agreed that a Lilly audit team would be permitted to visit both sites and review a sample of rebate submissions; data showing receipt, dispense, and utilization for each corresponding medicine; and other information related to DrugPlace's pharmacy operations and the Community Health program design.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 75 and therefore denies same.**

76. In November 2015, the Lilly auditors traveled to the 1930 Harrison Street address in Hollywood, Florida to audit DrugPlace's corporate headquarters. The headquarters were located in a small office building, which also contained offices for several other businesses associated with the DrugPlace Officers. The suite for DrugPlace's headquarters was labeled with a nondescript "Corporate Office" sign. It consisted entirely of one small conference room, with a back office attached. It looked nothing like the hub of a multimillion-dollar operation responsible for administering health benefits and dispensing medication for hundreds of thousands of patients.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 76 and therefore denies same.**

77. Upon arrival, the Lilly audit team was met by Defendant Singer and Daniel Hoffner, DrugPlace's office manager. Defendant Readus Smith, the head of Community Health and Director of Health for the Church, also joined them.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 77 and therefore denies same.**

78. The DrugPlace representatives purported to explain DrugPlace's business model. They claimed there were 1.2 million members of the Church eligible for the Community Health program benefit. However, neither Singer, Hoffner, nor Smith was able to define the eligibility requirements. Smith said eligibility usually depended on the member being in good standing with the Church, but could not offer any further detail.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 78 and therefore denies same.**

79. When Lilly sought to inspect DrugPlace's records—the very reason for the audit—Smith repeatedly deflected Lilly's requests, continually providing generalities about the Church's mission rather than specifics about Community Health's and DrugPlace's operations.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 79 and therefore denies same.**

80. Smith said that the prescribers for most prescriptions are individual physicians who have agreed to work with Community Health, and their identities are highly confidential. He claimed that only three people had ever seen the list of these prescribing physicians. This was highly suspicious, as prescriber information is standard information in the healthcare industry that

is required to be collected and maintained by pharmacies and is routinely included in health insurance claims.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 80 and therefore denies same.**

81. When Lilly's auditors returned the next day to continue the audit, the DrugPlace representatives provided small batches of prescription-level records for review. These records were in the form of printed-out screenshots of DrugPlace's electronic pharmacy management software purporting to show the filling and dispensation of medication. Lilly was never provided live access to that software, even though Singer had previously agreed to allow a real-time review to evaluate samples.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 81 and therefore denies same.**

82. All of the screenshots were redacted to remove prescriber information, including name and NPI, at Smith's instruction. He claimed that the Church's "constitution" required this, which was highly unusual, since prescriber information is generally non-sensitive, and disclosure is not prohibited by state or federal law. Nonetheless, Smith refused to allow the Lilly auditors to review unredacted versions. Without prescriber information, it was impossible for Lilly to verify the authenticity of the claimed utilization of dispensed medication on which DrugPlace's rebate claims were based.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 82 and therefore denies same.**

83. Despite the inadequacy of the information provided to them, the Lilly audit team identified inconsistencies in the redacted prescription data, including inconsistencies between the

prescribed volume of medicine and the filled volume. Smith could not explain these inconsistencies. Instead, he deflected and proceeded to show the audit team another small batch of screenshots. Some of the subsequent screenshots appeared to correct the inconsistencies between prescribed and filled volume that the auditors had identified in the previous batch. It appeared as though these supposedly exemplary records had been generated—and falsified—in real time.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 83 and therefore denies same.**

84. Further complicating Lilly's attempt to validate DrugPlace's rebate submissions, DrugPlace had the unusual practice of assigning unique prescription IDs to every transaction (and sometimes, to every unit of measure within a transaction)—rather than a single, consistent prescription ID that lasts throughout the life of a patient's prescription, including all refills, which is standard. This made it impossible for DrugPlace to demonstrate based on the rebate data provided whether a fill was a first fill or refill, and which fills corresponded to a given prescription.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 84 and therefore denies same.**

85. Given DrugPlace's inability to provide prescription-level records that supported its rebate claims, Lilly requested other evidence that the medications associated with DrugPlace's rebate claims had actually been shipped to patients—for example, records of shipping manifests or billing information from the shipping courier. DrugPlace refused to provide this information.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 85 and therefore denies same.**

86. Later that week, Lilly auditors continued the audit at DrugPlace's distribution center in Nashville.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 86 and therefore denies same.**

87. During this phase of the audit, DrugPlace again prohibited the Lilly team from accessing DrugPlace's pharmacy software system or any screenshots of utilization data for the requested samples. Again, the auditors found this very unusual, since the information should be readily accessible, and there was no valid reason for DrugPlace's refusal to make it available.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 87 and therefore denies same.**

88. Instead, the auditors were permitted to speak with two DrugPlace pharmacists, Stephen Webb and Jarrod Shirley. Shirley and Webb, the individuals closest to the prescriptions underlying the rebate claims, had no explanations for the extremely unusual prescription, dispensing, and utilization data underlying DrugPlace's rebate claims. One of the pharmacists verbally confirmed that the uniformity in medication quantities that DrugPlace listed in its rebate submissions to Lilly was inconsistent with his own experience filling prescriptions. As detailed below, Lilly has since learned that Shirley has been associated with other fraudulent schemes involving the individual Defendants in this action.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 88 and therefore denies same.**

89. Ultimately, Lilly's audit of DrugPlace was unable to confirm that any of DrugPlace's rebate claims were valid. In fact, given the anomalies in the aggregate data that DrugPlace did provide, and DrugPlace's steadfast refusal to provide the underlying data that it was required to retain as a licensed pharmacy, Lilly came away from the process with grave doubts about the legitimacy of DrugPlace, Community Health, and their respective operations.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 89 and therefore denies same.**

90. As a result, Lilly did not seek to renew the parties' rebate agreement, and it expired the following month.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 90 and therefore denies same.**

**B. Unbeknownst to Lilly, DrugPlace Continued and Expanded Its Fraudulent Scheme**

91. In 2025, as detailed below, Lilly discovered that, since at least 2020, DrugPlace had been the source of an enormous volumes of rebate claims, concealed through multiple layers of middlemen to circumvent Lilly's decision not to do business with DrugPlace. This time, the rebate claims were based on purported utilization of a single, different diabetes medicine: Trulicity.

**ANSWER: Maynard denies the allegations in Paragraph 91 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 91 and therefore denies same.**

92. The volume of these rebate claims is stunning. Since 2020, DrugPlace has submitted, through intermediaries, rebate claims for hundreds of thousands of boxes of Trulicity, seeking more than $250 million in fraudulent rebates—an average rate of over $40 million per year. At their peak, DrugPlace-affiliated rebate claims corresponded to nearly $75 million worth of Trulicity per year.

**ANSWER: Maynard denies the allegations in Paragraph 92 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks**

**knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 92 and therefore denies same.**

93. These rebates supposedly corresponded to hundreds of thousands of boxes of Trulicity that DrugPlace purchased from licensed wholesalers during the same period.

**<u>ANSWER:</u> Maynard denies the allegations in Paragraph 93 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 93 and therefore denies same.**

94. Lilly's investigation into the DrugPlace Conspiracy, however, has confirmed that DrugPlace does not function as a legitimate pharmacy that dispenses Trulicity to patients—at least not in anywhere near the volumes it claimed.

**<u>ANSWER:</u> Maynard denies the allegations in Paragraph 94 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 94 and therefore denies same.**

95. Instead, DrugPlace, in conjunction with affiliates including Nakorn and Brightline, operates as a de facto unauthorized secondary wholesaler of Trulicity. DrugPlace purchases Trulicity from wholesalers and resells it on the secondary market. Meanwhile, DrugPlace submits, through intermediaries, fraudulent rebate claims to Lilly for hundreds of millions of dollars, as if DrugPlace had operated as a pharmacy and actually dispensed the medicine to patients.

**<u>ANSWER:</u> Maynard denies the allegations in Paragraph 95 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks**

**knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 95 and therefore denies same.**

1. **Lilly Discovers That DrugPlace Has Been Submitting Large Volumes of Rebate Claims Through Middlemen**

96. Lilly was first alerted to DrugPlace's recent Trulicity claims through a data analysis of rebate claims. As explained above, due to privacy, contractual, and operational constraints, it is Lilly's commercial practice to allocate responsibility for the review and accuracy of rebate data to the parties that submit and process it, in particular PBMs. As a further layer of protection, Lilly also performs targeted reviews and analyses of various data sources associated with the sale and distribution of its medicines, for reasons including identifying potential fraud. This includes review of rebate claims for brand-name drugs that PBMs submitted to Lilly and for which the PBMs received payment.

**ANSWER: Maynard denies the allegations in Paragraph 96 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 96 and therefore denies same.**

97. The data available to Lilly is limited in scope. Lilly manufactures and distributes a vast amount of prescription medication each year, spanning dozens of medicines that are ultimately dispensed to tens of millions of patients nationwide through tens of thousands of individual pharmacies. But Lilly generally does not sell directly to pharmacies. Rather, Lilly sells its medicines to a limited number of wholesalers, who distribute a variety of pharmaceuticals sourced from multiple manufacturers to pharmacies throughout the country. Although Lilly has records of its own sales to the wholesalers with whom Lilly contracts to sell its products, also known as

"authorized distributors," Lilly has limited ability to trace these products to individual pharmacies, and ultimately to tie them to the rebate claims that are submitted by PBMs after Lilly's medicines are prescribed and dispensed to patients.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 97 and therefore denies same.**

98. To correlate sales data with prescription and rebate data, Lilly depends on reporting by downstream actors, which is not comprehensive. Furthermore, none of the data available to Lilly contains serialization information that would allow Lilly to trace a specific rebate claim to the original sale of that product. Historically, this has made it challenging to identify anomalous trends in downstream sales, dispenses, and rebates, particularly among independent pharmacies and secondary wholesalers where the data available is more limited.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 98 and therefore denies same.**

99. In 2025, Lilly discovered that, since 2020, DrugPlace had been submitting massive volumes of rebate claims for a single medicine, Trulicity, through a series of intermediaries to Lilly, which served to conceal their source.

**<u>ANSWER:</u> Maynard denies the allegations in Paragraph 99 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 99 and therefore denies same.**

100. The vast majority of those claims followed this pattern: DrugPlace submitted rebate claims to a single rebate aggregator called Health Delegates. Health Delegates then submitted the claims to one of two major PBMs: one from 2020 to September 2023 (hereinafter "PBM-1"), then

another from October 2023 to 2025 (hereinafter "PBM-2"). The PBMs then submitted the rebate claims to Lilly for payment.

**ANSWER: Maynard denies the allegations in Paragraph 100 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 100 and therefore denies same.**

101. The fact that DrugPlace submitted its claims through Health Delegates obscured that DrugPlace was the source of these rebate claims and that DrugPlace and Community Health were driving an enormous volume of Trulicity utilization. Health Delegates, as rebate aggregator, collected and submitted to each PBM rebate claims associated with its many clients. When each PBM submitted that data to Lilly for payment, the rebate claims were attributed to Health Delegates—not each of Health Delegates' underlying clients—and obscured the suspicious fact that one of those clients, DrugPlace, was responsible for large volumes of rebates for just a single drug, Trulicity. This enabled DrugPlace to avoid Lilly's scrutiny for a number of years.

**ANSWER: Maynard denies the allegations in Paragraph 101 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 101 and therefore denies same.**

102. All of DrugPlace's rebate claims between 2020 and 2025 were reflected in rebate data files that PBM-1 and PBM-2 electronically transmitted to Lilly on a monthly or quarterly basis. Each data file consisted of hundreds of thousands of rebate claims that the PBMs received from their clients. Within those sets were tens of thousands of rebate claims that Health Delegates had

submitted on DrugPlace's behalf to PBM-1 and PBM-2, based on prescription-level data transmitted by DrugPlace to Health Delegates.

**ANSWER: Maynard denies the allegations in Paragraph 102 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 102 and therefore denies same.**

103. Each data file received by Lilly from PBM-1 and PBM-2 exists in spreadsheet form. For each row (i.e., rebate claim), the spreadsheet contains dozens of different columns of inputs, including details about the dispensing pharmacy, the underlying prescription filled, and the client health plan covering the cost of the medicine. Each spreadsheet contains, and can be filtered by, rows corresponding to each of the tens of thousands of individual rebate claims associated with Lilly medicine purportedly dispensed by DrugPlace. As relevant here, the inputs in each such row include the following: the unique pharmacy identification number identifying DrugPlace as the dispensing pharmacy; the unique product identification number identifying Trulicity as the medicine purportedly dispensed by DrugPlace; the unique prescription identification number assigned by DrugPlace to the patient's prescription purportedly filled in the pharmacy sale transaction; the date on which DrugPlace purportedly filled the prescription; and the quantity and number of days' worth of Trulicity purportedly dispensed by DrugPlace to the patient.

**ANSWER: Maynard denies the allegations in Paragraph 103 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 103 and therefore denies same.**

104. Each of the prescription-level inputs for the tens of thousands of Trulicity rebate claims contained in the quarterly rebate data file necessarily ***originated from DrugPlace*** as the dispensing pharmacy. Then DrugPlace, acting as PBM, electronically transmitted its own data files containing those inputs to its rebate aggregator, Health Delegates, which in turn aggregated DrugPlace's data with other client PBMs and health insurance plans for submission to the PBMs and, ultimately, to Lilly to support fraudulent rebate claims.

**ANSWER: Maynard denies the allegations in Paragraph 104 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 104 and therefore denies same.**

**2. A Third-Party Audit of PBM-2 Indicates That DrugPlace's Rebate Claims Are Illegitimate**

105. In early 2025, Lilly exercised its contractual right to conduct an audit of PBM-2. Lilly used a third-party auditor named BlackPoint Consulting Group ("BlackPoint"). When Lilly learned that DrugPlace had been submitting suspicious rebate claims (via Health Delegates) through PBM-2 since late 2023, Lilly requested that BlackPoint add those rebate claims to the audit's scope.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 105 and therefore denies same.**

106. BlackPoint did not audit DrugPlace directly and, therefore, did not have direct access to DrugPlace's underlying prescription records. The scope of BlackPoint's audit was limited to analyzing the DrugPlace rebate data that Health Delegates submitted to PBM-2.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 106 and therefore denies same.**

107. Nevertheless, BlackPoint's audit raised serious questions about the legitimacy of DrugPlace's rebate claims. BlackPoint's audit of DrugPlace's rebate claims focused on one quarter of data, from Q4 2023, and compared the rebate claims to a large sample of PBM claims for utilization by members of over 100 health plans during the same period. BlackPoint concluded that rebate claims submitted on DrugPlace's behalf in Q4 2023 exhibited numerous aberrant patterns far outside the norm. Many of the anomalies mirrored those that Lilly had observed in DrugPlace's earlier rebate data ten years prior.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 107 and therefore denies same.**

108. For the tens of thousands of rebate claims submitted by Health Delegates for DrugPlace's utilization during the review period, BlackPoint found the following: a) All of DrugPlace's rebate claims corresponded to dispenses and utilization of just one Lilly medicine, Trulicity. By contrast, the rebate claims submitted by other health plans corresponded to dispenses and utilization of seven different Lilly medicines on average. b) None of DrugPlace's rebate claims reflected a reversal adjudication. Reversals refer to instances where a pharmacy fills a prescription and adjudicates it for rebate purposes, but then the product is not dispensed pursuant to that transaction—most often because the patient ultimately fails to pick up the medication. In that situation, the medication is returned to stock, and the pharmacy must amend its earlier adjudication to reflect a reversal of its rebate claim. Reversals are common in rebate claims data. Data from other plans and pharmacies showed an average reversal rate of approximately 15%. Claims submitted by DrugPlace, however, showed a reversal rate of 0%. c) All of DrugPlace's rebate

claims showed that—without exception— Trulicity prescriptions were filled for a single, uniform quantity of 2 mL, which corresponded to one box of four single-use injectable pens. The rebate claims submitted by other health plans had an average of five different dispense quantities listed. d) All of DrugPlace's rebate claims showed that—without exception— Trulicity prescriptions were filled for a single, uniform supply period of 30 days. The reality of differing patient needs and physician prescribing practices show this pattern to be a clear outlier: the rebate claims submitted by other health plans had an average of 11 different supply periods listed. e) All of DrugPlace's rebate claims for Trulicity were associated with a unique prescription number, meaning that every single dispense was coded as a first fill rather than a refill. This indicated that, despite uniformly filling prescriptions for a 30-day supply of Trulicity, DrugPlace dispensed exactly one fill per patient—and zero refills—across any of the tens of thousands of prescription fills spanning three months (i.e., roughly 90 days) of patient treatment. By contrast, data from other plans showed an average of 1.61 fills of Trulicity per patient within that same three-month period. f) All of Health Delegates' rebate claims corresponded to prescriptions filled at just one pharmacy, DrugPlace. By contrast, the rebate claims submitted by other health plans corresponded to prescriptions filled, on average, at over 2,000 pharmacies.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 108 and therefore denies same.**

109. Lilly conducted further review and analysis of all of DrugPlace's rebate claims from 2020 to 2025. Lilly determined that the anomalies BlackPoint identified for Q3 2024 were apparent in DrugPlace's rebate claims for the ***entire period of 2020 to 2025***. In particular, all of the rebate claims that DrugPlace submitted through its PBM intermediaries were for the exact same supply period and quantity of Trulicity: a 30-day supply consisting of 2 mL (i.e., a box of four single-use

injectable pens), without exception. Furthermore, all DrugPlace's rebate claims during that period were associated with a unique prescription number and, therefore, indicated a first fill rather than a refill. And for all but three quarters within this period, DrugPlace's quarterly reversal rate was 0%.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 109 and therefore denies same.**

110. Individually, each of these anomalies is inconsistent with legitimate rebate claims. Collectively, they constitute compelling evidence that DrugPlace's rebate claims did not correspond to legitimate prescriptions dispensed to patients, and that the underlying data was fabricated wholesale.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 110 and therefore denies same.**

**3. DrugPlace's Responses to the Audit Are Not Credible**

111. In response to BlackPoint's audit, Lilly received explanations through intermediaries, originating from DrugPlace, that purported to address or justify the anomalies BlackPoint had identified in DrugPlace's data. But these purported explanations only cast further doubt on DrugPlace's legitimacy.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 111 and therefore denies same.**

112. Regarding the uniform prescription quantities and supply periods, DrugPlace claimed that a 30-day supply of one box of four injectable pens was the only amount that Community Health members were permitted to fill at DrugPlace under Community Health's prescription cost share program. But there is no credible reason why DrugPlace and Community Health would limit

their formulary in this way. It is inconsistent with how physicians prescribe medication and how pharmacies log and fill those prescriptions. And there are no cost savings to be gained by covering only a 30-day supply of Trulicity as opposed to, for example, a 90-day supply. Moreover, as discussed below, Lilly has since received copies of DrugPlace's formularies showing that Community Health members in fact were ***not*** limited to 30-day supplies and were permitted to fill 90-day supplies at DrugPlace. But according to DrugPlace's data, none ever did— even though patients with diabetes routinely do so.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 112 and therefore denies same.**

113. Regarding the absence of refills in DrugPlace's rebate claims, DrugPlace claimed that its adjudication system automatically generates a new unique prescription number for each fill of a prescription and that, as a result, all refills appeared in DrugPlace's system as first fills. But this type of system is highly unusual since it would expose the pharmacy to legal risks and there is no good reason why a legitimate pharmacy would fail to accurately collect refill data as a matter of course and to do so at the claims level.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 113 and therefore denies same.**

114. Standard pharmacy retail prescription tracking systems track how many refills remain per patient. This centralized tracking is essential for fraud, waste, and abuse prevention, as it ensures refill limits are followed consistently and in real time, in accordance with applicable state and federal laws and regulations governing pharmacies, and in order to provide appropriate patient care. DrugPlace's alleged practice deviates sharply from the recordkeeping standards of other pharmacies that dispense Lilly products and cause rebate claims to be submitted for those products,

and would make it exceedingly challenging, if not impossible, for DrugPlace to comply with applicable laws and regulations, such as state Board of Pharmacy rules requiring pharmacies to record and maintain certain data for every prescription or medical order they dispense.[2] It would also present a significant risk to patient safety, as it would interfere with pharmacists' ability to track a patient's refills and drug interactions and counsel patients accordingly. There is simply no good reason for a legitimate pharmacy—one purportedly processing tens of thousands of prescriptions per month—to fail to collect refill data as a matter of course.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 114 and therefore denies same.**

115. DrugPlace's rebate claims data for Q4 2023 was later resubmitted with unique patient identification numbers and dates of first fills, allegedly for the purpose of allowing BlackPoint to separate first fills from refills—even though DrugPlace's computer systems purportedly do not record this information. The resubmitted data showed that, even by DrugPlace's account, ***84%*** of all Trulicity prescription fills in Q4 2023 were first fills. Second and third fills accounted for less

[2] These required data include, for example, (a) refill history showing each refill authorization and every refill dispensed, including the date of dispensing and the quantity dispensed for both the original fill and subsequent refills; and (b) the identity of the dispensing pharmacist for the original dispensing and for each refill, typically through initials, a name, or a unique identification code maintained in the paper record or electronic audit trail. Tenn. Comp. R & Regs. 1140-03-.03 (2026).

than 16% and less than 0.1%, respectively, and there were no fills beyond third fills. These trends are inconsistent with general prescribing and treatment trends for Trulicity.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 115 and therefore denies same.**

116. Regarding the absence of reversals in DrugPlace's rebate claims, DrugPlace claimed to submit "net paid claims only" and therefore removed any reversals from its data. However, in Lilly's experience dealing with rebate data submitted from a variety of PBMs, this is highly unusual. Reversals often occur after PBMs have submitted rebate claims to a manufacturer for a given period and are by necessity reflected in the data for the next period. Ordinarily, a pharmacy that was actually filling prescriptions and dispensing large volumes of medication on an ongoing basis will show some reversals in the rebate claims data submitted by the PBM.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 116 and therefore denies same.**

117. To date, Lilly has not received ***any*** underlying records that could be used to corroborate the authenticity of DrugPlace's rebate claims.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 117 and therefore denies same.**

118. After BlackPoint released its audit results, Lilly pressed for more information about DrugPlace's rebate claims. Among other things, Lilly requested from DrugPlace and its intermediaries the name, NPI, and contact information for the physician corresponding to each prescription fill; DrugPlace's unique patient identification number corresponding to each prescription fill; and copies of the underlying prescriptions corresponding to the rebate claims—all of which would assist Lilly in verifying the legitimacy of DrugPlace's claims. Lilly further

requested details about the plan and formularies that DrugPlace administered. However, no one has produced any records showing that DrugPlace's rebate claims correspond to real prescriptions written by doctors and dispensed to patients.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 118 and therefore denies same.**

### C. DrugPlace Has No Credible Explanations for Its Enormous Trulicity Volumes

119. DrugPlace has not just failed to provide substantiation for its rebate claims. It has also failed to provide any credible account of how the Community Health prescription cost share program could possibly be large enough, or possess enough funding, to cover tens of thousands of prescriptions per year of Trulicity, in addition to the other prescription drugs it purports to cover. The scant available information about the Community Health/DrugPlace operation is completely inconsistent with its claim to be legitimately providing this volume of prescriptions to patients.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 119 and therefore denies same.**

#### 1. Community Health's Documentation and Public Footprint Belie Its Claim to Be a Large Health-Benefits Program

120. In connection with the BlackPoint audit, Lilly obtained a series of documents purporting to lay out the details of the program administered by DrugPlace: Community Health's "Prescription Cost Share" program. Those documents appear to have been hastily put together in response to Lilly's request and lacked basic information about the program. They are completely inconsistent with the operation of a legitimate health plan serving hundreds of thousands or millions of members, as Community Health and DrugPlace assert.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 120 and therefore denies same.**

121. DrugPlace's documentation of its eligibility criteria and purported program design amounted to a two-page document consisting of a handful of informal bullet points on each topic. According to those bullet points, only members of the Church may participate in Community Health's "Prescription Cost Share" program. To be eligible, a "[c]hurch member approaches his or her [Church] pastor/bishop with a request for assistance from Community Health for prescription medication costs," and "the pastor/bishop makes the determination [whether] the member who is seeking this assistance is in 'good standing'" with the Church. The bullet points further explain that "[g]ood [s]tanding is determined by the church [pastors/bishops] themselves" in their sole discretion, and DrugPlace as program administrator and PBM "plays no role in that determination." The Church reevaluates Community Health program members "every month in order to verify that they all are still a member in good standing" with the Church.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 121 and therefore denies same.**

122. According to summary documents provided to Lilly about the Community Health prescription cost share program, Community Health members determined to be in good standing must fill out a two-page survey providing only summary information about their health—the date of their last physical; whether they personally rate their overall health as poor, fair, good, very good, or excellent; whether they personally have one of fourteen enumerated conditions; and their household income. Members must also verify that they are uninsured and do not receive Medicare or Medicaid benefits. There is no indication that the information contained in the survey form, apart from the patient's insurance status, impacts Community Health's assessment of eligibility or

the Church's assessment of whether the participant meets the "good standing" requirement for the program.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 122 and therefore denies same.**

123. Meanwhile, the program documents contain minimal information about how the medicines are paid for. Community Health purportedly offers members a "community-based way to help pay for prescription medicines without traditional insurance" and uses DrugPlace as its exclusive pharmacy to facilitate that program. According to documents initially provided to Lilly, a member pays DrugPlace a "co-share," but no information about the size of this co-share was provided.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 123 and therefore denies same.**

124. The program documents also state that Community Health will reimburse DrugPlace for the difference between the drug's Wholesale Acquisition Cost ("WAC") and the member co-share minus the manufacturer's rebate, plus a fill fee. This supposed reimbursement model is highly unusual, because health plans typically do not key their reimbursement off a drug's WAC, which is the manufacturer's list price to wholesalers and direct purchasers for a given drug. Rather, they reimburse based on a drug's wholesale price, which is typically 20% above WAC. Moreover, a legitimate pharmacy would not permit a health plan or program to subtract rebates from the reimbursement it remits to the pharmacy, which would require the pharmacy—rather than the plan or program—to bear the financial risk if the rebate claim is rejected or deemed ineligible for any reason.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 124 and therefore denies same.**

125. When Lilly noted that the documents contained no details about the economics of Community Health's program, DrugPlace provided different versions of its program documents with information about co-shares—now referred to in the documents as "co-payments" and "co-pays"—added. The metadata of those additional documents showed that the underlying Microsoft Word files were last edited on November 26, 2025—shortly after Lilly noted the deficiency—and the PDF documents were created that same day. According to those documents, the member co-pay for a 30-day supply of medications in Community Health's preferred tier of brand name drugs, including Trulicity, is $40.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 125 and therefore denies same.**

126. Critically, the documents do not explain how Community Health actually covers the balance of the cost of medicines that DrugPlace purportedly dispenses to Community Health members by DrugPlace. Prescription cost sharing programs typically rely on member contributions akin to premiums to cover the cost of members' drugs, but notably, none of the documents provided to Lilly mentions any contributions that members must pay to participate in the Community Health program. Apart from the putative copay, which accounts for only a fraction of the acquisition cost, the documents contain no information at all about how the covered medicines are supposedly paid for.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 126 and therefore denies same.**

127. No additional information about the prescription cost share program is publicly available. None of DrugPlace, Community Health, or the Church maintain a website that provides any significant information about the purported Community Health program. Community Health has no website at all. DrugPlace and the Church have outdated webpages that do not even mention Community Health or any purported prescription cost share program. This is highly suspicious for a healthcare program that purports to cover hundreds of thousands of patients and pay for hundreds of millions of dollars' worth of prescription medicines.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 127 and therefore denies same.**

**2. Incredible Claims of Funding by Community Health and the Church**

128. Shockingly, when pressed for more information about the basic economics of Community Health's Prescription Cost Sharing program, DrugPlace's intermediaries told Lilly that participants in Community Health's program do not pay premiums or make any member contributions. Instead, beyond the small co-pays, Community Health purportedly finances all medication purchases through charitable donations and unspecified federal grant money. This is completely implausible.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 128 and therefore denies same.**

129. Federal grants are a matter of public record. The federal government does not report having ever provided a grant to Community Health, and since 2008, the only reported federal money provided to the Church is a $1.3 million loan for pandemic assistance.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 129 and therefore denies same.**

130. Non-profit organizations also have public reporting obligations. But despite claiming to be funded solely by charitable donations and public grants, Community Health is registered as a ***for-profit*** corporation, not a non-profit organization. As for the Church, there is no public record of charitable donations anywhere near large enough to pay for the volume of medicine that DrugPlace purports to dispense on an annual basis. For example, the Church's 2024- 2025 national budget shows that the Church expected only $1.3 million total in donations; yet, in the same year, Community Health would have incurred net costs of tens of millions of dollars in connection with just DrugPlace's purported Trulicity dispenses, before considering any other medicines purportedly dispensed to patients. There simply is no support for the funding levels claimed by Community Health.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 130 and therefore denies same.**

**3. Community Health's Stark Contrast to Covenant HealthShare**

131. Covenant HealthShare ("Covenant"), a healthcare sharing ministry that is affiliated with the Church—but is not, according to public records, affiliated with any of the individual Defendants in this action—illustrates the implausibility of Community Health's cover story. Covenant does not cover prescription drugs, but rather covers medical services such as doctor visits. Covenant is a far smaller organization than Community Health purports to be. Yet it has many of the hallmarks of a traditional cost-sharing program that are missing from Community Health.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 131 and therefore denies same.**

132. Covenant has a functioning, robust website that clearly outlines various aspects of its health share plan. This information includes the amounts its members must pay to participate and the terms and conditions of the Covenant plan. There are varying levels of membership; higher levels of membership require higher "monthly member gift" payments in exchange for an increased list of covered services. This information describes a plausible funding mechanism for Covenant's operation.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 132 and therefore denies same.**

133. Furthermore, unlike Community Health, Covenant is registered as a nonprofit 501(c)(3) organization and files annual Internal Revenue Form 990s, an annual tax return for tax-exempt organizations. Like all such non-profits, Covenant's Form 990 is publicly available. Covenant's 2023 Form 990 indicates that it has real sources of funding, with approximately $2.25 million in annual program service revenue for that year.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 133 and therefore denies same.**

134. Covenant's public profile is consistent with what would ordinarily be expected from a cost-sharing program of its size. Yet, as alleged above, although Community Health purports to have operations that are orders of magnitude larger than those of Covenant, it has none of these hallmarks of legitimacy. Information about Community Health's terms and conditions does not exist in the public domain. Neither does information about Community Health's funding sources. Unlike Covenant, Community Health is a private company that does not have 501(c)(3) nonprofit status; yet by its own account, it is funded by charitable donations and grants rather than member

contributions. None of this adds up. It is not plausible that a legitimate healthcare organization of Community Health's size and alleged economic structure would have this public profile.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 134 and therefore denies same.**

**4. The Community Health/DrugPlace Formulary Indicates Fraud**

135. Lilly has also obtained copies of Community Health/DrugPlace formularies (lists of covered medicines) purportedly in effect for 2023, 2024, and 2025. The documents are deficient on their face and provide further evidence that DrugPlace is engaged in fraud.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 135 and therefore denies same.**

136. To start, the formularies contain various errors—such as typos, formatting problems, blank pages, and a phone number that does not work—suggesting that they were hastily put together and not the work product of a legitimate health plan providing coverage for hundreds of millions of dollars in Trulicity prescriptions alone. The metadata associated with the most recent formularies indicated that they were last modified in Microsoft Word and exported to PDF only days before being sent to Lilly.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 136 and therefore denies same.**

137. Furthermore, as explained above, although DrugPlace has claimed that all Trulicity prescriptions it filled over a four-year period were uniformly for a 30-day supply because that was the only amount the prescription cost share program allowed it to fill, Community Health/DrugPlace's formularies say exactly the opposite. According to the 2024 and 2025 formularies (but not the 2023 version), brand-name drugs like Trulicity are explicitly eligible either

for a 30-day or 90-day supply, with the former subject to a $40 co-pay and the latter subject to $90 co-pay reflecting patient cost savings through 90-day supplies. Yet, despite the savings available to patients, rebate claims associated with DrugPlace show no 90-day supplies of Trulicity dispensed.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 137 and therefore denies same.**

138. Moreover, while formularies typically are detailed and contain long lists of covered medications reflecting the varied needs of patients, the Community Health/DrugPlace formularies are short—ranging between two and four pages—and contain roughly 25 types of drugs that correspond to under 60 total covered brand-name medicines. By contrast, there are over 20,000 prescription drugs approved by the FDA.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 138 and therefore denies same.**

139. The formularies also are notably limited in the types of medicines offered. For example, Community Health purports to serve a community of low-income, uninsured members among whom there is a high incidence of diabetes. However, with the exception of a single medicine on the 2024 formulary, the formularies generally do not list a single covered insulin medicine. Yet the formularies list upwards of 19 covered non-insulin diabetes medicines.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 139 and therefore denies same.**

140. Given DrugPlace's limited formulary, the Community Health program would be of limited value to patients, who may encounter health conditions requiring medicines that Community Health does not cover. Patients needing prescription drug coverage typically benefit

from access to a broad range of covered medicines, rather than the handful of medicines listed on the Community Health/DrugPlace formulary.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 140 and therefore denies same.**

141. The factor uniting the drugs on DrugPlace's formulary is the size of the manufacturer rebates they command, not patient need. DrugPlace's formulary is deliberately constructed to include only branded medicines that are eligible for relatively higher rebates. By purporting to cover a limited number of medicines offering comparatively higher rebates, DrugPlace maximizes its collection of payments for products. After pocketing the rebates, DrugPlace and its business partners then sell the medicines on the secondary market at modest discounts from the purchase price instead of dispensing them.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 141 and therefore denies same.**

**5. The Church Does Not Have Enough Members to Account for DrugPlace's Trulicity Volume**

142. In an effort to justify its enormous Trulicity volumes, DrugPlace has claimed that the Church had 7 million members and, of that total, 2.5 million members purportedly "qualified" for enrollment in the Community Health program. This was a similar story to the one that DrugPlace and Community Health had told Lilly in 2015, when its rebate volumes were orders of magnitude smaller, yet still could not be authenticated in an audit. These claims are not credible and, apart from the Church's own website, they are not corroborated by any published source.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 142 and therefore denies same.**

143. In the first place, according to the Pew Religion in America 2025 survey—the leading survey of religion in the U.S.—the ***total*** number of COGIC adherents is estimated to be only about 1.9 million individuals, or 0.7% of the U.S. adult population.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 143 and therefore denies same.**

144. Moreover, Community Health's prescription cost share program is purportedly available only to church members who do not have commercial or governmental insurance. Thus, only a small fraction of the Church's membership would meet Community Health's eligibility criteria. Based on the Church's demographics and health insurance statistics, the expected number of potential Community Health members meeting those criteria was less than 210,000 in 2024.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 144 and therefore denies same.**

145. Further, not all Community Health members have diabetes or are prescribed to take a GLP-1 such as Trulicity. Adjusting for the portion of Community Health members expected to be diagnosed with diabetes and the fraction of such diagnosed members who use GLP-1s and Trulicity specifically, the expected number of Community Health members prescribed Trulicity is roughly ***1,700 members*** in total.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 145 and therefore denies same.**

146. Even under the extremely conservative assumptions that all uninsured Church members participate in the Community Health program, and that all Community Health members prescribed Trulicity adhere to their full-time treatment plan and use the product for 52 weeks per year, DrugPlace's purchases of Trulicity in a given year are over ***five times*** the expected demand

of relevant Community Health members. Alternatively, if one assumes that Community Health members prescribed Trulicity follow to the national average for adherence—which is less than 52 weeks—of therapy, then DrugPlace's purchases of Trulicity in a given year are approximately ***eight times*** the expected demand. Neither scenario is plausible.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 146 and therefore denies same.**

### D. Lilly Identifies Galaxy and Its Affiliates as an Additional Source of Suspicious Rebate Claims

147. In the course of investigating DrugPlace's rebate claims, Lilly identified a Texas-based pharmacy, Defendant Galaxy, that became associated with suspicious rebate claims for Trulicity in July 2024. Rebate submissions based on utilization data from Trulicity dispensed by Galaxy followed a pattern strikingly similar to those of DrugPlace. The rebate claims were first submitted to Health Delegates, the same rebate aggregator that DrugPlace used. The rebate aggregator then submitted rebate claims for that utilization to PBM-2—the same PBM used by DrugPlace—and PBM-2 then submitted the rebate claims to Lilly for payment. As with DrugPlace, these rebate claims were associated with a purported prescription drug cost share program operated by a religious organization—in this case the Texas Chapter of the National Hispanic Christian Leadership Conference ("NHCLC").

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 147 and therefore denies same.**

148. The Galaxy-associated rebate claims for Trulicity also stood out for their sudden expansion. For the eighteen months between January 2023 and June 2024, Lilly paid only several thousand dollars ***total*** in rebates for Trulicity purportedly utilized by Galaxy patients. In the six months that followed, however, claims for Galaxy-associated rebates began to be submitted

through DrugPlace's rebate aggregator, and the volume of Trulicity rebate claims surged. Between July and December 2024 alone, Lilly paid nearly $2 million in rebate payments for Trulicity allegedly dispensed by Galaxy, which amounts to a nearly ***19,000 percent increase*** from the prior eighteen-month period. These rebate claims continued to be submitted in 2025.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 148 and therefore denies same.**

149. The rebate claims for Trulicity utilization dispensed by Galaxy featured many of the same anomalies found in DrugPlace-associated rebate claims. Beginning in July 2024, ***all*** of these rebate claims were for the exact same supply period and quantity of Trulicity: a 30-day supply consisting of 2 mL (i.e., a box of four single-use injectable pens), without exception. Furthermore, all of those rebate claims were associated with a unique prescription number that indicated a first fill rather than a refill. And since July 2024, the utilization data underlying these rebate claims showed a reversal rate of 0%. As noted above, all of these were true of DrugPlace's rebate claims as well, and none of them is consistent with authentic claims.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 149 and therefore denies same.**

150. Further investigation confirmed that Galaxy is affiliated with DrugPlace and its owners and principals. For example, Galaxy's corporate registration lists DrugPlace's former Florida address—1930 Harrison Street in Hollywood, Florida—as Galaxy's own mailing address. Moreover, Galaxy is owned by Defendant Mazei, who has numerous ties to Defendants Leight and Singer. In addition to the shared Hollywood, Florida address for Galaxy, Mazei is also involved in other business ventures with Leight and Singer in Fort Lauderdale. Leight and Singer lent money to Galaxy through Funding Source International, LLC, one of their many companies,

and had a secured interest in Galaxy's assets. At the time the lien was filed, Funding Source International was located at 19300 Harrison Street, Ste. 605, Hollywood, Florida, and has since moved to 3900 SW 30th Ave, Fort Lauderdale, Florida. Both of these addresses are affiliated with DrugPlace, Leight, and Singer.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 150 and therefore denies same.**

151. Through its investigation, Lilly obtained a formulary for the NHCLC prescription cost share program associated with the rebate claims for which Galaxy was the dispensing pharmacy. The formulary closely resembled DrugPlace's formulary, down to its formatting, brevity, and specific medicines listed. Moreover, the metadata for the welcome brochure and eligibility requirements for the NHCLC program indicated that they were scanned on the same exact scanner model as the Church's welcome brochure documents. Further evidencing the hasty preparation of these documents, the welcome brochure for NHCLC's prescription cost share program had unfilled placeholders for a phone number and email address that program members were supposed to contact with questions.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 151 and therefore denies same.**

152. Like DrugPlace, Galaxy is closely affiliated with a secondary wholesaler, Defendant Brightline. Galaxy and Brightline are both owned by Mazei, and Brightline's corporate registration lists another one of DrugPlace's Florida addresses—the 3900 SW 30th Ave address in Fort Lauderdale, Florida—as Brightline's own mailing address. Defendant Giscombe, one of the registered pharmacy technicians at Galaxy, also serves as Brightline's Pharmaceutical Wholesale

Manager. Galaxy and Brightline are also listed as co-debtors in a December 10, 2024 UCC financing statement filed with the Texas Secretary of State by First Horizon Bank.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 152 and therefore denies same.**

153. Based on the parallel operations and close affiliations between DrugPlace and Galaxy alleged above, it is clear that Galaxy and Brightline are running the same scheme as DrugPlace, working in conjunction with a PBM to submit fraudulent rebate claims, through intermediaries, for Trulicity that was not utilized by patients but rather sold on the secondary market. Galaxy, Brightline, and their co-conspirators may be referred to hereinafter as the "Galaxy Operation."

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 153 and therefore denies same.**

### E. Lilly's Investigation of the DrugPlace Entities Reveals That They Resell Trulicity and Other Medicines on the Secondary Market

154. After identifying DrugPlace's anomalous rebate and purchase volumes and the Galaxy Operation's similar rebate patterns, Lilly investigated what the DrugPlace Entities were doing with the large volumes of Trulicity they were purchasing. Lilly's investigation confirmed that, rather than dispensing the medications to patients, as it claimed to be doing, DrugPlace transfers them to affiliated wholesalers like Nakorn and Brightline, and then resells them on the secondary market. Lilly's investigation further confirmed that the Galaxy Operation has adapted and deployed a similar diversion scheme, using Brightline to divert the medications Galaxy purchases and purportedly dispenses to patients.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 154 and therefore denies same.**

**1. Surveillance of DrugPlace Entities**

155. During surveillance of DrugPlace, Community Health, and Nakorn, the observed activity at DrugPlace's premises was inconsistent with either a retail or mail-order pharmacy. Multiple days of observation at the Tennessee location revealed just a handful of people coming and going from the office. There were neither customers coming to retrieve medications nor any indication of product being mailed to individual customers, such as FedEx or UPS trucks.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 155 and therefore denies same.**

156. Rather, DrugPlace appeared to be distributing medication or other products to other pharmacies and medical practices throughout the Nashville area. This was discovered by following the trucks coming to and from DrugPlace's Nashville location and observing them deliver what appeared to be pharmaceuticals to other healthcare providers.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 156 and therefore denies same.**

157. In May 2025, a Nashville Logistics truck backed into DrugPlace's delivery bay. After around twelve minutes at the delivery bay, the truck departed DrugPlace and drove to a courier service in Nashville called Courier Express. There, the truck driver unloaded what appeared to be a number of empty bins of various colors. The driver then loaded a pallet of red plastic bins into the truck and departed.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 157 and therefore denies same.**

158. Over the course of the next four hours, Lilly's investigator observed the truck travel to Murfreesboro, Tennessee, a suburb of Nashville, and make deliveries to nine separate locations,

each of which was either a health clinic, hospital, or pharmacy. At each stop, the truck driver delivered colored totes or cardboard boxes of pharmaceutical products to the clinic, hospital, or pharmacy. Some of these totes were labeled with the name of one of the authorized distributors that sells Trulicity and other Lilly products. Others were labeled with the names of specific medications. The truck then returned to DrugPlace.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 158 and therefore denies same.**

159. Still shots from the investigator's surveillance video are below [images appear in Complaint]:

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 159 and therefore denies same.**

### 2. DrugPlace's Sales on the Secondary Market

160. Furthermore, Lilly has learned from one of its wholesalers that an independent pharmacy had received Trulicity from a secondary wholesaler, and the pharmacy had traced the product back to the DrugPlace Entities. Lilly purchased other medications on the Community Health/DrugPlace formulary on the secondary market and learned, based on their pedigrees, that they had also originated from DrugPlace, Nakorn, and Brightline.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 160 and therefore denies same.**

161. A drug pedigree is documentation of the drug's movement through the supply chain, identifying, from the time of initial purchase, who handled the drug, when it changed ownership, where it was shipped, and what product was transferred. This enables each party in the supply chain to verify that the drug is legitimate and has not been diverted, adulterated, or counterfeited.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 161 and therefore denies same.**

162. The pedigrees from these purchases confirm that the DrugPlace Entities are reselling the medicines they purchase from manufacturers like Lilly on the secondary market.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 162 and therefore denies same.**

163. For example, on April 23, 2024, DrugPlace purchased 200 boxes of Trulicity from one of Lilly's authorized distributors of its medications (hereinafter "Distributor A"). That purchase was assigned a unique invoice number by Distributor A. The next day, Nakorn sold the exact same number of boxes to Dockside Partners, LLC ("Dockside"), a secondary wholesaler located in Scottsville, Kentucky that sells exclusively on online marketplaces. Besides Trulicity, Dockside offers a number of medications on the DrugPlace and NHCLC/Galaxy formularies, often at a discounted rate. Dockside's product offering closely matches the selected set of drugs listed on DrugPlace's and NHCLC/Galaxy's formularies.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 163 and therefore denies same.**

164. Dockside is closely connected with the DrugPlace Conspiracy: Dockside's corporate filing was signed by Laura Wolfe, the company controller for another secondary wholesaler in Kentucky called South Pointe. South Pointe is owned by Jarrod Shirley, the former DrugPlace pharmacist who met with the Lilly team during the 2015 DrugPlace audit. South Pointe shared an address with a prior Kentucky incorporation of DrugPlace that is now closed.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 164 and therefore denies same.**

165. Dockside sold the boxes of Trulicity purchased from Nakorn to a retail pharmacy. The pedigree provided to the retail pharmacy for those boxes of Trulicity stated that they had initially been purchased by ***Nakorn*** from Distributor A on April 23, 2024, under the same invoice number as Distributor A's sale to ***DrugPlace***. In other words, the pedigree falsely made it appear that Nakorn had purchased the Trulicity directly from Distributor A, and that it had never passed through DrugPlace.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 165 and therefore denies same.**

166. The matching invoice numbers make clear that DrugPlace purchased the boxes of Trulicity from Distributor A, but then transferred them to Nakorn, which sold the boxes the next day on the secondary market.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 166 and therefore denies same.**

167. Under relevant federal law regulating drug pedigrees, the transfer of medication requires the exchange of transaction information, transaction history, and transaction statements, and should have resulted in DrugPlace being listed on the medicine's pedigree as the original purchaser from Distributor A. However, the transfer between DrugPlace and Nakorn is not listed in the pedigree, and DrugPlace is not mentioned at all. There is no legitimate purpose for this unlawful omission, which appears designed to obscure DrugPlace's role in the sale and resale of this Trulicity.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 167 and therefore denies same.**

168. To further confirm DrugPlace's and Galaxy's activities, Lilly made other purchases from secondary wholesalers with suspected ties to the DrugPlace Conspiracy—namely, of non-Lilly medicines that also appeared on the DrugPlace or NHCLC/Galaxy formularies. These purchases confirmed that DrugPlace continued to purchase medicine from authorized distributors, transfer the items to Nakorn, and then resell them to Dockside.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 168 and therefore denies same.**

169. The purchases also confirmed that Brightline also has been purchasing medications appearing on the NHCLC/Galaxy formularies and selling them to HealthSource Distributors—another secondary wholesaler that, like Dockside, resells those medications at a discounted price. This indicates that Galaxy and Brightline, like DrugPlace and Nakorn, are engaging in intercompany transfers to sell prescription drug products on the secondary market.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 169 and therefore denies same.**

170. The Trulicity and other medications sold on the secondary market by DrugPlace/Nakorn and Galaxy/Brightline are sold at prices that are discounted from those at which DrugPlace or Galaxy purchased them from authorized distributors. That is, without fraudulent rebates, the DrugPlace Conspiracy loses money on every sale. This secondary market redistribution business is not economically viable by itself, and DrugPlace has no other, legitimate business to make up the difference. It makes economic sense only as a component of a rebate fraud scheme.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 170 and therefore denies same.**

**III. Each Defendant Participated in Orchestrating the DrugPlace Conspiracy**

171. Each Defendant is indispensable to the DrugPlace Conspiracy's fraudulent rebate scheme and engaged in overt acts in pursuit of the conspiracy's objective of fraudulently extracting rebate payments from Lilly for Trulicity that was never dispensed, while reselling the medicine on the secondary market.

**ANSWER: Maynard denies the allegations in Paragraph 171 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 171 and therefore denies same.**

172. The DrugPlace Entities act together under common ownership and officers, and often times from a common facility or address, to carry out their fraudulent rebate scheme. Each of the DrugPlace Entities and DrugPlace Officers play a role in creating and maintaining the appearance that DrugPlace and Galaxy are legitimate pharmacies servicing only legitimate patients in connection with a legitimate prescription cost share program that would make DrugPlace's and NHCLC/Galaxy's utilization of Trulicity eligible for rebate payments from Lilly. These interconnected roles are designed to enable the DrugPlace Entities to fraudulently induce Lilly to pay rebates to PBMs, and to fraudulently secure for themselves many millions of dollars through their share in those rebate payments, on the pretense that the medication has been dispensed to and utilized by patients.

**ANSWER: Maynard denies the allegations in Paragraph 172 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 172 and therefore denies same.**

173. Specifically, DrugPlace purports to act as the exclusive pharmacy and PBM for the Community Health prescription cost share program affiliated with the Church. Similarly, Galaxy purports to act as the exclusive pharmacy for a prescription cost share program affiliated with NHCLC.

**ANSWER: Maynard denies the allegations in Paragraph 173 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 173 and therefore denies same.**

174. DrugPlace and Galaxy each purchase medication, including Trulicity, from pharmaceutical wholesalers for the stated purpose of filling those prescriptions for COGIC and NHCLC members on the Community Health and NHCLC prescription cost share programs, respectively. DrugPlace and the Galaxy Operation then cause rebate claims to be submitted for the purportedly dispensed Trulicity, based on DrugPlace's and Galaxy's representations that the medication has in fact been dispensed to patients. They do so, among other ways, by listing a prescription number and fill date on each rebate claim.

**ANSWER: Maynard denies the allegations in Paragraph 174 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 174 and therefore denies same.**

175. But rather than dispensing that medicine to patients, DrugPlace and Galaxy sell most, if not all, of it on the secondary market. Their representations on rebate claims of having dispensed that medication, on a particular date, to an actual patient, are therefore false.

**ANSWER: Maynard denies the allegations in Paragraph 175 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 175 and therefore denies same.**

176. Many states, including Tennessee, require a license to sell or distribute prescription medicines. *See* Tenn. Comp. R. Regs. 1140-09.01. DrugPlace and Galaxy, which are licensed as retail pharmacies and not as wholesalers or distributors, cannot sell medications on the secondary market or to other pharmacies (except for extremely limited circumstances, such as to address an immediate patient need). Because they lack the required license to sell medicines, DrugPlace and Galaxy instead transfer the medication to their commonly owned wholesaler affiliates.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 176 and therefore denies same.**

177. Typically, DrugPlace transfers the medications it purchases, including Trulicity, to its commonly owned company Nakorn, and Galaxy transfers the medications it purchases, including Trulicity, to its commonly owned company, Brightline. Nakorn and Brightline each have wholesaler licenses and purport to act as pharmaceutical wholesalers. Although they are required to list all transactions on the pedigrees accompanying the medications they sell, the DrugPlace Entities obscure their scheme by omitting the transactions from the pharmacies (DrugPlace and Galaxy) to the commonly owned wholesalers (typically, Nakorn and Brightline) on the pedigrees they provide to their downstream customers, effectively erasing DrugPlace and Galaxy from the

chain of distribution and hiding their roles in the resale. Nakorn and Brightline, acting as licensed pharmaceutical wholesalers, then sell that medication on the secondary market.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 177 and therefore denies same.**

178. Each individual Defendant is or has been an officer, supervisor, or employee at one or more DrugPlace Entities. As such, they were personally involved in running the DrugPlace Conspiracy, and they agreed to participate in and engaged in overt acts in pursuit of its objectives.

**ANSWER: Maynard denies the allegations in Paragraph 178 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard admits only that she used to work for Ready Healthcare, which later became Community Health Initiative. She was fired by that entity on or about March 2013. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 178 and therefore denies same.**

179. The DrugPlace Officers—Leight, Singer, Smith, Enriquez, Jerry Maynard Sr., Jerry Maynard Jr., Misha Maynard, Mazei, and Giscombe—as the owners and officers of DrugPlace, Nakorn, and Community Health, direct and control the DrugPlace Entities, including devising, implementing, and enforcing policies and business practices that enable the other Defendants to carry out the fraud. The proceeds of Defendants' fraud flow to Leight, Singer, Smith, Enriquez, Jerry Maynard Sr., Jerry Maynard Jr., Misha Maynard, Mazei, Giscombe and others.

**ANSWER: Maynard denies the allegations in Paragraph 179 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard admits only that she used to work for Ready Healthcare, which later became Community Health Initiative. She was fired by that entity on or about March 2013. Maynard lacks knowledge**

**or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 179 and therefore denies same.**

180. Defendants Leight, Singer, Mazei, and Smith have orchestrated the DrugPlace Conspiracy. Defendants Leight, Singer, and Mazei have ownership interests in the DrugPlace Entities and are the driving force behind devising and advancing the fraudulent rebate practices. Furthermore, Defendants Leight, Singer and Mazei coordinated the activities of all Defendants and siphoned off significant profits for themselves. And Defendant Smith created the Community Health program and coordinated with the other defendants to provide the appearance of a legitimate patient base of Church members. With Defendants Leight, Singer, Mazei, and Smith supervising, and actively participating in, the scheme executed through the DrugPlace Entities, the DrugPlace Conspiracy was able to submit fraudulent rebate claims undetected.

**ANSWER: Maynard denies the allegations in Paragraph 180 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard admits only that she used to work for Ready Healthcare, which later became Community Health Initiative. She was fired by that entity on or about March 2013. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 180 and therefore denies same.**

### IV. Prior Allegations of Fraud and Other Illegal Activity Involving Defendants and Their Associates

181. Unsurprisingly, some of the named Defendants and their associates have been implicated in similar healthcare-related schemes over the years relating to their fraudulent business operations involving DrugPlace and other related business entities.

**ANSWER: Maynard denies the allegations in Paragraph 181 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme, or that she has been implicated in similar healthcare-related schemes. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 181 and therefore denies same.**

182. In 2011, Leight and Singer, owners of DrugPlace and Nakorn, were implicated in a healthcare-fraud scheme involving the misappropriation of funds related to a pharmaceutical returns (or "reverse distribution") business, Guaranteed Returns. The Vice President of Guaranteed Returns, a business associate of Leight and Singer's, was indicted in the Eastern District of Pennsylvania for his role devising and directing the scheme. During the investigation, one of Leight's business was searched, and the search warrant affidavit asserted that both Leight and Singer received significant amounts of the fraudulent proceeds of the scheme. Guaranteed Returns and two of its executives were later charged and convicted in a $180 million criminal healthcare fraud case in the Eastern District of Pennsylvania.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 182 and therefore denies same.**

183. Several years later, Abbott Laboratories sued Leight, Singer, and Able Wholesalers—an entity that Leight and Singer co-own indirectly—in the Eastern District of New York for their role in the unlawful importation and diversion of diabetic test strips. The court concluded that some of the unlawfully diverted blood test strips were supplied through Able Wholesalers.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 183 and therefore denies same.**

184. Leight and Singer's involvement in the Able Wholesalers scheme resurfaced in a separate prosecution by the United States Attorney's Office for the Southern District of Florida against two individuals, Mohammad Salemi and Joshua Joles. Salemi was prosecuted for healthcare fraud involving his wholesale business's purchase and distribution of millions of dollars in diverted pharmaceuticals. The diverted pharmaceuticals were branded medicines that were acquired unlawfully—through fraud, pharmacy burglaries, and cargo thefts. Salemi and Joles acquired these medicines in large quantities, at a cost well below normal wholesale prices, and then introduced the diverted medicines back into the legitimate marketplace to be resold to pharmacies and their patients. To conceal the fraud, Salemi produced falsified pedigrees.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 184 and therefore denies same.**

185. In an interview with the FBI, Salemi stated that he knew Defendant Singer and that the two were introduced by Joles in 2016 while Singer was running Able Wholesalers. Salemi explained that Joles had been acquiring significant amounts of one specific medicine from Able Wholesalers. During their meeting, Singer told Salemi that Able was supplying such quantities of drugs by using "intracompany transfers of prescription drugs"—much like the intercompany transfers of Trulicity from DrugPlace to Nakorn, and from Galaxy to Brightline. According to Salemi, Singer admitted that he used these transfers to turn millions of dollars in profit per year.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 185 and therefore denies same.**

186. Leight and Singer also co-owned a collection of entities known as Meds Direct Rx, located in Tennessee, New York, and Florida. Meds Direct Rx was identified in a series of criminal

and civil lawsuits against the healthcare company Next Health as a key player in laundering funds to facilitate unlawful co-pays, for which Next Health was ultimately criminally convicted.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 186 and therefore denies same.**

187. Next Health's lab business was premised on billing insurance for medically unnecessary lab tests. To secure reimbursement from insurers, Next Health represented that patients were responsible for thousands of dollars in co-pays for the lab tests, when in fact, patients were responsible for only a small fraction. Next Health then used various fraudulent means to make it appear that co-pays had been satisfied.

**ANSWER: Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 187 and therefore denies same.**

188. To perpetrate this scheme, Next Health deployed a pharmacy division that consisted of dozens of entities, including the Meds Direct Rx pharmacies owned by Leight and Singer. In one lawsuit, the court noted that Leight and Singer's pharmacies were used to funnel proceeds of the fraud through a fictitious charity set up by Defendant Jerry Maynard Sr. Maynard Sr. arranged the charity to appear like it was paying co-pays. Meds Direct then submitted fake invoices back to Next Health, which in turn remitted large payments back to Meds Direct that it used to create slush funds to pay the fake co-pays.

**ANSWER: Maynard admits only that she became aware of the lawsuit after it was filed, but otherwise Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 188 and therefore denies same.**

189. During Lilly's 2015 audit of DrugPlace, DrugPlace introduced Lilly to Jarrod Shirley as one of DrugPlace's lead pharmacists. In 2008, Johnson & Johnson and LifeScan sued Shirley

and South Pointe Wholesale, Inc., a pharmaceutical wholesaler that Shirley co-owns and operates, in the Eastern District of New York for their sale and distribution of thousands of counterfeit diabetes test strips. As discussed above, South Pointe has a number of connections to DrugPlace: Shirley is the former DrugPlace pharmacist who met with the Lilly team during the 2015 DrugPlace audit, and South Pointe shared an address with a prior Kentucky incorporation of DrugPlace that is now closed. Shirley and South Pointe ultimately settled the action, agreeing to a consent judgment and permanent injunction to stop their infringing sales. South Pointe's primary business address is 321 Matthews Mills Road, Glasgow, Kentucky–the same address listed for DrugPlace, Inc. in Kentucky.

**<u>ANSWER:</u> Maynard lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 189 and therefore denies same.**

**V. The Harm Caused by the DrugPlace Conspiracy's Fraud**

**A. Financial Harm**

190. The DrugPlace Conspiracy's ongoing fraud scheme has caused enormous financial harm to Lilly.

**<u>ANSWER:</u> Maynard denies the allegations in Paragraph 190 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 190 and therefore denies same.**

191. Between 2020 and 2024, DrugPlace and the Galaxy Operation together caused Lilly to pay ***over $200 million*** in rebates, corresponding to purported prescriptions for hundreds of thousands of boxes of Trulicity. DrugPlace and the Galaxy Operation also attempted to make Lilly

pay tens of millions of dollars in rebate claims for additional prescriptions of Trulicity that DrugPlace claimed to dispense between Q1 and Q3 2025.

**ANSWER: Maynard denies the allegations in Paragraph 191 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 191 and therefore denies same.**

192. As detailed above, for most or all of those rebate claims, the DrugPlace Entities never actually sold, dispensed, or shipped any boxes of Trulicity to patients—as required for rebate eligibility. Instead, they resold the boxes to other distributors.

**ANSWER: Maynard denies the allegations in Paragraph 192 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 192 and therefore denies same.**

193. DrugPlace's and the Galaxy Operation's rebate claims were fraudulent. To make its products accessible to patients, Lilly contracts to pay rebates to PBMs for formulary access. The rebates are paid based on utilization of medication actually dispensed by pharmacies to the PBM's client plans' member patients. If the PBM's rebates were paid on the sale of products to the pharmacy by the wholesaler, the same unit of medicine could be rebated again and Lilly would pay more in rebates than it charges for the medicine. Yet in hundreds of thousands of rebate claims submitted through intermediaries to Lilly, DrugPlace and the Galaxy Operation represented they had dispensed a box of Trulicity to an actual patient, when they instead sold that box on the secondary market.

**ANSWER: Maynard denies the allegations in Paragraph 193 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 193 and therefore denies same.**

194. Each time DrugPlace or the Galaxy Operation caused a false rebate claim to be submitted to Lilly, through intermediaries, purporting to have dispensed a box of Trulicity to a member patient, that it actually resold on the secondary market, Lilly reasonably relied on that false representation and was thereby defrauded into paying rebates. Had Lilly known the truth, it would never have paid the rebates in question. Lilly is entitled to damages and/or restitution in the aggregate amount of these fraudulent rebates.

**ANSWER: Maynard denies the allegations in Paragraph 194 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 194 and therefore denies same.**

195. Lilly is also entitled to disgorgement of, or a constructive trust over, the profits the DrugPlace Conspiracy earned at Lilly's direct expense in the form of rebate claims paid for medicines that were not actually dispensed to and utilized by patients. Specifically, Lilly is entitled to the proceeds of the scheme up to the amount of its direct out-of-pocket losses, which is the total amount it paid in fraudulent rebates.

**ANSWER: Maynard denies the allegations in Paragraph 195 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 195 and therefore denies same.**

**B. Irreparable Harm, Including Non-Financial Harm**

196. The harm Defendants are causing Lilly is ongoing, practically impossible to stop without a court-ordered injunction, and impossible to adequately remedy by money damages.

**ANSWER: Maynard denies the allegations in Paragraph 196 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 196 and therefore denies same.**

197. As described above, Defendants have demonstrated a pattern of concealing their fraud and a willingness to pivot their schemes to evade countermeasures, which they already have done repeatedly.

**ANSWER: Maynard denies the allegations in Paragraph 197 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 197 and therefore denies same.**

198. For example, between 2011 and 2015, DrugPlace, in its capacity as a PBM, had a direct commercial rebate agreement with Lilly. After identifying anomalies in DrugPlace's rebate claims for insulin medicines, Lilly attempted to audit DrugPlace's underlying pharmacy records. DrugPlace resisted the audit, and when it ultimately went forward, Lilly discovered that DrugPlace had no adequate substantiation for its rebate claims and no evidence that Lilly's medication had actually been dispensed to real patients. Based on these findings and other unexplained aberrations in DrugPlace's data and operations, Lilly ended its direct commercial rebate arrangement with DrugPlace.

**ANSWER: Maynard denies the allegations in Paragraph 198 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 198 and therefore denies same.**

199. Yet within a matter of years, DrugPlace again started submitting rebate claims for Lilly products, except this time, it submitted claims for a different medicine—Trulicity—and concealed those claims through intermediaries. For nearly five years, DrugPlace was able to avoid detection in this manner.

**ANSWER: Maynard denies the allegations in Paragraph 199 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 199 and therefore denies same.**

200. Beginning in July 2024, the DrugPlace's owners and principals, through their associates that included Defendant Mazei, reconstructed the DrugPlace model through new channels, using different entities comprising the Galaxy Operation to submit fraudulent rebate claims, through intermediaries, to Lilly under a strikingly similar scheme.

**ANSWER: Maynard denies the allegations in Paragraph 200 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 200 and therefore denies same.**

201. Due to the lag time between when pharmacies submit reimbursement claims to PBMs and when Lilly receives rebate claims data from PBMs seeking rebates, several months can pass and millions of dollars of claims can be paid before Lilly can conduct a meaningful investigation.

Even after Lilly receives rebate claims data, the process of analyzing and identifying anomalies in large amounts of aggregated data, which can flow through multiple and shifting intermediaries, is difficult and time-consuming. If and when Lilly spots one pattern of fraudulent activity, the DrugPlace Conspiracy may already be moving on to a new iteration of its unlawful scheme, whether using different products, different intermediaries, or different schemes altogether. The Drug Place Conspiracy already has the means and infrastructure to do so, as evidenced by its creation of the parallel operations run through the Galaxy Operation.

**ANSWER: Maynard denies the allegations in Paragraph 201 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 201 and therefore denies same.**

202. Moreover, given the DrugPlace Conspiracy's extensive history of obscuring the true nature of its activities and the identities of the individuals that control its business; the history of fraud and recidivism by the DrugPlace Officers, including Leight and Singer; the dishonesty Defendants have displayed during Lilly's investigation of their conduct; and the extent of Lilly's damages, it is highly unlikely that Lilly will be able to obtain and execute a damages judgment that provides full compensation for its financial losses. Indeed, in response to Lilly's scrutiny of Defendants' rebate claims and operations, Defendants recently caused DrugPlace and Nakorn to close their facilities, including surrendering Nakorn's wholesale distributor license and liquidating DrugPlace's equipment and assets—an apparent effort to cover their tracks.

**ANSWER: Maynard denies the allegations in Paragraph 202 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks**

**knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 202 and therefore denies same.**

203. The DrugPlace Conspiracy's fraud has also caused, and continues to cause, irreparable non-monetary harm to Lilly. Lilly's relationships with PBMs are important to Lilly's business and to its ability to deliver medicine to patients. To mitigate its losses from the DrugPlace Conspiracy's large-scale fraud, Lilly has taken and will continue to attempt certain self-help measures, including refusing to honor the most recent rebate claims submitted by DrugPlace and the Galaxy Operation through intermediaries. However, these self-help measures disrupt Lilly's business relationships with the payer intermediaries that submit those rebate claims to Lilly. Moreover, given the DrugPlace Conspiracy's history of pivots, it is highly likely that Defendants will continue to find new pathways by which to submit rebate claims to Lilly. To the extent DrugPlace moves its scheme to different intermediaries in the future, Lilly may be required to take similar action against other payers. This has disrupted and will continue to disrupt Lilly's relationships with some of its business counterparties. That is a detriment to Lilly's business relationships that is difficult or impossible to quantify in monetary terms or rectify through an award of damages.

**ANSWER: Maynard denies the allegations in Paragraph 203 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 203 and therefore denies same.**

204. For the above reasons, Lilly is entitled not only to compensation for the losses caused by the DrugPlace Conspiracy's massive fraud, but also to injunctive relief prohibiting Defendants from submitting any further rebate claims for any Lilly product absent adequate substantiation that the medicine was in fact dispensed to the patient to whom it was prescribed.

**ANSWER: Maynard denies the allegations in Paragraph 204 that she participated in or contributed to the operation of a fraudulent healthcare program or scheme. Maynard lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 204 and therefore denies same.**

**COUNT I**
**COMMON LAW FRAUD**
**(Against Defendants DrugPlace, Galaxy, Community Health, and Individual Defendants Leight, Singer, Smith, and Mazei)**

205. Lilly hereby repeats and realleges the allegations in paragraphs 1 to 204 above as if set forth fully herein.

**ANSWER: Maynard repeats and reiterates each and every response set forth in Paragraphs 1 through 204 above, as if fully set forth herein at length. Count I does not include Maynard and therefore, no response is required.**

206. DrugPlace, Galaxy, Community Health, and individual Defendants Leight, Singer, Smith, and Mazei (collectively, the "Fraud Defendants") knowingly and intentionally submitted or caused to be submitted, through rebate aggregators and PBMs, hundreds of thousands of false rebate claims to Lilly, as well as false health plan documents and formularies to which those false rebate claims could be attributed. Those submissions falsely misrepresented that Trulicity had been dispensed to their member patients when in fact they had not. In particular, each false and fabricated rebate claim that Lilly received and paid included, among other things, false statements originating from the Fraud Defendants as to the unique identification number associated with the purported patient's prescription, the date on which Trulicity was purportedly dispensed, and the quantity and number of days' worth of Trulicity purportedly dispensed. In reality, no patient existed and no dispense occurred. The Fraud Defendants knowingly and intentionally caused third-party rebate aggregators and PBMs to submit these fraudulent rebate claims to Lilly for payment.

**ANSWER: Count I does not include Maynard and therefore, no response is required.**

207. The Fraud Defendants made those false representations, or caused them to be made, with the intent to defraud. Specifically, the Fraud Defendants made those false representations, or caused them to be made, in order to profit from the rebates Lilly pays PBMs pursuant to contract for boxes of Trulicity actually dispensed to and utilized by patients.

**ANSWER: Count I does not include Maynard and therefore, no response is required.**

208. Defendants Leight, Singer, Smith, and Mazei, as owners, officers, and/or employees of DrugPlace, Galaxy, and Community Health, were personally involved in and approved of the fraudulent schemes. These Defendants had actual knowledge of, and substantially assisted in, the schemes to submit through intermediaries, and receive payment in connection with, fraudulent rebate claims to Lilly, and to create and perpetuate sham health plans to which those fraudulent rebates could be attributed.

**ANSWER: Count I does not include Maynard and therefore, no response is required.**

209. Lilly reasonably relied on these misrepresentations that Fraud Defendants' submitted to their third-party aggregator and, in doing so, caused to be submitted to third-party PBMs and ultimately to Lilly for payment. Pursuant to its contracts with PBMs, Lilly relied on the PBMs to review and validate pharmacy claim-level information when determining whether to pay the rebate claims. Lilly was unaware of the fraudulent scheme because Defendants took active steps to conceal their activities and evade detection.

**ANSWER: Count I does not include Maynard and therefore, no response is required.**

210. Defendants' fraud was gross, oppressive, and malicious, and as a result of the Fraud Defendants' conduct, Lilly was injured in an amount to be determined at trial.

**ANSWER: Count I does not include Maynard and therefore, no response is required.**

211. Furthermore, Lilly continues to be injured by the Fraud Defendants' conduct, which continues to defraud Lilly and continues to cause irreparable and monetary harm to Lilly.

**ANSWER: Count I does not include Maynard and therefore, no response is required.**

**COUNT II**
**CIVIL CONSPIRACY TO COMMIT FRAUD**
**(Against All Defendants)**

212. Lilly hereby repeats and realleges the allegations in paragraphs 1 to 211 above as if set forth fully herein.

**ANSWER: Maynard repeats and reiterates each and every response set forth in Paragraphs 1 through 211 above, as if fully set forth herein at length.**

213. Defendants unlawfully, knowingly, and willfully combined, conspired, confederated and agreed together to defraud Lilly. All Defendants adopted the goal of furthering and facilitating this conspiracy.

**ANSWER: Maynard denies the allegations in Paragraph 213.**

214. Defendants each committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to achieve the objects thereof, including but not limited to the acts set forth above.

**ANSWER: Maynard denies the allegations in Paragraph 214.**

215. Defendants' scheme depended upon the participation of all Defendants, including, among other things, (a) Community Health and individual Defendants Smith, Jerry Maynard Sr., Jerry Maynard Jr., and Misha Maynard willingly creating and perpetuating a sham health plan front to which fraudulent rebates could be attributed; (b) Nakorn, Brightline, and individual Defendants Enriquez and Giscombe knowingly diverting Lilly's medications that DrugPlace and Galaxy purported to dispense to patients to the secondary market for re-sale; and (c) DrugPlace,

Galaxy, and individual Defendants Leight, Singer, and Mazei knowingly submitting or causing to be submitted, through intermediaries, and receiving payment in connection with, fraudulent rebate claims to Lilly for medications that were not actually dispensed to and utilized by DrugPlace or Galaxy to patients.

**ANSWER: Maynard denies the allegations in Paragraph 215.**

216. Lilly reasonably relied on the misrepresentations that Defendants submitted to their third-party aggregator and, in doing so, caused to be submitted to third-party PBMs and ultimately to Lilly for payment. Pursuant to its contracts with PBMs, Lilly relied on the PBMs to review and validate pharmacy claim-level information when determining whether to pay the rebate claims. Lilly was unaware of Defendants' fraudulent scheme because Defendants took active steps to conceal their activities and evade detection.

**ANSWER: Maynard denies the allegations in Paragraph 216.**

217. As a result of Defendants' conduct, Lilly was injured in an amount to be determined at trial.

**ANSWER: Maynard denies the allegations in Paragraph 217.**

**COUNT III**
**NEGLIGENT MISREPRESENTATION**
**(Against All Fraud Defendants)**

218. Lilly hereby repeats and realleges the allegations in paragraphs 1 to 217 above as if set forth fully herein.

**ANSWER: Maynard repeats and reiterates each and every response set forth in Paragraphs 1 through 217 above, as if fully set forth herein at length. Count III does not include Maynard and therefore, no response is required.**

219. The Fraud Defendants misrepresented and caused to be misrepresented to Lilly, through intermediaries, that they were dispensing Trulicity to patients, when in fact they were not. These misrepresentations were passed along by third parties to Lilly, directly causing Lilly to pay millions of dollars in fraudulent rebates for medications that were not actually utilized by patients. These material statements of fact were false and misleading.

**ANSWER: Count III does not include Maynard and therefore, no response is required.**

220. These statements were negligent because the Fraud Defendants did not exercise reasonable care in verifying the accuracy of these statements or in ensuring that they did not fail to make material disclosures, yet represented that they knew the statements to be true. Indeed, the Fraud Defendants made these statements recklessly, without regard to their truth or falsity.

**ANSWER: Count III does not include Maynard and therefore, no response is required.**

221. The Fraud Defendants did not take any affirmative steps to correct their materially false statements.

**ANSWER: Count III does not include Maynard and therefore, no response is required.**

222. The Fraud Defendants had a duty to provide accurate information in their rebate claims and utilization data because they knew and intended Lilly would rely on their false representations in making rebate payments.

**ANSWER: Count III does not include Maynard and therefore, no response is required.**

223. Lilly reasonably relied upon the misrepresentations that the Fraud Defendants submitted to their third-party aggregator and, in doing so, caused to be submitted to third-party PBMs and ultimately to Lilly for payment. Pursuant to its contracts with PBMs, Lilly relied on the PBMs to review and validate pharmacy claim-level information when determining whether to pay

the rebate claims. Lilly was unaware that the rebate submissions received from intermediaries were false because Defendants took active steps to conceal their activities and evade detection.

**ANSWER: Count III does not include Maynard and therefore, no response is required.**

224. As a result of the Fraud Defendants' conduct, Lilly was injured in an amount to be determined at trial.

**ANSWER: Count III does not include Maynard and therefore, no response is required.**

**COUNT IV**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

225. Lilly hereby repeats and realleges the allegations in paragraphs 1 to 224 above as if set forth fully herein.

**ANSWER: Maynard repeats and reiterates each and every response set forth in Paragraphs 1 through 224 above, as if fully set forth herein at length.**

226. As set forth above, Defendants misrepresented, caused to be misrepresented, and/or conspired to misrepresent that they were dispensing Lilly's products—specifically, Trulicity—to patients, when in fact they were not. These misrepresentations were passed along by third parties to Lilly, directly causing Lilly to pay PBMs millions of dollars in fraudulently obtained rebates for medications that were not actually dispensed to and utilized by patients.

**ANSWER: Maynard denies the allegations in Paragraph 226.**

227. As a result of these false representations and material omissions, Defendants wrongfully obtained a monetary benefit to which they were not legally entitled.

**ANSWER: Maynard denies the allegations in Paragraph 227.**

228. Defendants have no right to retain these unjust gains.

**ANSWER: Maynard denies the allegations in Paragraph 228.**

229. If Defendants are permitted to keep this monetary benefit, it would be manifestly unjust.

**ANSWER: Maynard denies the allegations in Paragraph 229.**

230. Lilly is therefore entitled to the remedies of disgorgement and restitution in the amount by which Defendants were unjustly enriched, or the imposition of a constructive trust over Defendants' assets to that extent in order to prevent Defendants' enjoyment of that benefit. Lilly is also entitled to an order temporarily restraining and preliminarily enjoining Defendants from dissipating any profits or benefits heretofore received and which continue to be received from fraudulent adjudications of Lilly products insofar as such profits and benefits are rightfully Lilly's.

**ANSWER: Maynard denies the allegations in Paragraph 230.**

**COUNT V**
**MONEY HAD AND RECEIVED**
**(Against All Defendants)**

231. Lilly hereby repeats and realleges the allegations in paragraphs 1 to 230 above as if set forth fully herein.

**ANSWER: Maynard repeats and reiterates each and every response set forth in Paragraphs 1 through 230 above, as if fully set forth herein at length.**

232. For the reasons stated above, all Defendants have profited directly and indirectly from the fraudulent misrepresentations that the Defendants made and caused to be made, and conspired to make, to Lilly.

**ANSWER: Maynard denies the allegations in Paragraph 232.**

233. In equity and good conscience, Defendants ought not to retain those profits because in justness and fairness they belong to Lilly.

**<u>ANSWER:</u> Maynard denies the allegations in Paragraph 233.**

234. Lilly is therefore entitled to the remedies of disgorgement and restitution in the amount of money Defendants have received at Lilly's expense or the imposition of a constructive trust over Defendants' assets to that extent in order to prevent Defendants' enjoyment of the money so received. Lilly is also entitled to an order temporarily restraining and preliminarily enjoining Defendants from dissipating any profits or benefits heretofore received and which continue to be received as a result of fraudulent rebate claims for Lilly products, insofar as such profits and benefits are rightfully Lilly's.

**<u>ANSWER:</u> Maynard denies the allegations in Paragraph 234.**

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Lilly demands judgment against all Defendants as follows:

a) an order entering judgment in favor of Lilly against Defendants, jointly and severally;

b) an order temporarily restraining, and preliminarily and permanently enjoining Defendants from engaging in the unlawful behavior described above;

c) an order awarding Lilly full restitution for the unwarranted rebates it paid as the result of Defendants' fraud;

d) an order awarding Lilly the profits unlawfully earned by Defendants, in an amount to be determined, as restitution, disgorgement, or the imposition of a constructive trust over such profits;

e) an order awarding Lilly damages in an amount to be determined;

f) an order awarding Lilly pre-judgment and post-judgment interest;

g) an order awarding Lilly punitive damages;

h) an order awarding Lilly reasonable attorneys' fees and other costs; and

i) such additional relief as the Court finds just, equitable, and appropriate.

**<u>ANSWER:</u> Maynard denies each and every allegation set forth in Plaintiff's PRAYER FOR RELIEF, denies any and all liability and wrongdoing, and denies that Plaintiff is entitled to any relief, whether legal, equitable, or otherwise.**

## GENERAL DENIAL

Maynard denies each and every allegation of fact, conclusion of law, or other matter contained in the Complaint that has not been expressly admitted above. Maynard denies any and all liability and wrongdoing, and denies that Plaintiff is entitled to any relief, whether legal, equitable, or otherwise.

## MAYNARD'S AFFIRMATIVE AND OTHER DEFENSES

Maynard sets forth the following affirmative and other defenses to Plaintiff's Complaint, and reserves the right to assert additional affirmative and other defenses as this case proceeds:

### First Affirmative Defense

The Complaint fails to allege facts sufficient to state a claim for relief against Maynard individually. Plaintiff relies principally upon conclusory and collective allegations concerning "Defendants" while failing to allege specific facts demonstrating that Maynard knowingly participated in, agreed to, or benefited from the alleged fraudulent rebate scheme.

### Second Affirmative Defense

Maynard ceased working for Ready Healthcare, Community Health Initiative, and/or Promise Care Pharmacy on or about March 2013, years before the rebate activity alleged in the Complaint beginning in or about 2020. Maynard therefore did not participate in, supervise, direct,

control, authorize, or have knowledge of the alleged rebate program or the conduct forming the basis of Plaintiff's claims.

**Third Affirmative Defense**

Maynard never entered into any agreement, express or implied, with any Defendant or other person to defraud Plaintiff or to participate in any fraudulent rebate scheme. Maynard did not knowingly participate in any alleged conspiracy and did not commit or cause any unlawful overt act in furtherance of such a conspiracy.

**Fourth Affirmative Defense**

Maynard had no knowledge of the rebate program or alleged fraudulent conduct described in the Complaint and did not knowingly, intentionally, or willfully participate in any conduct intended to defraud Plaintiff. To the extent any other Defendant engaged in wrongful conduct, such conduct occurred without Maynard's knowledge, authorization, direction, participation, or consent.

**Fifth Affirmative Defense**

Maynard is not liable for the independent acts or omissions of the other Defendants merely because she previously worked with or knew certain of those individuals. During the period relevant to Plaintiff's allegations, Maynard did not employ, supervise, direct, control, or act as the agent or principal of the persons or entities alleged to have submitted rebate claims or otherwise participated in the alleged scheme.

**Sixth Affirmative Defense**

No act or omission by Maynard caused or contributed to Plaintiff's alleged damages. Maynard had no involvement in the creation, submission, review, approval, processing, or

payment of any rebate claim at issue and did not cause any representation concerning such claims to be made to Plaintiff or any intermediary.

**Seventh Affirmative Defense**

Any loss allegedly sustained by Plaintiff resulted from acts or omissions of persons or entities other than Maynard over whom she exercised no control and for whose conduct she is not legally responsible. Maynard cannot be held liable for conduct undertaken independently by other Defendants or third parties without her knowledge, agreement, authorization, or participation.

**Eighth Affirmative Defense**

Plaintiff's unjust-enrichment claim is barred because Plaintiff did not confer any benefit upon Maynard, directly or indirectly, arising from the alleged rebate program, and Maynard did not knowingly accept or retain any such benefit. Maynard did not receive rebate proceeds or other funds derived from the rebate activity alleged in the Complaint.

**Ninth Affirmative Defense**

Plaintiff's claim for money had and received fails because Maynard did not receive, possess, control, or retain any money belonging to Plaintiff or derived from the alleged rebate scheme. There are therefore no funds received by Maynard that equity and good conscience require her to return to Plaintiff.

**Tenth Affirmative Defense**

Plaintiff is not entitled to restitution, disgorgement, or the imposition of a constructive trust against Maynard because Maynard did not receive or retain any proceeds, profits, or other identifiable benefit traceable to the rebate activity alleged in the Complaint. Plaintiff may not require Maynard to disgorge funds or assets received solely by other persons or entities.

**Eleventh Affirmative Defense**

Because Maynard did not knowingly join, agree to, participate in, or commit any overt act in furtherance of the alleged conspiracy, she cannot be held jointly or severally liable for losses allegedly caused by the independent conduct of other Defendants. Plaintiff may recover from Maynard, if at all, only for damages legally attributable to conduct proven against Maynard herself.

**Twelfth Affirmative Defense**

Any recovery against Maynard, which is expressly denied, must be reduced by amounts Plaintiff has recovered or obtains from any other Defendant, third party, insurer, settlement, restitution payment, or other source for the same alleged injury. Plaintiff is not entitled to multiple or duplicative recovery for the same alleged rebate payments or losses.

**Thirteenth Affirmative Defense**

Plaintiff is not entitled to punitive damages against Maynard because Maynard did not engage in fraud, intentional misconduct, malice, gross negligence, or any other conduct sufficient to support such an award. Punitive damages may not be imposed against Maynard merely because of alleged misconduct committed independently by other Defendants without her knowledge or participation.

**Fourteenth Affirmative Defense**

To the extent permitted by applicable law, any damages attributable to the conduct of persons or entities other than Maynard should be apportioned to those persons or entities and should not be imposed upon Maynard. Maynard denies responsibility for the independent acts, omissions, representations, or business decisions of the other Defendants or third parties.

**Fifteenth Affirmative Defense**

Plaintiff is not entitled to recover attorneys' fees from Maynard absent a contractual, statutory, or other legal basis authorizing such an award. Maynard denies that any such basis exists with respect to the claims asserted against her.

**Sixteenth Affirmative Defense**

Plaintiff may not obtain duplicative recovery under its claims for civil conspiracy, unjust enrichment, and money had and received based upon the same alleged rebate payments or injury. Any recovery against Maynard, which is denied, must be limited to damages or benefits that Plaintiff proves are legally attributable to Maynard and may not include profits, proceeds, or damages attributable solely to other Defendants.

Discovery in this action is ongoing. Maynard reserves the right to amend her Answer to assert additional defenses that become appropriate based upon facts learned through discovery, investigation, or further proceedings in this action, consistent with the Federal Rules of Civil Procedure and the Court's applicable orders.

**MAYNARD'S PRAYER FOR RELIEF**

Defendant Misha Maynard respectfully requests that the Court: (i) enter a judgment in Maynard's favor and against Plaintiff as to the claims and allegations applicable to her in the Complaint; (ii) order that Maynard be entitled to recover her attorney's fees and costs incurred in connection with defense of this action as allowable by law; and (iii) grant any other and further relief the Court deems just and proper.

Dated: August 17, 2026

Respectfully Submitted,

**MARK FERRER & HAYDEN**
80 S.W. 8th Street, Suite 1999
Miami, Florida 33130
Telephone: (305) 374-0440

By: *s/ Stephanie Turk*
Stephanie Turk, Esq.
Florida Bar No. 99138
stephanie@mfh.law
eservice@mfh.law

*Counsel for Defendant Misha Maynard*

**CERTIFICATE OF SERVICE**

I hereby certify that I filed the foregoing document (including any attached exhibits and documents) electronically on the Court's CM/ECF docket on August 17, 2026, which served same electronically upon all counsel of record.

*s/ Stephanie Turk*
Stephanie Turk, Esq.