**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| ELI LILLY AND COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>DRUGPLACE, INC. (FL); DRUGPLACE, INC. (TN); COMMUNITY HEALTH INITIATIVE, INC.; NAKORN WHOLESALERS, LLC; GALAXY MED, LLC d/b/a GALAXY PHARMACY; BRIGHTLINE WHOLESALE LLC; PAUL LEIGHT; KEVIN SINGER; READUS SMITH; JERRY MAYNARD SR.; JERRY MAYNARD II; MISHA MAYNARD; EDGAR ENRIQUEZ; LANE MAZEI; DANIELLE GISCOMBE; DANIEL HOFFNER; and TEXAS PHARMACY ENTERPRISE, LLC,<br><br>Defendants, and<br><br>CHRISTOPHER DEMARCO; DEMARCO LANDSCAPE DESIGN GROUP, LLC; GLOBUS INDUSTRIES, LLC; ROCKAWAY INVESTMENTS INC.; U.S. HEALTHCARE DISTRIBUTORS LLC,<br><br>Relief Defendants. | Case No.: 1:26-cv-23516-FAM (EFD)<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT AND JURY TRIAL DEMAND**

## INTRODUCTION

1. Plaintiff Eli Lilly and Company ("Lilly") is one of the nation's leading pharmaceutical companies. Lilly brings this action to permanently end a rebate fraud scheme that stole hundreds of millions of dollars from Lilly, to recover the proceeds of Defendants' fraud, and to secure an award of treble damages for Defendants' brazen theft.

2. The DrugPlace Defendants, defined below, are a group of interrelated entities and individuals that purported to operate massive "prescription cost share programs" for members of large national church organizations. These Defendants include entities that held themselves out as the church-affiliated payer, the pharmacy benefits manager ("PBM"), and the exclusive pharmacy for individuals participating in the programs. Despite playing these distinct roles, these entities share overlapping ownership, control, and addresses. Their owners and principals, also named as Defendants, have previously been implicated in a lengthy string of healthcare fraud schemes.

3. The DrugPlace Defendants purchased enormous quantities of TRULICITY® (hereinafter "Trulicity"), a Lilly prescription medication, through a pharmacy run by Defendants DrugPlace, Inc., located in Florida ("DrugPlace FL"), and DrugPlace, Inc., located in Tennessee ("DrugPlace TN") (together "DrugPlace"). In a parallel scheme, they purchased medication through a Texas-based pharmacy, Defendants Galaxy Med, LLC (d/b/a Galaxy Pharmacy) ("Galaxy"). After purchasing the medication, they sought rebates from Lilly for purported utilization of the medication, filtering the rebate claims through a series of intermediaries. In connection with these rebate claims, the DrugPlace Defendants represented that the Trulicity had been dispensed to patients—a necessary condition to qualify for rebates. The DrugPlace Defendants purported to fill and process tens of thousands of Trulicity prescriptions per year, and caused Lilly to pay rebates for that massive purported utilization.

4. But the vast majority of the prescriptions, dispenses, utilization, and patients identified in the DrugPlace Defendants' rebate submissions were fictional. Instead of dispensing Trulicity to patients, the DrugPlace Defendants resold it to pharmaceutical wholesalers on the secondary market. Bank records confirm that the DrugPlace Defendants sold massive quantities of Trulicity and other medications to wholesalers. They did not dispense the medication to patients as they represented in their rebate claims. Those representations were brazenly fraudulent.

5. Since Lilly filed this action, it has confirmed that the DrugPlace Defendants' prescription drug "cost share programs" were shams. After reviewing Lilly's initial complaint, the church group that purportedly sponsored the larger cost-sharing program publicly announced that it has "no knowledge" of the acts alleged, and had "not knowingly participated in, authorized, or condoned" any of it. The church organization that purportedly sponsored the other program declared that they had no such program, and that Defendants' claims were false.

6. Subsequently, DrugPlace's former pharmacists-in-charge testified under oath that they had never heard of the cost share program that purportedly served DrugPlace's patients, that no DrugPlace patient had ever represented themselves as a participant in any such program, and that—in direct contradiction to the DrugPlace Defendants' representations—no such program ever covered the costs of any medicine dispensed by DrugPlace.

7. The pharmacists also confirmed under oath that, in direct contradiction to the DrugPlace Defendants' claims that DrugPlace had dispensed hundreds of thousands of prescriptions of Trulicity to patients, DrugPlace actually filled no more than a handful of Trulicity prescriptions each year. The remainder of the DrugPlace Defendants' purported Trulicity prescriptions were nonexistent.

8. The pharmacists' testimonies are shocking, but they are not surprising, because the DrugPlace Defendants' story never added up. Despite claiming to provide prescription drug coverage for a Church with more than a million members, the DrugPlace Defendants actually operated out of a nondescript two-room office; the data they provided to support the rebate claims showed highly anomalous prescription and utilization trends antithetical to a legitimate patient population; and their prescription-level data was unsupported by basic verifying information.

9. The church-affiliated prescription cost share programs, and the DrugPlace Defendants' entire businesses, were nothing more than fronts for their fraudulent rebate scheme. Through this scheme, the DrugPlace Defendants defrauded Lilly out of more than ***$200 million***. They have similarly defrauded other pharmaceutical manufacturers as well.

10. The DrugPlace Defendants were able to conceal their rebate fraud scheme for years by submitting claims through multiple layers of intermediaries and repeatedly pivoting to different intermediaries. Only by identifying and examining the anomalies in the DrugPlace Defendants' rebate data and initiating an extensive pre-suit investigation was Lilly able to piece together the nature and scope of the DrugPlace Defendants' fraud.

11. Post-suit discovery corroborated Lilly's allegations and evidence of fraud. It has also shown that the DrugPlace Defendants siphoned the proceeds of their fraud from the corporate entities through which they conducted their business to various accounts and financial vehicles controlled by Defendants Paul Leight and Kevin Singer, the principal owners of the enterprise.

12. In addition to flowing to Leight and Singer, substantial amounts of the proceeds of the DrugPlace Defendants' fraud were transferred (through a series of layered transactions) to other entities that could not have provided goods or services commensurate with the enormous sums of money they received. These entities, identified herein as the Relief Defendants, are being

named as defendants to enable Lilly to obtain a return of the fraudulent proceeds of which those entities are unjustly in possession.

## PARTIES

### I. Plaintiff

13. Lilly is a public corporation organized under the laws of the State of Indiana, with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285. Lilly discovers, develops, manufactures, and markets innovative medicines. Throughout its 150-year history, Lilly has worked to address some of the most pressing challenges facing humanity, including infectious disease, diabetes, depression, cancer, obesity, and Alzheimer's disease. Last year, more than 55 million people used Lilly's medicines.

### II. DrugPlace Defendants

14. The DrugPlace Defendants are an interconnected group of individuals and entities with common ownership and shared addresses—including pharmacies, pharmaceutical wholesalers, and prescription drug programs—that work together to devise and perpetuate healthcare fraud schemes.

15. The following is a visual representation showing the DrugPlace Defendants and their respective relationships and roles in the fraudulent scheme.




### B. DrugPlace

16. DrugPlace, Inc. (FL) is a business corporation organized under the laws of the State of Florida with an address of 3900 SW 30th Avenue in Fort Lauderdale, Florida. It is therefore a citizen of Florida.

17. DrugPlace, Inc. (TN) is separately organized under the laws of the State of Tennessee. It is located at 617 Airpark Center Drive, Nashville, Tennessee and maintains a mailing address at 3900 SW 30th Ave, Fort Lauderdale, Florida, in this District. It is therefore a citizen of Tennessee and Florida.

18. DrugPlace Inc. (FL) and DrugPlace Inc. (TN) operated as one company, with the Fort Lauderdale, Florida location serving as its corporate headquarters and the Nashville,

Tennessee location serving as its current distribution center. The company operated by the two corporations is referred to as "DrugPlace." DrugPlace purported to be a mail-order pharmacy and PBM for a prescription cost share program operated by Defendant Community Health. Until April 2026, DrugPlace maintained a National Provider Identifier ("NPI") as a Community/Retail Pharmacy.

19. In April 2026, after learning that Lilly was investigating its fraudulent rebate activity, DrugPlace closed its pharmacy in Nashville and began to liquidate its assets and equipment.

**C. Community Health**

20. Community Health, Inc. ("Community Health") is a business corporation organized under the laws of the State of Tennessee with its principal place of business at 617 Airpark Center Drive in Nashville, Tennessee (the same address as DrugPlace Inc. (TN)). Community Health is therefore a citizen of Tennessee.

21. Community Health purported to be an affiliate of the Church of God in Christ (the "COGIC" or the "Church"), which describes itself as a Pentecostal denomination with millions of adherents. Community Health sometimes did business under the name "COGIC Department of Health." Community Health purported to be responsible for recruiting patients and administering the Church's prescription cost share program. Community Health was originally formed as ReadyHealthcare Services Corporation and was originally located at 4300 Clarksville Pike, Nashville, Tennessee. Community Health maintained no independent website or internet presence, besides a reference on DrugPlace's website and historical references on the COGIC Department of Health website. Community Health, under its former name ReadyHealthcare Services Corporation, is the owner of registered trademarks for "DrugPlace" and "COGIC Department of Health." Additionally, DrugPlace's "formularies" were printed on COGIC

Department of Health letterhead and purported to be approved by the COGIC Department of Health.

**D. Nakorn**

22. Defendant Nakorn Wholesalers, LLC ("Nakorn") is a limited liability company organized under the laws of the State of Tennessee. Its sole member is Defendant Kevin Singer, a Florida resident. Therefore, Nakorn is a citizen of Florida. Nakorn's principal place of business is 1400 Donelson Pike, Suite A16, Nashville, Tennessee, which was also DrugPlace's address until March 2017, when Nakorn was formed. Nakorn's corporate registration lists DrugPlace's Florida address, 3900 SW 30th Ave, Fort Lauderdale, Florida, as Nakorn's own mailing address, and that address serves as Nakorn's corporate headquarters.

23. Nakorn purported to be a wholesaler of pharmaceutical products and maintained wholesaler licenses in Arizona, Kentucky, Pennsylvania, and Tennessee, though none of those licenses are currently valid. Like DrugPlace, Nakorn submitted a request to close its facility with the Tennessee Department of Health and to surrender its wholesaler license with the Kentucky Board of Pharmacy in January 2026, evidently after Defendants were made aware of Lilly's fraud investigation. Defendant Edgar Enriquez is the General Manager of Nakorn and listed as the contact on Nakorn's Tennessee Department of Health facility license.

**E. Galaxy**

24. Defendant Galaxy is a limited liability company organized under the laws of the State of Texas with its principal place of business at 6655 Travis Street, Suite 120, Houston, Texas. Its sole member is Defendant Lane Mazei, a Florida resident. Therefore, Galaxy is a citizen of Florida. Galaxy's corporate registration also lists DrugPlace's former Florida address, 1930 Harrison Street, Suite 605, Hollywood, Florida, as Galaxy's own address, and that address serves as Galaxy's corporate headquarters.

25. Galaxy purported to be a mail-order pharmacy for a prescription cost share program operated by the Texas Chapter of the National Hispanic Christian Leadership Conference. Until around March 2026, Galaxy maintained an NPI code as a Community Pharmacy. Defendant Lane Mazei is listed as the manager, director, officer of record, and registered agent for Galaxy.

**F. Texas Pharmacy Enterprise**

26. Defendant Texas Pharmacy Enterprise, LLC ("TPE") is a limited liability company organized under the laws of the State of Florida with its principal address at 3900 SW 30th Ave in Fort Lauderdale, Florida. TPE is managed by Defendants Kevin Singer, Paul Leight, and CrossLinx Corporation (another entity owned and controlled by Defendant Singer), all domiciled in Florida, who are believed to be its members. TPE is therefore a citizen of Florida. TPE served as a dummy company for the Galaxy operation, and directly received the fraudulently obtained rebate payments for claims associated with Galaxy. These funds were then distributed by TPE to other Defendants. TPE is also a creditor to Lane Mazei and has a security interest in Mazei's ownership stake of Galaxy. TPE is also a signatory to an agreement between TPE, DrugPlace, and Health Delegates relating to DrugPlace and Galaxy's rebate submissions.

**G. Brightline**

27. Defendant Brightline Wholesale LLC ("Brightline") is a limited liability company organized under the laws of the State of Texas with its principal place of business at 1224 North Post Oak Road, Suite 130, Houston, Texas. Its sole member is Defendant Lane Mazei, a Florida resident. Therefore, Brightline is a citizen of Florida. Brightline's corporate registration also lists DrugPlace's address, 1930 Harrison Street, Suite 605, Hollywood, Florida, as Brightline's own address, and that address serves as Brightline's corporate headquarters.

28. Brightline purported to be a wholesaler of pharmaceutical products and has previously maintained wholesaler licenses in Alabama, Texas, Tennessee, and Kentucky, though

none of those licenses are currently valid. Defendant Lane Mazei filed the corporate registration for Brightline. Defendant Danielle Giscombe describes herself as Brightline's Pharmaceutical Wholesale Manager and also is listed as a contact on Galaxy's Texas pharmacy license.

29. Defendants DrugPlace, Community Health, Nakorn, Galaxy, TPE, and Brightline are collectively referred to as the "DrugPlace Entities."

30. The entities described above are independent legal entities. They hold unique company registrations in their respective states of incorporation, and file separate tax returns.

**H. Individual Defendants**

31. Defendant Paul Joshua Leight is a Florida citizen domiciled in Aventura, Florida. Leight is a co-owner and the President of DrugPlace and an investor in Galaxy. He has been affiliated with numerous corporations, including non-defendant entities associated with the 1400 Donelson Pike address in Nashville, Tennessee (where Nakorn is located) and the 1930 Harrison Street address in Hollywood, Florida (DrugPlace's former address, and Galaxy and Brightline's mailing address).

32. Defendant Kevin Michael Singer is a Florida citizen domiciled in Fort Lauderdale, Florida. Singer is Leight's business partner. Singer is a co-owner and the Vice President, Secretary, and Director of DrugPlace. He is also the owner of Nakorn, for which he submitted applications for wholesaler licenses with various state licensing authorities, and an investor in Galaxy. He has been affiliated with numerous corporations, including non-defendant entities associated with the 1400 Donelson Pike address in Nashville, Tennessee (where Nakorn is located) and the 1930 Harrison Street address in Hollywood, Florida (DrugPlace's former address, and Galaxy and Brightline's mailing address).

33. Additionally, Defendants Singer and Leight jointly own a limited liability company that owns the 3900 SW 30th Ave address in Fort Lauderdale, Florida (DrugPlace FL's current

address and DrugPlace TN and Nakorn's mailing address). Leight and Singer also co-own dozens of other business enterprises, including at least seven that were formed since February 2025. As alleged below, like Leight, Singer has repeatedly been implicated in healthcare fraud and diversion schemes. Leight and Singer personally supervised, participated in, conspired to participate in, and benefited from the fraudulent scheme described below.

34. Defendant Readus C. Smith III is a Florida citizen domiciled in Jacksonville, Florida. Smith was, until his resignation on May 22, 2026, the Secretary General of Health and Business for the Church. He was formerly the Director of the COGIC Department of Health. He is also the CEO and registered agent for Defendant Community Health, which he developed, and has been affiliated with Leight and Singer's non-defendant companies, including several associated with the 617 Airpark Center Drive address in Nashville, Tennessee (where DrugPlace TN and Community Health are located). Smith is also the President for National Partnerships, U.S., at Wellvana, a "value-based" healthcare provider that recruits physicians. Smith leads the Wellvana Interfaith Network, which launched a "partnership" with the Church in 2024 to recruit physicians to provide healthcare services to Church members and other religious communities, particularly in connection with chronic diseases such as diabetes. Smith personally supervised, participated in, conspired to participate in, and benefited from the fraudulent scheme described below.

35. Defendant Jerry Maynard, Sr. is a Tennessee citizen domiciled in Ashland City, Tennessee. He is a Church bishop and businessman in the Nashville area. He was the Jurisdictional Prelate of the COGIC Department of Health and partnered with DrugPlace to lead and promote the Community Health Initiative in 2008, which purported to visit 40 cities in America to bring word about the program to COGIC churches. As alleged below, Maynard has

also previously been implicated in a healthcare fraud scheme involving pharmacies owned by Leight and Singer. Through his role in the Church and relationship with Leight and Singer, Maynard Sr. personally supervised, participated in, conspired to participate in, and benefited from the fraudulent scheme described below.

36. Defendant Jerry Maynard II is a Tennessee citizen domiciled in Nashville, Tennessee. He is a Church pastor, businessman, politician, and attorney in the Nashville area, and is Defendant Jerry Maynard, Sr.'s son. He registered the trademarks for DrugPlace, Ready Healthcare Services (the legal predecessor to Community Health), and COGIC Department of Health. He also served as the Chairman of the Board for Community Health. In his role at Community Health and as an agent for DrugPlace, Mr. Maynard supervised, participated in, conspired to participate in, and benefited from the fraudulent scheme described below.

37. Defendant Misha Maynard is a Tennessee citizen domiciled in Watertown, Tennessee. She is the Vice President of Operations for Community Health, a Church pastor, and Defendant Jerry Maynard Sr.'s daughter and Defendant Jerry Maynard II's sister. In her roles at Community Health and the Church, Ms. Maynard supervised, participated in, conspired to participate in, and benefited from the fraudulent scheme described below.

38. Defendant Edgar Enriquez is a Tennessee citizen domiciled in Brentwood, Tennessee. He previously resided in Florida and worked at DrugPlace, Inc. (FL) with Defendant Singer. He is the General Manager of Nakorn, and in that capacity, signed inspection reports conducted by the Tennessee Department of Health Board of Pharmacy. He is also listed as a contact for Community Health and other entities that share DrugPlace's mailing address, and is affiliated with Leight, Singer, and Smith. In these roles, Enriquez supervised, participated in, conspired to participate in, and benefited from the fraudulent scheme described below.

39. Defendant Lane ("Po") Jeremy Mazei is a Florida citizen domiciled in Fort Lauderdale, Florida. Mazei is the Manager and registered agent of Galaxy as well as the Manager and Organizer and registered agent of Brightline. Mazei works in DrugPlace's corporate headquarters in Florida. Mazei has numerous connections to Defendants Leight and Singer, including shared Florida addresses for Galaxy, Brightline, and other ventures.

40. TPE lent money to Mazei personally in 2021 and holds a security interest in Mazei's ownership interest in Galaxy. Additionally, Leight and Singer lent money to Galaxy in 2021 through their company Funding Source International LLC and held a security interest in Galaxy's assets and receivables. Mazei received payroll deposits from DrugPlace, and Galaxy received funding from Brightline and Singer, and other Singer-affiliated entities. In these roles, Mazei supervised, participated in, conspired to participate in, and benefited from the fraudulent scheme described below.

41. Defendant Danielle Giscombe is a Texas citizen domiciled in Humble, Texas. She is the Pharmaceutical Wholesale Manager at Brightline, and a registered pharmacy technician at Galaxy. In these roles, Giscombe supervised, participated in, conspired to participate in, and benefited from the fraudulent scheme described below.

42. Defendant Daniel Hoffner is a Florida citizen domiciled in Boca Raton, Florida. He was DrugPlace's Office Manager and Director of Purchasing. In these roles, Hoffner managed and participated in operational matters regarding DrugPlace's rebate business, including in discussions regarding DrugPlace's rebate submissions with both the DrugPlace rebate aggregator and Lilly. He also prepared false prescription cost share program documents with the intent to deceive third parties into believing that DrugPlace's rebate claims were legitimate. Hoffner was also in charge of purchasing wholesale medications on behalf of DrugPlace, and supervised and

coordinated Nakorn and Brightline's resales of medication to secondary distributors. In these roles, Hoffner supervised, participated in, conspired to participate in, and benefited from the fraudulent scheme described below.

43. Defendants Leight, Singer, Smith, Jerry Maynard Sr., Jerry Maynard II, Misha Maynard, Enriquez, Mazei, Giscombe, and Hoffner are referred to herein collectively as the "DrugPlace Officers," and together with the DrugPlace Entities, as the "DrugPlace Conspiracy" or the "DrugPlace Defendants."

**III. Relief Defendants**

44. Through a detailed forensic accounting investigation, Lilly has identified numerous large and suspicious transactions involving money that Defendants fraudulently obtained from Lilly. These transactions show that large sums of Defendants' fraudulent proceeds were transferred to certain accounts, individuals, and entities associated with the DrugPlace Defendants. These associated individuals and entities are referred to here as the Relief Defendants.

45. The Relief Defendants are DeMarco Landscape Design Group LLC ("DeMarco Landscaping"); Christopher DeMarco; Globus Industries, LLC ("Globus"); Rockaway Investments, Inc. ("Rockaway"); and U.S. Healthcare Distributors, LLC ("U.S. Healthcare"). The DrugPlace Defendants routed their ill-gotten gains to accounts associated with the Relief Defendants without a legitimate purpose in order to disperse and conceal their fraudulent proceeds.

46. DeMarco Landscape Design Group LLC ("DeMarco Landscaping") is a limited liability company organized under the laws of the State of Florida with its principal address at 2017 Sherman Street in Hollywood, Florida. Its sole member and manager is Christopher DeMarco, a Florida resident. Therefore, DeMarco Landscaping is a citizen of Florida. DeMarco Landscaping received over $65 million in checks and transfers from Defendant Singer. These

funds are traceable to accounts that received misappropriated Lilly funds or funds commingled with Lilly funds. These funds are too large to constitute legitimate landscaping services.

47. Defendant Christopher DeMarco is a Florida citizen residing in Hollywood, Florida. DeMarco is the sole member and manager of DeMarco Landscaping, which received millions of dollars from Defendant Singer. These funds are too large to constitute legitimate landscaping services, and are traceable to accounts that received misappropriated Lilly funds or funds commingled with Lilly funds.

48. Globus Industries, LLC ("Globus") is a limited liability company organized under the laws of the State of Florida with its principal address at 800 International Parkway in Sunrise, Florida. It purports to be an import-export business, operating in primarily household cleaning products. Bernadett Csillag and Alicia Seth, both Florida residents, are listed as its authorized persons and are believed to be its members. Globus Industries is a citizen of Florida. Bernadett Csillag is the ex-wife and current business partner of Nasir Khan, a convicted conspirator in a multi-million-dollar scheme to resell stolen medications.[1] Csillag and Khan are associated with Kevin Singer, Paul Leight, and Daniel Hoffner through various entities, including PKDH Holdings LLC ("PKDH"), an entity formed by Daniel Hoffner in 2018 with its initial address at 1930 Harrison Street, Suite 605, Hollywood, FL. Csillag and Khan are manager and director, respectively, of PKDH. PKDH was also the parent company of Esprit Sales Corporation, a U.K. entity that identified Leight and Singer as each holding a 25-50% ownership stake (i.e., as persons with "significant control" of Espirit) . Globus received over $9 million from Defendant Singer. These funds are traceable to accounts that received misappropriated Lilly funds or funds

[1] "Defendants Sentenced in Interstate Transportation of Stolen Property Conspiracy" (Apr. 16, 2009), https://www.fbi.gov/miami/press-releases/2009/mm041609.htm (last visited Aug. 24, 2026).

commingled with Lilly funds. Globus is a conduit for holding the ill-gotten gains of Defendants' scheme and has no legitimate claim to these funds, which Globus received in exchange for no legitimate consideration, and/or which vastly exceeded the value of any goods and services that Globus provided.

49. Rockaway Investments Inc. ("Rockaway") is a business corporation organized under the laws of the State of Florida with an address of 3900 SW 30th Avenue in Fort Lauderdale, Florida. It is therefore a citizen of Florida. Defendant Paul Leight is the sole director and signatory/beneficial owner. Rockaway has received at least $9 million from Defendant Leight. These funds are traceable to accounts that received misappropriated Lilly funds or funds commingled with Lilly funds. Rockaway is a conduit for holding the ill-gotten gains of Defendants' scheme and has no legitimate claim to these funds, which Rockaway received in exchange for no legitimate consideration, and/or which vastly exceeded the value of any goods and services that Rockaway provided.

50. U.S. Healthcare Distributors, LLC ("U.S. Healthcare") is a limited liability company organized under the laws of the State of Florida with its principal address at 800 International Parkway in Sunrise, Florida. Its members are Defendant Bernadett Csillag and Alicia Seth, both Florida residents. Therefore, U.S. Healthcare is a citizen of Florida. Csillag is also the registered agent and president. U.S. Healthcare has received at least $3 million in funds that are traceable to Defendant Singer's accounts that received misappropriated Lilly funds or funds commingled with Lilly funds. U.S. Healthcare is a conduit for holding the ill-gotten gains of Defendants' scheme and has no legitimate claim to these funds, which U.S. Healthcare received for no legitimate consideration, and/or which vastly exceeded the value of any goods and services that U.S. Healthcare provided.

## JURISDICTION AND VENUE

51. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

52. Lilly is a citizen of the state of Indiana and of no other state. Defendants are citizens of Florida, Tennessee, and Texas. No Defendant is a citizen of Indiana.

53. The amount of damages at issue exceeds $75,000, exclusive of interest and costs.

54. The Court has personal jurisdiction over all Defendants. As alleged below, the owners and principals of the DrugPlace Entities—i.e., Defendants Singer, Leight, Smith, Mazei, and Hoffner—are domiciled in Florida and conduct multiple overt fraudulent activities in this State, including at their operations' headquarters in Fort Lauderdale. These Florida-based activities are conducted on behalf of and as agents of the DrugPlace Entities (DrugPlace, Community Health, Nakorn, Galaxy, TPE, and Brightline). Further, DrugPlace, Nakorn, Galaxy, TPE, and Brightline are all headquartered in Florida.

55. The non-Florida resident Defendants Maynard Sr., Maynard II, Misha Maynard, Giscombe, and Enriquez have sufficient contacts with Florida so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

56. Maynard Sr. has longstanding ties with Leight, Singer, and their businesses in Florida. Maynard Sr. has traveled to Florida repeatedly in connection with his work for Community Health and COGIC, including to meet with Defendants Leight and Singer to discuss Church-related initiatives.

57. In a sworn declaration, Maynard Sr. testified that between 2020 to 2025, he visited Florida seven times for church and COGIC ministry-related activities, and to meet with Defendants Leight and/or Singer to discuss community initiatives. For instance, as documented in social media posts, Maynard Sr. visited Florida in May 2023 and May to June 2024 for the COGIC Women's International Convention and associated Golf Tournament.






58. Maynard II also frequently travels to Florida and resides in Miami for extended periods of time, posting about his visits regularly on social media. As recently as 2024, he described Miami as his "home away from home." He is a regular guest at the Fountainebleau hotel, an oceanfront property averaging $500 a night, which he also describes as his second home.


jerrylmaynardii • Follow
jerrylmaynardii 127w
Home away from Home. Miami just feels right!
No comments yet.
Start the conversation.
13
March 11, 2024
Log in to like or comment.


jerrylmaynardii • Follow
jerrylmaynardii 116w
Back home (2nd) at the Fountain!
flawlessconcepts 116w
Like Reply
13
1
May 24, 2024
Log in to like or comment.




59. Defendant Giscombe has purposefully transacted business in Florida through her communications with and activities on behalf of the Florida-based entities and individuals, namely Singer, Leight, Smith, Mazei, Hoffner, DrugPlace, Nakorn, Galaxy, TPE, and Brightline.

60. Defendant Enriquez previously worked for DrugPlace in Florida and purposefully transacted business in Florida through his communications with and activities on behalf of the Florida-based entities and individuals. He is also the contact person for the Florida-registered Community Health Initiative. Enriquez previously resided in Miami, owned multiple properties in Miami-Dade County from 1994-2022, and is believed to be registered to vote in Miami.

61. All DrugPlace Defendants, including Jerry Maynard Sr., Jerry Maynard II, Misha Maynard, Enriquez, and Giscombe, personally joined and participated in the DrugPlace Conspiracy, in which multiple overt acts were performed in Florida by various Florida-based co-conspirators, including the masterminds of the scheme, in furtherance of the fraudulent scheme.

62. The Court has personal jurisdiction over Relief Defendants DeMarco Landscaping, Christopher DeMarco, Globus, Rockaway, and U.S. Healthcare because they are domiciled and/or headquartered in this district and thus are subject to the Court's general personal jurisdiction. *See infra* ¶¶ 44–50. And as alleged herein, all Relief Defendants received the proceeds of the DrugPlace Defendants' fraudulent and conspiratorial activity, which was conducted in this District and around the State of Florida.

63. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(a) in that a substantial part of the events or omissions giving rise to the claims occurred in this district; at least one Defendant resides, is found, or transacts business in this District; and Defendants are subject to personal jurisdiction in this District.

## FACTS COMMON TO ALL CLAIMS

### I. Trulicity and Rebates

#### A. Lilly's Trulicity Medication

64. People with type 2 diabetes have difficulty using or making enough insulin, which regulates blood sugar. This can put them at risk of severe health complications, including heart damage, chronic kidney disease, nerve damage, and eye damage.

65. For over a decade, millions of people with type 2 diabetes have made Lilly's injectable prescription medicine Trulicity (dulaglutide) a vital part of their treatment journey. Trulicity mimics the effects of the natural hormone GLP-1 to stimulate insulin secretion, among other effects. When used in conjunction with diet and exercise, Trulicity is indicated to improve glycemic control in adult patients and pediatric patients ten years of age and older with type 2 diabetes. Trulicity also is indicated to reduce the risk of major cardiovascular events (stroke, myocardial infarction, or death) in adults with type 2 diabetes who have established cardiovascular disease or multiple cardiovascular risk factors.

66. Trulicity is a long-term treatment. It must be taken continuously to effectively control blood sugar on an ongoing basis and facilitate the body's natural release of insulin during and after meals.

67. The supply period of each prescription for Trulicity varies, often depending on the prescribing physician's judgment and the terms of the patient's insurance and pharmacy benefit plan. Trulicity is commonly dispensed to patients in a 30-day supply or a 90-day supply. A 30-day supply consists of one box containing four single-use injectable pens. Each injectable pen contains 0.5 milliliters ("mL") of liquid solution, so each Trulicity box of four pens consists of a total of 2 mL, or units, of solution. Trulicity is offered in 0.75 mg, 1.5 mg, 3 mg, and 4.5 mg doses, with dosing dependent on each patient's individual need for adequate glycemic control.

**B. Prescription Drug Benefits and Manufacturer Rebates**

68. As with many other prescription medicines, most Trulicity dispensed in the United States is covered by private insurance, such as employers or commercial health insurers, or by government health insurance programs such as Medicare or Medicaid. Trulicity is typically covered by insurers under what is known as a pharmacy benefit plan.

69. Typically, when a prescription medicine is dispensed by the pharmacy to a patient, some of the cost of the medicine is covered by the pharmacy benefit plan (once the patient's deductible is met), and the patient is responsible for the remainder, paid through a copay or coinsurance. To participate in a commercial pharmacy benefit plan, patients (or their employers) typically pay premiums, which are usually assessed on a monthly basis and do not vary according to an individual patient's medicine usage or other health expenditures. Alternatively, employers may self-fund pharmacy benefit plans for their employees, covering some or (less frequently) all of the costs as a business expense. In both instances, members covered by the insurance plan who

pay premiums are entitled to coverage of their prescription drugs based on the terms of the coverage agreement with the insurer.

70. A health care sharing program is a non-profit, community-based, and often faith-based alternative to a traditional insurance plan. As relevant here, to cover the costs of their members' prescription medicine needs, health care sharing programs require members to pay monthly contributions, which are akin to premiums. These contributions are used to pay some of the cost of each member's prescription medicine, with the remainder paid by each member through a co-pay (or "co-share").

71. Many insurers contract with pharmacy benefit managers ("PBMs") to manage and administer the pharmacy benefit of their health plans. In that role, the PBM often manages the drug formulary, which is a list of medications covered by the insurer's health plan. The PBM also separately contracts with pharmacies to manage reimbursement for medicines dispensed by the pharmacy to patients of the PBM's client health insurance plans.

72. In addition, PBMs contract directly or indirectly with most major manufacturers of name-brand drugs, and the terms of such agreements generally include rebates on drugs dispensed to patients of the PBM's client health insurance plans.

73. After a prescription for a rebate-eligible drug is dispensed to a patient, and the pharmacy is reimbursed by the patient's health insurer or its PBM for the cost of the medicine, the PBM submits a rebate claim to the manufacturer in connection with utilization of that dispensed prescription, and the manufacturer pays that rebate to the PBM.

74. Typically, rebates are conditioned on the manufacturer's medicine being placed in a specified position on the applicable drug formulary, thereby increasing patient access to that medicine. The amounts of these rebates are negotiated between the PBMs and the manufacturer.

The size of the rebates specified in contracts between manufacturers and PBMs can vary significantly depending on the circumstances.

75. After receiving these rebates from a drug manufacturer, PBMs may (or may not) share a portion of these rebates with their payer or health plan clients. Each PBM has separate contracts with its clients that specify whether and how these rebate payments from manufacturers will be shared between the PBM and the client. Manufacturers typically do not have visibility into or knowledge of the terms of PBMs' agreements with their clients. The payment terms under these agreements may vary widely.

76. PBMs may consolidate claims for medicines dispensed to patients of a variety of participating plans for submission to manufacturers. PBMs may also submit rebate claims to manufacturers through one or more layers of intermediaries, including other PBMs and entities known as "rebate aggregators."

77. A rebate aggregator contracts with multiple entities (such as PBMs or health plans) and submits rebate claims for utilization of dispensed medication to other PBMs, who in turn submit the rebate claims to the drug manufacturers with whom they contract for rebates (as discussed above). Similar to a PBM, the aggregator has at least two sets of contracts: one set with the PBMs through which it routes rebate claims, specifying the rebate payments that the PBM will make to the aggregator, and a second set with its client PBMs or health plans, specifying any payments that the aggregator may make to them.

78. Manufacturers review the rebate submissions and pay the rebates back to the submitting PBM, in accordance with the terms of their contracts with the PBMs. Under these contracts, manufacturers typically do not have primary responsibility for verifying the authenticity of every rebate claim (but do retain the final right to determine if a claim is payable). Instead,

these contracts typically require the PBM to review and analyze the claims adjudication data to determine eligibility for rebates before the claims are submitted to manufacturers. Manufacturers rely on the accuracy of the information submitted by the pharmacy to the PBM, and on the PBM's subsequent review of claim-level data and other information furnished to the PBM by the pharmacy through the client health insurance plan, to ensure the claims are rebate-eligible.

79. Manufacturers' reliance on plan and PBM representations is consistent with widely accepted industry norms and is necessary for timely and efficient administration of rebate programs. Manufacturers review submissions for contractual conformity rather than reconstructing primary data, which would be impractical given the millions of rebate claims they receive on a monthly or quarterly basis, and would be duplicative of work that is already required to be done at the plan and PBM level.

80. This general practice is true of Lilly as well. Lilly generally does not have any contractual obligation to conduct the process for authenticating rebate claims. Rather, consistent with common industry practice, in processing rebate claims, Lilly relies on the claims data submitted by PBMs and rebate aggregators, which are the primary custodians of the underlying eligibility, utilization, and adjudication data that determine rebate eligibility. Those entities control the claims-processing infrastructure, and Lilly lacks independent access to patient- or claim-level information due to privacy, contractual, and operational constraints.

81. In such an environment, when entering rebate agreements, it is Lilly's reasonable commercial practice—indeed, a necessity—to place responsibility for the review and accuracy of the data squarely on the parties that process and submit the data. This includes ensuring that rebate claims meet certain eligibility criteria specified in the contracts between manufacturers and PBMs. Lilly compensates PBMs to administer the rebate-claims processing infrastructure, use the various

sources of data to verify that claims meet the specified eligibility requirements, and submit only eligible claims (which must meet a number of conditions that Lilly does not have the ability to verify) to Lilly for payment. PBMs warrant the accuracy and completeness of submitted claims. After payment, Lilly reserves the right to audit and review the submitted claims to ensure that PBMs are complying with their contracts and, among other things, that Lilly is not paying more than it owes. In performing these reviews, Lilly uses certain data provided by PBMs, which reflects only a portion of the total data in the PBMs' possession regarding the rebate claims.

82. One of the most fundamental claims-eligibility conditions in a typical contract between a manufacturer and PBM is that the medicine for which a rebate is sought must actually have been dispensed to the patient to whom it was prescribed and covered by the patient's health plan. Under its contracts with PBMs, Lilly pays rebates only for utilization of Lilly products dispensed to covered member patients. It does not pay rebates (for example) for a pharmacy's sale of medications to another pharmacy or to a pharmaceutical distributor. As a result, to be eligible for payment, a rebate claim being submitted to Lilly indicates that a medicine was utilized by a covered member patient.

83. A PBM's rebate submission to a manufacturer typically follows a standard format set by the National Council for Prescription Drug Programs ("NCPDP"). That submission, transmitted electronically to the manufacturer on a monthly or quarterly basis, contains information about each prescription dispense covered by a client health plan during the period. Some of that information originates from the dispensing pharmacy, including a unique identification number associated with the patient's prescription, the medicine dispensed to the patient, the date on which the medicine was dispensed to the patient, the quantity and number of

days supplied, and the name and NPI of the dispensing pharmacy. The PBM's submission also contains other information sourced from the client health plan or the PBM itself.

## II. The DrugPlace Conspiracy's Fraudulent Scheme

84. DrugPlace and its affiliates and business partners have, over the course of years, knowingly caused the submission of hundreds of thousands of fraudulent rebate claims for Lilly medicines. Rather than dispense these medicines to patients, as Defendants represented in data underlying rebate submissions to Lilly, Defendants sold those medicines on the secondary market to other distributors or pharmacies. Defendants turned a significant profit on each unit of Trulicity they purchase, by collecting both a portion of the rebate payments and the net resale proceeds for each unit.

### A. Lilly Terminates Its Direct Relationship with DrugPlace in 2015 Over Serious Concerns About DrugPlace's Rebate Submissions

85. From 2011 to 2015, Lilly had a direct contractual relationship with DrugPlace, which at the time acted as the PBM for Community Health, the prescription cost share program for members of the Church. DrugPlace also purported to serve as the exclusive dispensing pharmacy for Community Health. DrugPlace, acting as PBM, submitted rebate claims and received rebates for medicines manufactured by Lilly.

86. The medicines for which DrugPlace obtained rebates during this period included Humalog and Humulin, insulin medications used to treat diabetes, and Cialis, used to treat erectile dysfunction. By 2015, DrugPlace's volume of rebate claims was substantial, but not yet astronomical. At the time, DrugPlace was receiving rebates at a rate of about $6 million per year. The vast majority of those rebates were for Humalog and Humulin.

87. The relationship between Lilly and DrugPlace was governed by a rebate agreement, under which Lilly paid rebates directly to DrugPlace, in its role as PBM for Community Health,

conditioned on the placement of the Lilly medications on Community Health/DrugPlace's formulary. Lilly's agreement with DrugPlace required that covered medicines be dispensed to and utilized by patients and covered by a client health plan in order to be eligible for rebates.

88. In August 2015, a drug wholesaler informed Lilly that it was terminating its relationship with DrugPlace's pharmacy business, because DrugPlace had violated the wholesaler's contractual "own use" requirements. This meant that DrugPlace's pharmacy business was not actually dispensing to patients the medication it purchased, but rather, was redistributing or reselling the medication to other distributors or pharmacies. Because DrugPlace's pharmacy and PBM businesses were tightly linked, and medicines resold to distributors or pharmacies are not eligible for rebates, Lilly decided to initiate its own review and audit of rebate claims submitted by DrugPlace in its capacity as PBM, as the agreement between Lilly and DrugPlace expressly authorized Lilly to do.

89. At the commencement of the review, Lilly informed DrugPlace through multiple phone calls with DrugPlace's then-Vice President, Defendant Kevin Singer, that Lilly was conducting an inquiry into DrugPlace's rebate submissions. In connection with the planned audit, Lilly requested that DrugPlace resubmit all contractually required data to validate the eligibility of its rebate submissions. DrugPlace responded by resubmitting data in aggregate form, rather than at a prescription level, even though the parties' agreement required DrugPlace to provide individualized, prescription-level data. The reason for this requirement is that, without prescription-level data, it is not possible to confirm whether individual rebate claims are contractually valid, or even whether they are authentic.

90. Even the limited and insufficient data that Lilly received from DrugPlace over the course of the audit was highly concerning. Specifically, DrugPlace's aggregate data purporting to

show the quantities of medication dispensed, days of supply prescribed, and number of refills were completely inconsistent with known prescribing practices for the medicines on DrugPlace's formulary.

91. For example, DrugPlace's rebate data indicated that every single patient had been prescribed only a 30-day (rather than a 90-day) supply of Humalog or Humulin, without exception. This was unusual, as insulin is often prescribed in 90-day supplies to improve clinically appropriate adherence in chronic patients who require stable and consistent treatment. Thirty-day supplies are often prescribed during the initiation of a patient's treatment protocol, but most patients switch to 90-day supplies thereafter. This irregularity suggested that DrugPlace's data were fraudulent and did not correspond to real prescriptions.

92. In addition, every single rebate claim was for a patient's ***initial*** fill of the medication or for their ***first*** refill. Not a single claim corresponded to even a second refill. Again, for insulin in particular, this made no sense: diabetes is a chronic condition, and patients with diabetes typically do not suddenly stop taking or filling their insulin prescriptions after a single refill. It was highly implausible for an entire patient base to consist of patients with diabetes filling their prescriptions for the first or second time, which is irreconcilable with known prescription trends for comparable, non-COGIC populations. This irregularity, too, suggested that DrugPlace's data were fraudulent and did not correspond to real prescriptions.

93. Lilly shared these concerns, among others, with DrugPlace. Lilly notified DrugPlace that, due to the magnitude of aberrant rebate claims, it was disputing all of DrugPlace's Q2 2015 rebate submissions and would be suspending any future rebate payments until the dispute was resolved by a formal audit of DrugPlace.

94. In October 2015, Lilly auditors requested an on-site audit of DrugPlace's corporate headquarters in Hollywood, Florida for two full days, to be followed by an audit of DrugPlace's distribution center in Nashville, Tennessee.

95. Eventually, after weeks of negotiation, Singer agreed that a Lilly audit team would be permitted to visit both sites and review a sample of rebate submissions; data showing receipt, dispense, and utilization for each corresponding medicine; and other information related to DrugPlace's pharmacy operations and the Community Health program design.

96. In November 2015, the Lilly auditors traveled to the 1930 Harrison Street address in Hollywood, Florida to audit DrugPlace's corporate headquarters. The headquarters were located in a small office building, which also contained offices for several other businesses associated with the DrugPlace Officers. The suite for DrugPlace's headquarters was labeled with a nondescript "Corporate Office" sign. It consisted entirely of one small conference room, with a back office attached. It looked nothing like the hub of a multimillion-dollar operation responsible for administering health benefits and dispensing medication for hundreds of thousands of patients.

97. Upon arrival, the Lilly audit team was met by Defendant Singer and Defendant Daniel Hoffner, DrugPlace's office manager at the time. Defendant Readus Smith, the head of Community Health and Director of Health for the Church, also joined them.

98. The DrugPlace representatives purported to explain DrugPlace's business model. They claimed there were 1.2 million members of the Church eligible for the Community Health program benefit. However, neither Singer, Hoffner, nor Smith was able to define the eligibility requirements. Smith said eligibility usually depended on the member being in good standing with the Church, but could not offer any further detail.

99. When Lilly sought to inspect DrugPlace's records—the very reason for the audit—Smith repeatedly deflected Lilly's requests, continually providing generalities about the Church's mission rather than specifics about Community Health's and DrugPlace's operations.

100. Smith said that the prescribers for most prescriptions are individual physicians who have agreed to work with Community Health, and their identities are highly confidential. He claimed that only three people had ever seen the list of these prescribing physicians. This was highly suspicious, as prescriber information is standard information in the healthcare industry that is required to be collected and maintained by pharmacies and is routinely included in health insurance claims.

101. When Lilly's auditors returned the next day to continue the audit, the DrugPlace representatives provided small batches of prescription-level records for review. These records were in the form of printed-out screenshots of DrugPlace's electronic pharmacy management software purporting to show the filling and dispensation of medication. Lilly was never provided live access to that software, even though Singer had previously agreed to allow a real-time review to evaluate samples.

102. All of the screenshots were redacted to remove prescriber information, including name and NPI, at Smith's instruction. He claimed that the Church's "constitution" required this, which was highly unusual, since prescriber information is generally non-sensitive, and disclosure is not prohibited by state or federal law.

103. Nonetheless, Smith refused to allow the Lilly auditors to review unredacted versions. Without prescriber information, it was impossible for Lilly to verify the authenticity of the claimed utilization of dispensed medication on which DrugPlace's rebate claims were based.

104. Despite the inadequacy of the information provided to them, the Lilly audit team identified inconsistencies in the redacted prescription data, including inconsistencies between the prescribed volume of medicine and the filled volume. Smith could not explain these inconsistencies. Instead, he deflected and proceeded to show the audit team another small batch of screenshots. Some of the subsequent screenshots appeared to correct the inconsistencies between prescribed and filled volume that the auditors had identified in the previous batch. It appeared as though these supposedly exemplary records had been generated—and falsified—in real time.

105. Further complicating Lilly's attempt to validate DrugPlace's rebate submissions, DrugPlace had the unusual practice of assigning unique prescription IDs to every transaction (and sometimes, to every unit of measure within a transaction)—rather than a single, consistent prescription ID that lasts throughout the life of a patient's prescription, including all refills, which is standard. This made it impossible for DrugPlace to demonstrate based on the rebate data provided whether a fill was a first fill or refill, and which fills corresponded to a given prescription.

106. Given DrugPlace's inability to provide prescription-level records that supported its rebate claims, Lilly requested other evidence that the medications associated with DrugPlace's rebate claims had actually been shipped to patients—for example, records of shipping manifests or billing information from the shipping courier. DrugPlace refused to provide this information.

107. Later that week, Lilly auditors continued the audit at DrugPlace's distribution center in Nashville.

108. During this phase of the audit, DrugPlace again prohibited the Lilly team from accessing DrugPlace's pharmacy software system or any screenshots of utilization data for the

requested samples. Again, the auditors found this very unusual, since the information should be readily accessible, and there was no valid reason for DrugPlace's refusal to make it available.

109. Instead, the auditors were permitted to speak with two pharmacists, Stephen Webb and Jarrod Shirley. Shirley and Webb, the individuals closest to the prescriptions underlying the rebate claims, had no explanations for the extremely unusual prescription, dispensing, and utilization data underlying DrugPlace's rebate claims. One of the pharmacists verbally confirmed that the uniformity in medication quantities that DrugPlace listed in its rebate submissions to Lilly was inconsistent with his own experience filling prescriptions. As detailed below, Lilly has since learned that Shirley has been associated with other fraudulent schemes involving the individual Defendants in this action.

110. Since filing this lawsuit, Lilly has learned that in advance of Lilly's audit and site visit, Singer instructed Webb to withhold information from Lilly's auditors, "stall and run out the clock," and deliberately provide false information in response to their questions. In an email, Singer explained to Webb that Lilly would "have one guy who is a pharmacists [sic] – he HAS NEVER worked in mail order so you can make up crap."

111. Ultimately, Lilly's audit of DrugPlace was unable to confirm that ***any*** of DrugPlace's rebate claims were valid. In fact, given the anomalies in the aggregate data that DrugPlace did provide, and DrugPlace's steadfast refusal to provide the underlying data that it was required to retain as a licensed pharmacy, Lilly came away from the process with grave doubts about the legitimacy of DrugPlace, Community Health, and their respective operations.

112. As a result, Lilly did not seek to renew the parties' rebate agreement, and it expired the following month.

### B. Unbeknownst to Lilly, DrugPlace Continued and Expanded Its Fraudulent Scheme

113. In 2025, as detailed below, Lilly discovered that, since at least 2020, DrugPlace had been the source of an enormous volume of rebate claims, concealed through multiple layers of middlemen to circumvent Lilly's decision not to do business with DrugPlace. This time, the rebate claims were based on purported utilization of a single, different diabetes medicine: Trulicity.

114. The volume of these rebate claims is stunning. Since 2020, DrugPlace had submitted, through intermediaries, rebate claims for hundreds of thousands of boxes of Trulicity, seeking more than $250 million in fraudulent rebates—an average rate of over $40 million per year. At their peak, DrugPlace-affiliated rebate claims corresponded to nearly $75 million worth of Trulicity per year.

115. These rebates supposedly corresponded to hundreds of thousands of boxes of Trulicity that DrugPlace purchased from licensed wholesalers during the same period.

116. Lilly's investigation into the DrugPlace Conspiracy, however, has confirmed that DrugPlace did not function as a legitimate pharmacy that dispenses Trulicity to patients—at least not in anywhere near the volumes it claimed.

117. Instead, DrugPlace, in conjunction with affiliates including Nakorn and Brightline, operated as a de facto unauthorized secondary ***wholesaler*** of Trulicity. DrugPlace purchased Trulicity from wholesalers and resold it on the secondary market. Meanwhile, DrugPlace submitted, through intermediaries, fraudulent rebate claims to Lilly for hundreds of millions of dollars, as if DrugPlace had operated as a pharmacy and actually dispensed the medicine to patients.

### 1. Lilly Discovers That DrugPlace Has Been Submitting Large Volumes of Rebate Claims through Middlemen

118. Lilly was first alerted to DrugPlace's recent Trulicity claims through a data analysis of rebate claims. As explained above, due to privacy, contractual, and operational constraints, it is Lilly's commercial practice to allocate responsibility for the review and accuracy of rebate data to the parties that submit and process it, in particular PBMs. As a further layer of protection, Lilly also performs targeted reviews and analyses of various data sources associated with the sale and distribution of its medicines, for reasons including identifying potential fraud. This includes review of rebate claims for brand-name drugs that PBMs submitted to Lilly and for which the PBMs received payment.

119. The data available to Lilly is limited in scope. Lilly manufactures and distributes a vast amount of prescription medication each year, spanning dozens of medicines that are ultimately dispensed to tens of millions of patients nationwide through tens of thousands of individual pharmacies. But Lilly generally does not sell directly to pharmacies. Rather, Lilly sells its medicines to a limited number of wholesalers, who distribute a variety of pharmaceuticals sourced from multiple manufacturers to pharmacies throughout the country. Although Lilly has records of its own sales to the wholesalers with whom Lilly contracts to sell its products, also known as "authorized distributors," Lilly has limited ability to trace these products to individual pharmacies, and ultimately to tie them to the rebate claims that are submitted by PBMs after Lilly's medicines are prescribed and dispensed to patients.

120. To correlate sales data with prescription and rebate data, Lilly depends on reporting by downstream actors, which is not comprehensive. Furthermore, none of the data available to Lilly contains serialization information that would allow Lilly to trace a specific rebate claim to the original sale of that product. Historically, this has made it challenging to identify anomalous

trends in downstream sales, dispenses, and rebates, particularly among independent pharmacies and secondary wholesalers where the data available is more limited.

121. In 2025, Lilly discovered that, since 2020, DrugPlace had been submitting massive volumes of rebate claims for a single medicine, Trulicity, through a series of intermediaries to Lilly, which served to conceal their source.

122. The vast majority of those claims followed this pattern: DrugPlace submitted rebate claims to a single rebate aggregator called Health Delegates. These claims included data supplied by DrugPlace for each Trulicity prescription purportedly utilized and dispensed—namely, the corresponding Prescription Rx number, the Fill number, the Date of Service, the NDC code, Days Supply, Service Provider ID, the Dispensing Fee, and the Total Patient Pay Amount.

123. Health Delegates then submitted the claims to one of two major PBMs, Ascent Health Services ("Ascent") and Emisar Pharma Services ("Emisar"). Claims were submitted to Ascent from 2020 to September 2023, then to Emisar from October 2023 to 2025. The PBMs then submitted the rebate claims to Lilly for payment. Each of the rebate claims submitted to Lilly contained the utilization information that had been supplied by DrugPlace.

124. The fact that DrugPlace submitted its claims through Health Delegates obscured that DrugPlace was the source of these rebate claims and that DrugPlace and Community Health were driving an enormous volume of Trulicity utilization. Health Delegates, as rebate aggregator, collected and submitted to each PBM rebate claims associated with its many clients. When each PBM submitted that data to Lilly for payment, the rebate claims were attributed to Health Delegates—not each of Health Delegates' underlying clients—and obscured the suspicious fact that one of those clients, DrugPlace, was responsible for large volumes of rebates for just a single drug, Trulicity. This enabled DrugPlace to avoid Lilly's scrutiny for a number of years.

125. All of DrugPlace's rebate claims between 2020 and 2025 were reflected in rebate data files that Ascent and Emisar electronically transmitted to Lilly on a monthly or quarterly basis. Each data file consisted of hundreds of thousands of rebate claims that the PBMs received from their clients. Within those sets were tens of thousands of rebate claims that Health Delegates had submitted on DrugPlace's behalf to Ascent and Emisar, based on prescription-level data transmitted by DrugPlace to Health Delegates, detailed above.

126. Each data file received by Lilly from Ascent and Emisar exists in spreadsheet form. For each row (i.e., rebate claim), the spreadsheet contains dozens of different columns of inputs, including details about the dispensing pharmacy, the underlying prescription filled, and the client health plan covering the cost of the medicine. Each spreadsheet contains, and can be filtered by, rows corresponding to each of the tens of thousands of individual rebate claims associated with Lilly medicine purportedly dispensed by DrugPlace. As relevant here, the inputs in each such row include the following: the unique pharmacy identification number identifying DrugPlace as the dispensing pharmacy; the unique product identification number identifying Trulicity as the medicine purportedly dispensed by DrugPlace; the unique prescription identification number assigned by DrugPlace to the patient's prescription purportedly filled in the pharmacy sale transaction; the date on which DrugPlace purportedly filled the prescription; and the quantity and number of days' worth of Trulicity purportedly dispensed by DrugPlace to the patient. Except for the pharmacy ID, which is added by intermediaries when aggregating claims, all of these inputs were supplied by, and originated with, DrugPlace.

127. Each of the prescription-level inputs for the tens of thousands of Trulicity rebate claims contained in the quarterly rebate data file necessarily ***originated from DrugPlace*** as the dispensing pharmacy. Then DrugPlace, acting as PBM, electronically transmitted its own data

files containing those inputs to its rebate aggregator, Health Delegates, which in turn aggregated DrugPlace's data with other client PBMs and health insurance plans for submission to the PBMs and, ultimately, to Lilly to support fraudulent rebate claims.

**2. A Third-Party Audit of Emisar Indicates That DrugPlace's Rebate Claims Are Illegitimate**

128. In early 2025, Lilly exercised its contractual right to conduct an audit of Emisar. Lilly used a third-party auditor named BlackPoint Consulting Group ("BlackPoint"). When Lilly learned that DrugPlace had been submitting suspicious rebate claims (via Health Delegates) through Emisar since late 2023, Lilly requested that BlackPoint add those rebate claims to the audit's scope.

129. BlackPoint did not audit DrugPlace directly and, therefore, did not have direct access to DrugPlace's underlying prescription records. The scope of BlackPoint's audit was limited to analyzing the DrugPlace rebate data that Health Delegates submitted to Emisar.

130. Nevertheless, BlackPoint's audit raised serious questions about the legitimacy of DrugPlace's rebate claims. BlackPoint's audit of DrugPlace's rebate claims focused on one quarter of data, from Q4 2023, and compared the rebate claims to a large sample of PBM claims for utilization by members of over 100 health plans during the same period. BlackPoint concluded that rebate claims submitted on DrugPlace's behalf in Q4 2023 exhibited numerous aberrant patterns far outside the norm. Many of the anomalies mirrored those that Lilly had observed in DrugPlace's earlier rebate data ten years prior.

131. For the tens of thousands of rebate claims submitted by Health Delegates for DrugPlace's utilization during the review period, BlackPoint found the following:

a) All of DrugPlace's rebate claims corresponded to dispenses and utilization of just one Lilly medicine, Trulicity. By contrast, the rebate claims submitted by other health plans corresponded to dispenses and utilization of seven different Lilly medicines on average.

b) None of DrugPlace's rebate claims reflected a reversal adjudication. Reversals refer to instances where a pharmacy fills a prescription and adjudicates it for rebate purposes, but then the product is not dispensed pursuant to that transaction—most often because the patient ultimately fails to pick up the medication. In that situation, the medication is returned to stock, and the pharmacy must amend its earlier adjudication to reflect a reversal of its rebate claim. Reversals are common in rebate claims data. Data from other plans and pharmacies showed an average reversal rate of approximately 15%. Claims submitted by DrugPlace, however, showed a reversal rate of 0%.

c) All of DrugPlace's rebate claims showed that—without exception—Trulicity prescriptions were filled for a single, uniform quantity of 2 mL, which corresponded to one box of four single-use injectable pens. The rebate claims submitted by other health plans had an average of five different dispense quantities listed.

d) All of DrugPlace's rebate claims showed that—without exception—Trulicity prescriptions were filled for a single, uniform supply period of 30 days. The reality of differing patient needs and physician prescribing practices show this pattern to be a clear outlier: the rebate claims submitted by other health plans had an average of 11 different supply periods listed.

e) All of DrugPlace's rebate claims for Trulicity were associated with a unique prescription number, meaning that every single dispense was coded as a first fill rather than a refill. This indicated that, despite uniformly filling prescriptions for a 30-day supply of Trulicity, DrugPlace dispensed exactly one fill per patient—and zero refills—across any of the tens of thousands of prescription fills spanning three months (i.e., roughly 90 days) of patient treatment. By contrast, data from other plans showed an average of 1.61 fills of Trulicity per patient within that same three-month period.

f) All of Health Delegates' rebate claims corresponded to prescriptions filled at just one pharmacy, DrugPlace. By contrast, the rebate claims submitted by other health plans corresponded to prescriptions filled, on average, at over 2,000 pharmacies.

132. Lilly conducted further review and analysis of all of DrugPlace's rebate claims from 2020 to 2025. Lilly determined that the anomalies BlackPoint identified for Q4 2023 were apparent in DrugPlace's rebate claims for the ***entire period of 2020 to 2025***. In particular, ***all*** of the rebate claims that DrugPlace submitted through its PBM intermediaries were for the exact same supply period and quantity of Trulicity: a 30-day supply consisting of 2 mL (i.e., a box of

four single-use injectable pens)—without exception. Furthermore, all DrugPlace's rebate claims during that period were associated with a unique prescription number and, therefore, indicated a first fill rather than a refill. And for all but three quarters within this period, DrugPlace's quarterly reversal rate was 0%.

133. Individually, each of these anomalies is inconsistent with legitimate rebate claims. Collectively, they constitute compelling evidence that DrugPlace's rebate claims did not correspond to legitimate prescriptions dispensed to patients, and that the underlying data was fabricated wholesale.

### 3. DrugPlace's Responses to the Audit Are Not Credible

134. In response to BlackPoint's audit, Lilly received explanations through intermediaries, originating from DrugPlace, that purported to address or justify the anomalies BlackPoint had identified in DrugPlace's data. But these purported explanations only cast further doubt on DrugPlace's legitimacy.

135. Regarding the uniform prescription quantities and supply periods, DrugPlace claimed that a 30-day supply of one box of four injectable pens was the only amount that Community Health members were permitted to fill at DrugPlace under Community Health's prescription cost share program. But there is no credible reason why DrugPlace and Community Health would limit their formulary in this way. It is inconsistent with how physicians prescribe medication and how pharmacies log and fill those prescriptions. And there are no cost savings to be gained by covering only a 30-day supply of Trulicity as opposed to, for example, a 90-day supply. Moreover, as discussed below, Lilly has since received copies of DrugPlace's formularies showing that Community Health members in fact were ***not*** limited to 30-day supplies and were permitted to fill 90-day supplies at DrugPlace. But according to DrugPlace's data, none ever did—even though patients with diabetes routinely do so.

136. Regarding the absence of refills in DrugPlace's rebate claims, DrugPlace claimed that its adjudication system automatically generates a new unique prescription number for each fill of a prescription and that, as a result, all refills appeared in DrugPlace's system as first fills. But this type of system is highly unusual since it would expose the pharmacy to legal risks and there is no good reason why a legitimate pharmacy would fail to accurately collect refill data as a matter of course and to do so at the claims level.

137. Standard pharmacy retail prescription tracking systems track how many refills remain per patient. This centralized tracking is essential for fraud, waste, and abuse prevention, as it ensures refill limits are followed consistently and in real time, in accordance with applicable state and federal laws and regulations governing pharmacies, and in order to provide appropriate patient care. DrugPlace's alleged practice deviates sharply from the recordkeeping standards of other pharmacies that dispense Lilly products and cause rebate claims to be submitted for those products, and would make it exceedingly challenging, if not impossible, for DrugPlace to comply with applicable laws and regulations, such as state Board of Pharmacy rules requiring pharmacies to record and maintain certain data for every prescription or medical order they dispense.[2] It would also present a significant risk to patient safety, as it would interfere with pharmacists' ability to track a patient's refills and drug interactions and counsel patients accordingly. There is simply no good reason for a legitimate pharmacy—one purportedly processing tens of thousands of prescriptions per month—to fail to collect refill data as a matter of course.

---

[2] These required data include, for example, (a) refill history showing each refill authorization and every refill dispensed, including the date of dispensing and the quantity dispensed for both the original fill and subsequent refills; and (b) the identity of the dispensing pharmacist for the original dispensing and for each refill, typically through initials, a name, or a unique identification code maintained in the paper record or electronic audit trail. Tenn. Comp. R & Regs. 1140-03-.03 (2026).

138. DrugPlace's former pharmacist testified that DrugPlace's system did not automatically generate a new unique prescription number for each fill of a prescription. Rather, the system used the same base prescription number and only the last two digits changed to reflect a first fill versus a refill (e.g., -00 indicated an initial fill, -01 indicated a first refill, and so on).

139. DrugPlace's rebate claims data for Q4 2023 was later resubmitted with unique patient identification numbers and dates of first fills, allegedly for the purpose of allowing BlackPoint to separate first fills from refills—even though DrugPlace's computer systems purportedly do not record this information. The resubmitted data showed that, even by DrugPlace's account, ***84%*** of all Trulicity prescription fills in Q4 2023 were first fills. Second and third fills accounted for less than 16% and less than 0.1%, respectively, and there were no fills beyond third fills. These trends are inconsistent with general prescribing and treatment trends for Trulicity.

140. Regarding the absence of reversals in DrugPlace's rebate claims, DrugPlace claimed to submit "net paid claims only" and therefore removed any reversals from its data. However, in Lilly's experience dealing with rebate data submitted from a variety of PBMs, this is highly unusual. Reversals often occur after PBMs have submitted rebate claims to a manufacturer for a given period and are by necessity reflected in the data for the next period. Ordinarily, a pharmacy that was actually filling prescriptions and dispensing large volumes of medication on an ongoing basis will show some reversals in the rebate claims data submitted by the PBM.

141. DrugPlace also provided intermediaries screenshots of its purported prescription management software, which purported to represent a sample of prescriptions for Trulicity had been dispensed to COGIC patients in 2024. Lilly only obtained these after filing this lawsuit. The

redactions in the screenshots removed any information that could be used to validate patient or prescriber identities, as well as basic prescription information such as frequency and Rx expiration.

142. Former DrugPlace pharmacist Ms. Renfro testified at her deposition that these screenshots could not possibly correspond to actual DrugPlace prescriptions from 2024. She explained that the prescription management software depicted in the screenshot hadn't been used by DrugPlace since at least 2016. There was only one computer in the pharmacy that could still access that older software, but the computer was never on, and the pharmacists didn't have access to it. She further testified that she had no idea who had redacted the screenshot provided by DrugPlace.

143. To date, Lilly has not received ***any*** underlying records that could be used to corroborate the authenticity of DrugPlace's rebate claims.

144. After BlackPoint released its audit results, Lilly pressed for more information about DrugPlace's rebate claims. Among other things, Lilly requested from DrugPlace and its intermediaries the name, NPI, and contact information for the physician corresponding to each prescription fill; DrugPlace's unique patient identification number corresponding to each prescription fill; and copies of the underlying prescriptions corresponding to the rebate claims—all of which would assist Lilly in verifying the legitimacy of DrugPlace's claims. Lilly further requested details about the plan and formularies that DrugPlace administered. However, no one has produced any records showing that DrugPlace's rebate claims correspond to real prescriptions written by doctors and dispensed to patients.

### C. DrugPlace's Rebate Claims Are Confirmed to Be Fraudulent

145. Evidence that has emerged since this action was filed confirms that the DrugPlace Defendants perpetrated a massive fraudulent scheme. The claimed prescriptions never existed, and the pharmacy benefits programs Defendants purported to serve were fake.

#### 1. DrugPlace Filled Only a Handful of Trulicity Prescriptions Each Year And Had No Connection to a Prescription Cost Share Program for COGIC Members

146. Since filing its initial complaint, Lilly deposed two DrugPlace pharmacists. Both testified that they had personal knowledge of DrugPlace's dispenses during the relevant time period. Both confirmed that DrugPlace did not dispense anything remotely approaching the number of Trulicity prescriptions for which it sought and obtained rebates.

147. Allison Supko, former pharmacist-in-charge from 2022 to 2026, testified under oath that DrugPlace filled an average of only one prescription of Trulicity per month. This is directly contrary to DrugPlace's representations that it filled hundreds of thousands of Trulicity prescriptions. In fact, in an average month, DrugPlace filled fewer than 100 prescriptions, in total, of any medication. Supko also testified that DrugPlace could not have filled prescriptions for Trulicity without her knowledge.

148. Another former DrugPlace pharmacist, Laura Renfro, similarly testified that from 2020 through 2026, DrugPlace had fewer than ten Trulicity patients per year and did not fill more than 50 Trulicity prescriptions in any given year. When shown records purporting to be from 2024 that Defendants had previously offered as evidence of DrugPlace's prescriptions and dispensations of Trulicity, Renfro testified that those documents did not even come from the prescription management system that DrugPlace used at the time, and rather were from the system the pharmacy had stopped using *years* earlier. Like Supko, Renfro confirmed that DrugPlace could not have filled prescriptions without her knowledge.

149. Contrary to the representations in the DrugPlace data, both pharmacists testified that they commonly prescribed refills for medicine, and that prescriptions were often filled in 90-day supplies.

150. The pharmacists' testimony also strongly suggests the Community Health prescription cost share program never existed in anything like the form that the DrugPlace Defendants claimed.

151. Ms. Supko testified that she had never heard that DrugPlace was affiliated with a Church of God in Christ formulary, had never heard of any formularies or prescription cost share programs associated with Community Health, and had never heard of any relationship between DrugPlace and COGIC. When shown DrugPlace's representations that DrugPlace was the exclusive pharmacy for Community Health Initiative, she flatly refuted it. She testified that as pharmacist-in-charge, had DrugPlace in fact been the exclusive pharmacy for Community Health Initiative, she would have known it. She never dispensed any Trulicity prescriptions to members of any Community Health Initiative prescription cost share plan and no patient ever represented themselves to be a member of a prescription cost share program associated with Community Health Initiative. Ms. Supko did not recognize any of the purported COGIC/CHI plan documents that the DrugPlace Defendants had provided to Lilly.

152. Ms. Renfro also testified that no patient ever represented themselves as a member of a prescription cost share program associated with COGIC, that she never heard of the COGIC Community Plan, a DrugPlace formulary, or a CHI prescription cost share plan, and that Community Health Initiative never covered the costs of any medicine dispensed by DrugPlace. Like Ms. Supko, Ms. Renfro was unfamiliar with any of the COGIC plan documents.

153. COGIC, for its part, has denied the purported affiliation with DrugPlace ever existed. After the complaint was filed, COGIC publicly confirmed that it had "no knowledge" of the acts described in the complaint and did not "knowingly participate[] in, authorize[], or condone[] any of the alleged fraudulent activity described in the lawsuit."

**2. Community Health's Documentation and Public Footprint Belie Its Claim to Be a Large Health-Benefits Program**

154. The pharmacists' testimony is direct evidence confirming that the purported Community Health and DrugPlace program was a complete scam and a front for fraud. Even prior to this testimony, the scant available information about the Community Health/DrugPlace operation revealed a program that was highly inconsistent with a legitimate plan dispensing the purported volume of Trulicity to patients.

155. Prior to filing suit, Lilly obtained a series of documents purporting to lay out the details of the program administered by DrugPlace: Community Health's "Prescription Cost Share" program. Those documents appeared to have been hastily put together in response to Lilly's request and lacked basic information about the program. They are printed on the Community Health Initiative letterhead, with a Community Health logo. They are completely inconsistent with the operation of a legitimate health plan serving hundreds of thousands or millions of members, as Community Health and DrugPlace assert.

156. DrugPlace's documentation of its eligibility criteria and purported program design amounted to a two-page document consisting of a handful of informal bullet points on each topic. According to those bullet points, only members of the Church may participate in Community Health's "Prescription Cost Share" program. To be eligible, a "[c]hurch member approaches his or her [Church] pastor/bishop with a request for assistance from Community Health for prescription medication costs," and "the pastor/bishop makes the determination [whether] the

member who is seeking this assistance is in 'good standing'" with the Church. The bullet points further explain that "[g]ood [s]tanding is determined by the church [pastors/bishops] themselves" in their sole discretion, and DrugPlace as program administrator and PBM "plays no role in that determination." The Church reevaluates Community Health program members "every month in order to verify that they all are still a member in good standing" with the Church.

157. The program documents contain minimal information about how the medicines are paid for. Community Health purportedly offers members a "community-based way to help pay for prescription medicines without traditional insurance" and uses DrugPlace as its exclusive pharmacy to facilitate that program. According to documents initially provided to Lilly, a member pays DrugPlace a "co-share," but no information about the size of this co-share was provided.

158. The program documents also state that Community Health will reimburse DrugPlace for the difference between the drug's Wholesale Acquisition Cost ("WAC") and the member co-share minus the manufacturer's rebate, plus a fill fee. This supposed reimbursement model is highly unusual, because health plans typically do not key their reimbursement off a drug's WAC, which is the manufacturer's list price to wholesalers and direct purchasers for a given drug. Rather, they reimburse based on a drug's wholesale price, which is typically 20% above WAC. Moreover, a legitimate pharmacy would not permit a health plan or program to subtract rebates from the reimbursement it remits to the pharmacy, which would require the pharmacy—rather than the plan or program—to bear the financial risk if the rebate claim is rejected or deemed ineligible for any reason.

159. When Lilly noted that the documents contained no details about the economics of Community Health's program, DrugPlace provided different versions of its program documents with information about co-shares—now referred to in the documents as "co-payments" and "co-

pays"—added. The metadata of those additional documents showed that the underlying Microsoft Word files were last edited on November 26, 2025 (shortly after Lilly noted the deficiency), the PDF documents were created that same day, and that they were authored and/or compiled by Defendant Daniel Hoffner. According to those documents, the member co-pay for a 30-day supply of medications in Community Health's preferred tier of brand name drugs, including Trulicity, is $40.

160. Critically, the documents do not explain how Community Health actually covers the balance of the cost of medicines that DrugPlace purportedly dispenses to Community Health members by DrugPlace. Prescription cost sharing programs typically rely on member contributions akin to premiums to cover the cost of members' drugs, but notably, none of the documents provided to Lilly mentions any contributions that members must pay to participate in the Community Health program. Apart from the putative copay, which accounts for only a fraction of the acquisition cost, the documents contain no information at all about how the covered medicines are supposedly paid for. No additional information about the prescription cost share program is publicly available. None of DrugPlace, Community Health, or the Church maintain a website that provides any significant information about the purported Community Health program. Community Health has no website at all. DrugPlace and the Church have outdated webpages that do not even mention Community Health or any purported prescription cost share program. This is highly suspicious for a healthcare program that purports to cover hundreds of thousands of patients and pay for hundreds of millions of dollars' worth of prescription medicines

### 3. Incredible Claims of Funding by Community Health and the Church

161. Shockingly, when pressed for more information about the basic economics of Community Health's Prescription Cost Sharing program, DrugPlace's intermediaries told Lilly that participants in Community Health's program do not pay premiums or make any member

contributions. Instead, beyond the small co-pays, Community Health purportedly finances all medication purchases through charitable donations and unspecified federal grant money. This is completely implausible.

162. Federal grants are a matter of public record. The federal government does not report having ever provided a grant to Community Health, and since 2008, the only reported federal money provided to the Church is a $1.3 million loan for pandemic assistance.

163. Non-profit organizations also have public reporting obligations. But despite claiming to be funded solely by charitable donations and public grants, Community Health is registered as a ***for-profit*** corporation, not a non-profit organization. As for the Church, there is no public record of charitable donations anywhere near large enough to pay for the volume of medicine that DrugPlace purports to dispense on an annual basis. For example, the Church's 2024-2025 national budget shows that the Church expected only $1.3 million total in donations; yet, in the same year, Community Health would have incurred net costs of ***tens of millions of dollars*** in connection with just DrugPlace's purported Trulicity dispenses, before considering any other medicines purportedly dispensed to patients. There simply is no support for the funding levels claimed by Community Health.

### 4. The Community Health/DrugPlace Formulary Indicates Fraud

164. Lilly has also obtained copies of Community Health/DrugPlace formularies (lists of covered medicines) purportedly in effect for 2023, 2024, and 2025. The documents are deficient on their face and further confirm that DrugPlace is engaged in fraud.

165. To start, the formularies contain various errors—such as typos, formatting problems, blank pages, and a phone number that does not work—suggesting that they were hastily put together and not the work product of a legitimate health plan providing coverage for hundreds of millions of dollars in Trulicity prescriptions alone. The metadata associated with the most recent

formularies indicated that they were last modified in Microsoft Word and exported to PDF only days before being sent to Lilly.

166. Furthermore, as explained above, although DrugPlace has claimed that all Trulicity prescriptions it filled over a four-year period were uniformly for a 30-day supply because that was the only amount the prescription cost share program allowed it to fill, Community Health/DrugPlace's formularies say exactly the opposite. According to the 2024 and 2025 formularies (but not the 2023 version), brand-name drugs like Trulicity are explicitly eligible either for a 30-day or 90-day supply, with the former subject to a $40 co-pay and the latter subject to $90 co-pay reflecting patient cost savings through 90-day supplies. Yet, despite the savings available to patients, rebate claims associated with DrugPlace show no 90-day supplies of Trulicity dispensed.

167. Moreover, while formularies typically are detailed and contain long lists of covered medications reflecting the varied needs of patients, the Community Health/DrugPlace formularies are short—ranging between two and four pages—and contain roughly 25 types of drugs that correspond to under 60 total covered brand-name medicines. By contrast, there are over 20,000 prescription drugs approved by the FDA.

168. The formularies also are notably limited in the types of medicines offered. For example, Community Health purports to serve a community of low-income, uninsured members among whom there is a high incidence of diabetes. However, with the exception of a single medicine on the 2024 formulary, the formularies generally do not list a single covered insulin medicine. Yet the formularies list upwards of 19 covered non-insulin diabetes medicines.

169. Given DrugPlace's limited formulary, the Community Health program would be of limited value to patients, who may encounter health conditions requiring medicines that

Community Health does not cover. Patients needing prescription drug coverage typically benefit from access to a broad range of covered medicines, rather than the handful of medicines listed on the Community Health/DrugPlace formulary. The factor uniting the drugs on DrugPlace's formulary is the size of the manufacturer rebates they command, not patient need. DrugPlace's formulary is deliberately constructed to include only branded medicines that are eligible for relatively higher rebates. By purporting to cover a limited number of medicines offering comparatively higher rebates, DrugPlace maximizes its collection of payments for products.

### 5. The Church Does Not Have Enough Members to Account for DrugPlace's Trulicity Volume

170. In an effort to justify its enormous Trulicity volumes, which Lilly has now confirmed are fabricated, DrugPlace has claimed that the Church had 7 million members and, of that total, 2.5 million members purportedly "qualified" for enrollment in the Community Health program. This was a similar story to the one that DrugPlace and Community Health had told Lilly in 2015, when its rebate volumes were orders of magnitude smaller, yet still could not be authenticated in an audit. These claims are not credible and, apart from the Church's own website, they are not corroborated by any published source.

171. In the first place, according to the Pew Religion in America 2025 survey—the leading survey of religion in the U.S.—the ***total*** number of COGIC adherents is estimated to be only about 1.9 million individuals, or 0.7% of the U.S. adult population.

172. Moreover, Community Health's prescription cost share program is purportedly available only to church members who do not have commercial or governmental insurance. Thus, only a small fraction of the Church's membership would meet Community Health's eligibility criteria. Based on the Church's demographics and health insurance statistics, the expected number of potential Community Health members meeting those criteria was less than 210,000 in 2024.

173. Further, not all Community Health members have diabetes or are prescribed to take a GLP-1 such as Trulicity. Adjusting for the portion of Community Health members expected to be diagnosed with diabetes and the fraction of such diagnosed members who use GLP-1s and Trulicity specifically, the expected number of Community Health members prescribed Trulicity is roughly ***1,700 members*** in total.

174. Even under the extremely conservative assumptions that all uninsured Church members participate in the Community Health program, and that all Community Health members prescribed Trulicity adhere to their full-time treatment plan and use the product for 52 weeks per year, DrugPlace's purchases of Trulicity in a given year are over ***five times*** the expected demand of relevant Community Health members. Alternatively, if one assumes that Community Health members prescribed Trulicity follow to the national average for adherence—which is less than 52 weeks—of therapy, then DrugPlace's purchases of Trulicity in a given year are approximately ***eight times*** the expected demand. Neither scenario is plausible.

**D. Lilly Identifies Galaxy and Its Affiliates as an Additional Source of Suspicious Rebate Claims**

175. In the course of investigating DrugPlace's rebate claims, Lilly identified a Texas-based pharmacy, Defendant Galaxy, that became associated with suspicious rebate claims for Trulicity in July 2024. Rebate submissions based on utilization data from Trulicity dispensed by Galaxy followed a pattern strikingly similar to those of DrugPlace. The rebate claims were first submitted to Health Delegates, the same rebate aggregator that DrugPlace used. The rebate aggregator then submitted rebate claims for that utilization to Emisar—the same PBM used by DrugPlace—and Emisar then submitted the rebate claims to Lilly for payment. As with DrugPlace, these rebate claims were associated with a purported prescription drug cost share

program operated by a religious organization—in this case the Texas Chapter of the National Hispanic Christian Leadership Conference ("NHCLC").

176. The Galaxy-associated rebate claims for Trulicity also stood out for their sudden expansion. For the eighteen months between January 2023 and June 2024, Lilly paid only several thousand dollars total in rebates for Trulicity purportedly utilized by Galaxy patients. In the six months that followed, however, claims for Galaxy-associated rebates began to be submitted through DrugPlace's rebate aggregator, and the volume of Trulicity rebate claims surged. Between July and December 2024 alone, Lilly paid nearly $2 million in rebate payments for Trulicity allegedly dispensed by Galaxy, which amounts to a nearly 19,000 percent increase from the prior eighteen-month period. These rebate claims continued to be submitted in 2025.

177. The rebate claims for Trulicity utilization dispensed by Galaxy featured many of the same anomalies found in DrugPlace-associated rebate claims. Beginning in July 2024, all of these rebate claims were for the exact same supply period and quantity of Trulicity: a 30-day supply consisting of 2 mL (i.e., a box of four single-use injectable pens), without exception. Furthermore, all of those rebate claims were associated with a unique prescription number that indicated a first fill rather than a refill. And since July 2024, the utilization data underlying these rebate claims showed a reversal rate of 0%. As noted above, all of these were true of DrugPlace's rebate claims as well, and none of them is consistent with authentic claims.

178. Further investigation confirmed that Galaxy is affiliated with DrugPlace and its owners and principals. For example, Galaxy's corporate registration lists DrugPlace's former Florida address—1930 Harrison Street in Hollywood, Florida—as Galaxy's own mailing address. Moreover, Galaxy is owned by Defendant Mazei, who has numerous ties to Defendants Leight and Singer. In addition to the shared Hollywood, Florida address for Galaxy, Mazei is also

involved in other business ventures with Leight and Singer in Fort Lauderdale. TPE lent money to Mazei personally and has a security interest in Mazei's ownership stake in Galaxy. Leight and Singer also lent money to Galaxy through Funding Source International, LLC, one of their many companies, and had a security interest in Galaxy's assets. At the time the lien was filed, Funding Source International was located at 1930 Harrison Street, Ste. 605, Hollywood, Florida, and has since moved to 3900 SW 30th Ave, Fort Lauderdale, Florida. Both of these addresses are affiliated with DrugPlace, Leight, and Singer.

179. Unlike DrugPlace, Galaxy did not receive rebate payments directly from Health Delegates. Rather, rebate payments from Health Delegates associated with claims submitted by Galaxy totaling at least $14 million were deposited into a bank account held in the name of Defendant TPE. Part of these funds were then swept into Leight-controlled accounts.

180. Through its investigation, Lilly obtained a formulary for the NHCLC prescription cost share program associated with the rebate claims for which Galaxy was the dispensing pharmacy. The formulary closely resembled DrugPlace's formulary, down to its formatting, brevity, and specific medicines listed. Moreover, the metadata for the welcome brochure and eligibility requirements for the NHCLC program indicated that they were scanned on the same exact scanner model as the Church's welcome brochure documents. Further evidencing the hasty preparation of these documents, the welcome brochure for NHCLC's prescription cost share program had unfilled placeholders for a phone number and email address that program members were supposed to contact with questions.

181. Like DrugPlace, Galaxy is closely affiliated with a secondary wholesaler, Defendant Brightline. Galaxy and Brightline are both owned by Mazei, and Brightline's corporate registration lists another one of DrugPlace's Florida addresses—the 3900 SW 30th Ave address in

Fort Lauderdale, Florida—as Brightline's own mailing address. Defendant Giscombe, one of the registered pharmacy technicians at Galaxy, also serves as Brightline's Pharmaceutical Wholesale Manager. Galaxy and Brightline are also listed as co-debtors in a December 10, 2024 UCC financing statement filed with the Texas Secretary of State by First Horizon Bank.

182. Based on the parallel operations and close affiliations between DrugPlace and Galaxy alleged above, it is clear that Galaxy and Brightline were running the same scheme as DrugPlace, working in conjunction with a PBM to submit fraudulent rebate claims, through intermediaries, for Trulicity that was not utilized by patients but rather sold on the secondary market. Galaxy, Brightline, and their co-conspirators may be referred to hereinafter as the "Galaxy Operation."

183. Since the filing of Lilly's original complaint, NHCLC, the church organization whose prescription drug program the Galaxy Operation claimed to partner with, confirmed that it was "shocked" to hear of Defendants' assertions, as it has no prescription drug program and no relationship with Defendants, and indeed, has never operated, administered, or affiliated with any such pharmacy program, prescription drug benefit program, prescription cost share program, or healthcare sharing ministry involving the dispensation of pharmaceutical products. NHCLC also declared in a sworn statement that it (1) had no knowledge of Galaxy, (2) had no "Texas Chapter" (which Galaxy purported to have partnered with), and (3) had no knowledge of any of the program documents referenced above or the formulary they describe. NHCLC declared that these documents had been fabricated.

**E. The DrugPlace Entities Resell Trulicity and Other Medicines on the Secondary Market**

184. Discovery to date has confirmed that, rather than dispensing the medications to patients, as it claimed to be doing, DrugPlace transferred them to affiliated wholesalers like Nakorn

and Brightline, and then resold them on the secondary market. Lilly has also confirmed that the Galaxy Operation adapted and deployed a similar diversion scheme, using Brightline to divert the medications Galaxy purchases and purportedly dispenses to patients.

**1. DrugPlace's Sales on the Secondary Market**

185. Prior to the filing of the Complaint, Lilly learned from one of its wholesalers that an independent pharmacy had received Trulicity from a secondary wholesaler, and the pharmacy had traced the product back to the DrugPlace Entities. Lilly purchased other medications on the Community Health/DrugPlace formulary on the secondary market and learned, based on their pedigrees, that they had also originated from DrugPlace, Nakorn, and Brightline.

186. A drug pedigree is documentation of the drug's movement through the supply chain, identifying, from the time of initial purchase, who handled the drug, when it changed ownership, where it was shipped, and what product was transferred. This enables each party in the supply chain to verify that the drug is legitimate and has not been diverted, adulterated, or counterfeited.

187. The pedigrees from these purchases confirm that the DrugPlace Entities were reselling the medicines they purchase from manufacturers like Lilly on the secondary market.

188. For example, on April 23, 2024, DrugPlace purchased 200 boxes of Trulicity from one of Lilly's authorized distributors of its medications (hereinafter "Distributor A"). That purchase was assigned a unique invoice number by Distributor A. The next day, Nakorn sold the exact same number of boxes to Dockside Partners, LLC ("Dockside"), a secondary wholesaler located in Scottsville, Kentucky that sells exclusively on online marketplaces. Besides Trulicity, Dockside offers a number of medications on the DrugPlace and NHCLC/Galaxy formularies, often at a discounted rate. Dockside's product offering closely matches the selected set of drugs listed on DrugPlace's and NHCLC/Galaxy's formularies.

189. Dockside is closely connected with the DrugPlace Conspiracy: Dockside's corporate filing was signed by Laura Wolfe, the company controller for another secondary wholesaler in Kentucky called South Pointe. South Pointe is owned by Jarrod Shirley, the former DrugPlace pharmacist who met with the Lilly team during the 2015 DrugPlace audit. South Pointe shared an address with a prior Kentucky incorporation of DrugPlace that is now closed.

190. Dockside sold the boxes of Trulicity purchased from Nakorn to a retail pharmacy. The pedigree provided to the retail pharmacy for those boxes of Trulicity stated that they had initially been purchased by Nakorn from Distributor A on April 2024, under the same invoice number as Distributor A's sale to ***DrugPlace***. In other words, the pedigree falsely made it appear that Nakorn had purchased the Trulicity directly from Distributor A, and that it had never passed through DrugPlace.

191. The matching invoice numbers make clear that DrugPlace purchased the boxes of Trulicity from Distributor A, but then transferred them to Nakorn, which sold the boxes the next day on the secondary market.

192. Under relevant federal law regulating drug pedigrees, the transfer of medication requires the exchange of transaction information, transaction history, and transaction statements, and should have resulted in DrugPlace being listed on the medicine's pedigree as the original purchaser from Distributor A. However, the transfer between DrugPlace and Nakorn is not listed in the pedigree, and DrugPlace is not mentioned at all. There is no legitimate purpose for this unlawful omission, which appears designed to obscure DrugPlace's role in the sale and resale of this Trulicity.

193. To further confirm DrugPlace's and Galaxy's activities, Lilly made other purchases from secondary wholesalers with suspected ties to the DrugPlace Conspiracy—namely, of non-

Lilly medicines that also appeared on the DrugPlace or NHCLC/Galaxy formularies. These purchases confirmed that DrugPlace continued to purchase medicine from authorized distributors, transfer the items to Nakorn, and then resell them to Dockside.

194. The purchases also confirmed that Brightline also had been purchasing medications appearing on the NHCLC/Galaxy formularies and selling them to HealthSource Distributors—another secondary wholesaler that, like Dockside, resold those medications at a discounted price. This indicates that Galaxy and Brightline, like DrugPlace and Nakorn, engaged in intercompany transfers to sell prescription drug products on the secondary market.

195. Since filing this lawsuit, Lilly has confirmed that these transfers and purchases were happening in massive quantities—nearly $5 billion in secondary market transactions (including but not limited to sales of Lilly medicine) in a six-year period. HealthSource Distributors paid over $4.1 billion to Nakorn between 2019-2025 and over $176 million to Brightline between 2022-2025. Dockside also paid over $593 million to Nakorn between 2022-2025 and over $58 million to Brightline between 2023-2025. The Trulicity and other medications sold on the secondary market by DrugPlace/Nakorn and Galaxy/Brightline are sold at prices that are discounted from those at which DrugPlace or Galaxy purchased them from authorized distributors. That is, without fraudulent rebates, the DrugPlace Conspiracy loses money on every sale. This secondary market redistribution business is not economically viable by itself, and DrugPlace has no other, legitimate business to make up the difference. It makes economic sense only as a component of a rebate fraud scheme.

196. Before discovery had confirmed DrugPlace Defendants' massive resale business, surveillance conducted during Lilly's investigation of DrugPlace, Community Health, and Nakorn's premises also showed activity inconsistent with either a retail or mail-order pharmacy.

Multiple days of observation at the Tennessee location revealed just a handful of people coming and going from the office. There were neither customers coming to retrieve medications nor any indication of product being mailed to individual customers, such as FedEx or UPS trucks.

197. Rather, DrugPlace appeared to be distributing medication or other products to other pharmacies and medical practices throughout the Nashville area. This was discovered by following the trucks coming to and from DrugPlace's Nashville location and observing them deliver what appeared to be pharmaceuticals to other healthcare providers.

198. In May 2025, a Nashville Logistics truck backed into DrugPlace's delivery bay. After around twelve minutes at the delivery bay, the truck departed DrugPlace and drove to a courier service in Nashville called Courier Express. There, the truck driver unloaded what appeared to be a number of empty bins of various colors. The driver then loaded a pallet of red plastic bins into the truck and departed.

199. Over the course of the next four hours, Lilly's investigator observed the truck travel to Murfreesboro, Tennessee, a suburb of Nashville, and make deliveries to nine separate locations, each of which was either a health clinic, hospital, or pharmacy. At each stop, the truck driver delivered colored totes or cardboard boxes of pharmaceutical products to the clinic, hospital, or pharmacy. Some of these totes were labeled with the name of one of the authorized distributors that sells Trulicity and other Lilly products. Others were labeled with the names of specific medications. The truck then returned to DrugPlace.

200. Still shots from the investigator's surveillance video are below:







### F. Analysis of Bank Accounts Confirms Lilly's Allegations of Defendants' Massive Fraud

201. Bank records produced to date have confirmed Lilly's allegations of fraud. The records demonstrate that Defendants are not prescribing medicine to patients as they claim but rather are reselling them to pharmaceutical distributors on the secondary market. Indeed, the

records show that Defendants sold more than ***four and a half*** billion dollars' worth of prescription medication to secondary market wholesalers between 2019 and 2026.

202. The records further reveal that Defendants layered and concealed their fraudulent proceeds through a complicated series of transactions that have all the hallmarks of fraud, siphoning nearly ***a billion dollars*** to accounts controlled by individual defendants Paul Leight and Kevin Singer (millions of dollars of which was then transferred to third-party co-conspirators to conceal and reintegrate the funds), and more than a quarter billion dollars to American Express travel accounts that have yet to produce records.

203. Each month, tens or hundreds of millions of dollars flowed into DrugPlace's and Nakorn's bank accounts, and were then swept to other accounts in a complex web of transfers. For example, $270 million flowed in and out of a single DrugPlace account in December 2024 alone, including $25 million transferred to Defendant Kevin Singer's account ending in 4262, $25 million transferred to Defendant Paul Leight's account ending in 4199, and tens of millions more distributed to accounts that Lilly had no knowledge of prior to receiving the bank records.

204. The bank records also reveal that Defendants have laundered and concealed the proceeds of their fraud through transactions characteristic of illegal activity. While its forensic accounting of the financial records is still underway, Lilly has so far been able to locate at least $150 million in funds related to Lilly rebate claim proceeds. This money was then comingled with other funds, and layered and distributed among dozens of entities, the majority of which are controlled by individual Defendants Paul Leight and Kevin Singer. Nearly a billion dollars in total flowed to these Leight and Singer entities. These transactions have all the hallmarks of efforts to conceal and launder the proceeds of fraud.

### III. Each Defendant Participated in and Benefited from the DrugPlace Conspiracy

205. Each Defendant is indispensable to the DrugPlace Conspiracy's fraudulent rebate scheme and engaged in overt acts in pursuit of the conspiracy's objective of fraudulently extracting rebate payments from Lilly for Trulicity that was never dispensed, while reselling the medicine on the secondary market.

#### A. The DrugPlace Entities

206. The DrugPlace Entities acted together under common ownership and officers, and often times from a common facility or address, to carry out their fraudulent rebate scheme. Each of the DrugPlace Entities and DrugPlace Officers played a role in creating and maintaining the appearance that DrugPlace and Galaxy were legitimate pharmacies servicing only legitimate patients in connection with a legitimate prescription cost share program that would make DrugPlace's and NHCLC/Galaxy's utilization of Trulicity eligible for rebate payments from Lilly. These interconnected roles were designed to enable the DrugPlace Entities to fraudulently induce Lilly to pay rebates to PBMs, and to fraudulently secure for themselves many millions of dollars through their share in those rebate payments, on the pretense that the medication had been dispensed to and utilized by patients.

207. Specifically, DrugPlace purported to act as the exclusive pharmacy and PBM for the Community Health prescription cost share program affiliated with the Church. Similarly, Galaxy purported to act as the exclusive pharmacy for a prescription cost share program affiliated with NHCLC.

208. DrugPlace and Galaxy each purchased medication, including Trulicity, from pharmaceutical wholesalers for the stated purpose of filling those prescriptions for COGIC and NHCLC members on the Community Health and NHCLC prescription cost share programs, respectively. DrugPlace and the Galaxy Operation then caused rebate claims to be submitted for

the purportedly dispensed Trulicity, based on DrugPlace's and Galaxy's representations that the medication had in fact been dispensed to patients. They did so, among other ways, by listing a prescription number and fill date on each rebate claim. DrugPlace and TPE, on behalf of Galaxy, received payments of Lilly funds based on the representations made in the rebate claims.

209. But rather than dispensing that medicine to patients, DrugPlace and Galaxy sold most, if not all, of it on the secondary market. Their representations on rebate claims of having dispensed that medication, on a particular date, to an actual patient, are therefore false.

210. Many states, including Tennessee, require a license to sell or distribute prescription medicines. See Tenn. Comp. R. Regs. 1140-09.01. DrugPlace and Galaxy, which are licensed as retail pharmacies and not as wholesalers or distributors, cannot sell medications on the secondary market or to other pharmacies (except for extremely limited circumstances, such as to address an immediate patient need). Because they lack the required license to sell medicines, DrugPlace and Galaxy instead transfer the medication to their commonly owned wholesaler affiliates.

211. Typically, DrugPlace transferred the medications it purchased, including Trulicity, to its commonly owned company Nakorn, and Galaxy transferred the medications it purchased, including Trulicity, to its commonly owned company, Brightline. Nakorn and Brightline each had wholesaler licenses and purported to act as pharmaceutical wholesalers. Although they are required to list all transactions on the pedigrees accompanying the medications they sell, the DrugPlace Entities obscured their scheme by omitting the transactions from the pharmacies (DrugPlace and Galaxy) to the commonly owned wholesalers (typically, Nakorn and Brightline) on the pedigrees they provide to their downstream customers, effectively erasing DrugPlace and Galaxy from the chain of distribution and hiding their roles in the resale. Nakorn and Brightline, acting as licensed pharmaceutical wholesalers, then sold that medication on the secondary market.

212. Each individual Defendant is or has been an officer, supervisor, or employee at one or more DrugPlace Entities. As such, they were personally involved in running the DrugPlace Conspiracy, and they agreed to participate in and engaged in overt acts in pursuit of its objectives.

213. The DrugPlace Officers—Leight, Singer, Smith, Enriquez, Jerry Maynard Sr., Jerry Maynard II, Misha Maynard, Mazei, Giscombe, and Hoffner—as the owners, officers, and employees of DrugPlace, Nakorn, Galaxy, Brightline, TPE, and Community Health, directed and controlled the DrugPlace Entities, including devising, implementing, and enforcing policies and business practices that enabled the other Defendants to carry out the fraud. The proceeds of Defendants' fraud flowed to the DrugPlace Officers and others.

**B. The Individual Fraud Defendants**

214. Defendants Leight, Singer, Mazei, Hoffner, and Smith have together orchestrated the DrugPlace Conspiracy. Defendants Leight, Singer, and Mazei have ownership interests in the DrugPlace Entities and are the driving force behind devising and advancing the fraudulent rebate practices. Defendants Leight and Singer directed the submission of rebate claims through the DrugPlace Entities and managed the DrugPlace Conspiracy's relationships with other healthcare participants, including the rebate aggregator, PBMs, manufacturers, and secondary wholesalers. Furthermore, Defendants Leight and Singer coordinated the activities of all the DrugPlace Defendants and siphoned off significant profits for themselves.

215. Defendants Leight and Singer are the leaders and organizers of the DrugPlace Conspiracy. They developed the scheme's structure and bankrolled the operation, with Singer serving as the primary operational liaison with pharmaceutical manufacturers and managing staff on a day-to-day basis. They have received hundreds of millions of dollars from the rebate fraud scheme, both through entities that they control and in their personal capacities.

216. Most of the funds received by the DrugPlace Entities have been moved by Defendants Leight and Singer across a network of accounts they controlled, with the funds often layered multiple times and commingled with other funds prior to being spent or distributed. Overall, the DrugPlace Entities and Defendants Leight and Singer transferred or spent at least $1 billion from accounts that received Lilly funds or commingled funds to investment accounts, affiliated entities, ADP payroll, IRS, and to purchase real estate, luxury cars, and other assets.

217. Together, using funds from the accounts that received Lilly's rebate payments, Leight and Singer placed almost $400 million in personal investment accounts, diverted at least $65 million to DeMarco Landscaping, spent millions of dollars toward real estate purchases, and paid off their bills for a fleet of luxury cars, including models from Rolls Royce, Bentley, and others.

218. Defendant Hoffner was DrugPlace's Office Manager and Director of Purchasing. In these roles, Hoffner managed and participated in DrugPlace's operations, including the rebate scheme, and specifically held discussions regarding DrugPlace's rebate submissions with both Health Delegates and Lilly. Hoffner also directed the purchasing of wholesale medications on behalf of DrugPlace. He was responsible for all of DrugPlace's orders from one of the pharmaceutical wholesalers through which the majority of Trulicity was purchased during the relevant period. He also supervised and coordinated Nakorn and Brightline's sales of medication to secondary distributors.

219. Defendant Smith's involvement with the DrugPlace scheme spans multiple decades. Smith created and was CEO of Defendant Community Health and, with Maynard Sr., conceived of the program with Defendants Leight and Singer and lent ecclesiastical legitimacy to the scheme. He coordinated with the other DrugPlace Defendants to use the program to make it

seem like the DrugPlace Entities were serving a legitimate patient base of Church members and to ensure the appearance of a legitimate faith-based benefit plan, thus insulating the conspiracy from routine scrutiny. Smith was also the CEO of PromiseCare, the predecessor pharmacy to DrugPlace in Tennessee with which Singer and Leight were also involved. As CEO of PromiseCare and later of Community Health, which was based out of the same location as DrugPlace (TN), Smith was a daily presence in the DrugPlace office complex in Tennessee and helped managed operations at that location. Smith also led the 2015 Lilly audit, during which he made multiple false representations regarding the Community Health program in order to further the fraudulent scheme. During the audit and thereafter, Smith used his position in the Church to provide the scheme with a semblance of legitimacy, to deter Lilly from asking questions and obstruct its investigation, and to insulate the scheme from scrutiny.

220. Defendant Mazei has carried out and perpetuated the exact same scheme through the Galaxy Operation. As sole manager of Galaxy Med LLC and Brightline Wholesale, LLC, he operated the wholesale distribution infrastructure through which diverted pharmaceuticals were channeled into secondary markets while DrugPlace and Galaxy simultaneously submitted rebate claims for those same products as though dispensed to patients. Together with Defendant Giscombe, he held himself out to secondary market distributors as Brightline's primary representative. He is also the signatory or proposed signatory for Brightline and Galaxy on agreements relating to the Galaxy and Brightline rebate and resale businesses, respectively. Mazei conducts Galaxy business in the Florida headquarters of DrugPlace.

221. With Defendants Leight, Singer, Mazei, Smith, and Hoffner supervising, and actively participating in, the scheme executed through the DrugPlace Entities, the DrugPlace Conspiracy, with the substantial assistance of all conspirators, was able to submit fraudulent rebate

claims undetected. As set forth above, each Defendant's conduct was necessary to, and furthered, the submission of fraudulent rebate claims that could not have gone undetected absent their coordinated participation.

=

**C. The Co-Conspirators**

222. Defendant Jerry Maynard Sr. was head of the COGIC Department of Health and partnered with the Fraud Defendants to lead and promote the Community Health Initiative. In his role at Community Health and as an agent for DrugPlace, Maynard Sr. created the guise of a massive "prescription cost share program" for COGIC members, enabling the Fraud Defendants to perpetuate their rebate scheme. Maynard Sr. attended meetings with Maynard II, Singer, and Leight in Tennessee at DrugPlace's location.

223. Defendant Jerry Maynard II registered the trademarks for DrugPlace, Ready Healthcare Services (the legal predecessor to Community Health), and COGIC Department of Health. He also served as the Chairman of the Board for Community Health. In his role at Community Health and as an agent for DrugPlace, Maynard II created the guise of a massive "prescription cost share program" for COGIC members, enabling the Fraud Defendants to perpetuate their rebate scheme. Maynard II attended meetings with Maynard Sr., Singer, and Leight in Tennessee at the DrugPlace offices.

224. Defendant Misha Maynard is the Vice President of Operations for Community Health. In her roles at Community Health and the Church, Ms. Maynard supervised, participated in, conspired to participate in, and benefited from the fraudulent scheme.

225. Defendant Edgar Enriquez is the General Manager of Nakorn, and the main contact on the facility's license. He has recruited at least one employee to work at the DrugPlace pharmacy and was described to be the "go-to" person for the wholesale business. According to Ms. Renfro,

Enriquez was responsible for effectuating the transfers of medicine between DrugPlace Tennessee and Nakorn. When medicine arrived at the DrugPlace facility, he would take the medicine from DrugPlace to Nakorn to be processed for wholesale. Enriquez also drove vans that delivered the medicines after they were purchased.

226. Ms. Supko explained that Enriquez supervised all the wholesale employees at the Nakorn warehouse. He also frequently communicated and coordinated with Supko regarding her responsibilities as pharmacist-in-charge.

227. Defendant Giscombe also held herself out to secondary market distributors as Brightline's primary representative, and described herself as the Pharmaceutical Wholesale Manager of the Company. She recently worked as the pharmacy technician at Galaxy, which purportedly dispensed thousands of Trulicity packages to NHCLC members over the course of one year. However, as noted above, NHCLC has confirmed this putative program does not exist, and has never existed.

228. These co-conspirators, with the Fraud Defendants, as a part of the DrugPlace Conspiracy, committed and caused to be committed multiple overt acts pursuant to and in furtherance of the conspiracy, including but not limited to the acts set forth above.

**D. The Relief Defendants**

229. As alleged above, each of the Relief Defendants (DeMarco Landscaping, Christopher DeMarco, Globus, Rockaway, and U.S. Healthcare) received proceeds of Defendants' fraud with no legitimate purpose for their receipt of the payments. Although the role of these entities in Defendants' fraudulent scheme, if any, is unknown to Lilly, they are unjustly in possession of substantial sums traceable to Defendants' fraud.

### IV. Prior Allegations of Fraud and Other Illegal Activity Involving Defendants and Their Associates

230. Some of the named Defendants and their associates have been implicated in similar healthcare-related schemes over the years relating to their fraudulent business operations involving DrugPlace and other related business entities.

231. In 2011, Leight and Singer, owners of DrugPlace and Nakorn, were implicated in a healthcare-fraud scheme involving the misappropriation of funds related to a pharmaceutical returns (or "reverse distribution") business, Guaranteed Returns. The Vice President of Guaranteed Returns, a business associate of Leight and Singer's, was indicted in the Eastern District of Pennsylvania for his role devising and directing the scheme. During the investigation, one of Leight's businesses was searched, and the search warrant affidavit asserted that both Leight and Singer received significant amounts of the fraudulent proceeds of the scheme. Guaranteed Returns and two of its executives were later charged and convicted in a $180 million criminal healthcare fraud case in the Eastern District of Pennsylvania.

232. Several years later, Abbott Laboratories sued Leight, Singer, and Able Wholesalers—an entity that Leight and Singer co-own indirectly—in the Eastern District of New York for their role in the unlawful importation and diversion of diabetic test strips. The court concluded that some of the unlawfully diverted blood test strips were supplied through Able Wholesalers.

233. Leight and Singer's involvement in the Able Wholesalers scheme resurfaced in a separate prosecution by the United States Attorney's Office for the Southern District of Florida against two individuals, Mohammad Salemi and Joshua Joles. Salemi was prosecuted for healthcare fraud involving his wholesale business's purchase and distribution of millions of dollars in diverted pharmaceuticals. The diverted pharmaceuticals were branded medicines that were

acquired unlawfully—through fraud, pharmacy burglaries, and cargo thefts. Salemi and Joles acquired these medicines in large quantities, at a cost well below normal wholesale prices, and then introduced the diverted medicines back into the legitimate marketplace to be resold to pharmacies and their patients. To conceal the fraud, Salemi produced falsified pedigrees.

234. In an interview with the FBI, Salemi stated that he knew Defendant Singer and that the two were introduced by Joles in 2016 while Singer was running Able Wholesalers. Salemi explained that Joles had been acquiring significant amounts of one specific medicine from Able Wholesalers. During their meeting, Singer told Salemi that Able was supplying such quantities of drugs by using "intracompany transfers of prescription drugs"—much like the intercompany transfers of Trulicity from DrugPlace to Nakorn, and from Galaxy to Brightline. According to Salemi, Singer admitted that he used these transfers to turn millions of dollars in profit per year.

235. Leight and Singer also co-owned a collection of entities known as Meds Direct Rx, located in Tennessee, New York, and Florida. Meds Direct Rx was identified in a series of criminal and civil lawsuits against the healthcare company Next Health as a key player in laundering funds to facilitate unlawful co-pays, for which Next Health was ultimately criminally convicted.

236. Next Health's lab business was premised on billing insurance for medically unnecessary lab tests. To secure reimbursement from insurers, Next Health represented that patients were responsible for thousands of dollars in co-pays for the lab tests, when in fact, patients were responsible for only a small fraction. Next Health then used various fraudulent means to make it appear that co-pays had been satisfied.

237. To perpetrate this scheme, Next Health deployed a pharmacy division that consisted of dozens of entities, including the Meds Direct Rx pharmacies owned by Leight and Singer. In one lawsuit, the court noted that Leight and Singer's pharmacies were used to funnel proceeds of

the fraud through a fictitious charity set up by Defendant Jerry Maynard Sr. Maynard Sr. arranged the charity to appear like it was paying co-pays. Meds Direct then submitted fake invoices back to Next Health, which in turn remitted large payments back to Meds Direct that it used to create slush funds to pay the fake co-pays.

238. During Lilly's 2015 audit of DrugPlace, DrugPlace introduced Lilly to Jarrod Shirley as one of DrugPlace's lead pharmacists. In 2008, Johnson & Johnson and LifeScan sued Shirley and South Pointe Wholesale, Inc., a pharmaceutical wholesaler that Shirley co-owns and operates, in the Eastern District of New York for their sale and distribution of thousands of counterfeit diabetes test strips. As discussed above, South Pointe has a number of connections to DrugPlace: Shirley is the former DrugPlace pharmacist who met with the Lilly team during the 2015 DrugPlace audit, and South Pointe shared an address with a prior Kentucky incorporation of DrugPlace that is now closed. Shirley and South Pointe ultimately settled the action, agreeing to a consent judgment and permanent injunction to stop their infringing sales. South Pointe's primary business address is 321 Matthews Mills Road, Glasgow, Kentucky–the same address listed for DrugPlace, Inc. in Kentucky.

## V. The Harm Caused by the DrugPlace Conspiracy's Fraud

### A. Financial Harm

239. The DrugPlace Conspiracy's ongoing fraud scheme has caused enormous financial harm to Lilly.

240. Between 2020 and 2024, DrugPlace and the Galaxy Operation together caused Lilly to pay over $200 million in rebates, corresponding to purported prescriptions for hundreds of thousands of boxes of Trulicity. DrugPlace and the Galaxy Operation also attempted to make Lilly pay tens of millions of dollars in rebate claims for additional prescriptions of Trulicity that DrugPlace claimed to dispense between Q1 and Q3 2025.

241. As detailed above, for most or all of those rebate claims, the DrugPlace Entities never actually sold, dispensed, or shipped any boxes of Trulicity to patients—as required for rebate eligibility. Instead, they resold the boxes to other distributors.

242. DrugPlace's and the Galaxy Operation's rebate claims were fraudulent. To make its products accessible to patients, Lilly contracts to pay rebates to PBMs for formulary access. The rebates are paid based on utilization of medication actually dispensed by pharmacies to the PBM's client plans' member patients. If the PBM's rebates were paid on the sale of products to the pharmacy by the wholesaler, the same unit of medicine could be rebated again and Lilly would pay more in rebates than it charges for the medicine. Yet in hundreds of thousands of rebate claims submitted through intermediaries to Lilly, DrugPlace, and the Galaxy Operation represented they had dispensed a box of Trulicity to an actual patient, when they instead sold that box on the secondary market.

243. Each time DrugPlace or the Galaxy Operation caused a false rebate claim to be submitted to Lilly, through intermediaries, purporting to have dispensed a box of Trulicity to a member patient, that it actually resold on the secondary market, Lilly reasonably relied on that false representation and was thereby defrauded into paying rebates. Had Lilly known the truth, it would never have paid the rebates in question. Lilly is entitled to damages and/or restitution in the aggregate amount of these fraudulent rebates.

244. Lilly is also entitled to disgorgement of, or a constructive trust over, the profits the DrugPlace Conspiracy earned at Lilly's direct expense in the form of rebate claims paid for medicines that were not actually dispensed to and utilized by patients. Specifically, Lilly is entitled to the proceeds of the scheme up to the amount of its direct out-of-pocket losses, which is the total amount it paid in fraudulent rebates.

**B. Irreparable Harm, Including Non-Financial Harm**

245. The harm the DrugPlace Defendants have caused Lilly is practically impossible to stop without a permanent, court-ordered injunction, and impossible to adequately remedy by money damages.

246. As described above, the DrugPlace Defendants have demonstrated a pattern of concealing their fraud and a willingness to pivot their schemes to evade countermeasures, which they already have done repeatedly.

247. For example, between 2011 and 2015, DrugPlace, in its capacity as a PBM, had a direct commercial rebate agreement with Lilly. After identifying anomalies in DrugPlace's rebate claims for insulin medicines, Lilly attempted to audit DrugPlace's underlying pharmacy records. DrugPlace resisted the audit, and when it ultimately went forward, Lilly discovered that DrugPlace had no adequate substantiation for its rebate claims and no evidence that Lilly's medication had actually been dispensed to real patients. Based on these findings and other unexplained aberrations in DrugPlace's data and operations, Lilly ended its direct commercial rebate arrangement with DrugPlace.

248. Yet within a matter of years, DrugPlace again started submitting rebate claims for Lilly products, except this time, it submitted claims for a different medicine—Trulicity—and concealed those claims through intermediaries. For nearly five years, DrugPlace was able to avoid detection in this manner.

249. Beginning in July 2024, DrugPlace's owners and principals, through their associates that included Defendant Mazei, reconstructed the DrugPlace model through new channels, using different entities comprising the Galaxy Operation to submit fraudulent rebate claims, through intermediaries, to Lilly under a strikingly similar scheme.

250. Due to the lag time between when pharmacies submit reimbursement claims to PBMs and when Lilly receives rebate claims data from PBMs seeking rebates, several months can pass and millions of dollars of claims can be paid before Lilly can conduct a meaningful investigation. Even after Lilly receives rebate claims data, the process of analyzing and identifying anomalies in large amounts of aggregated data, which can flow through multiple and shifting intermediaries, is difficult and time-consuming. If and when Lilly spots one pattern of fraudulent activity, the DrugPlace Conspiracy may already be moving on to a new iteration of its unlawful scheme, whether using different products, different intermediaries, or different schemes altogether. The Drug Place Conspiracy already has the means and infrastructure to do so, as evidenced by its creation of the parallel operations run through the Galaxy Operation.

251. Moreover, given the DrugPlace Conspiracy's extensive history of obscuring the true nature of its activities and the identities of the individuals that control its business; the history of fraud and recidivism by the DrugPlace Officers, including Leight and Singer; the dishonesty the DrugPlace Defendants have displayed during Lilly's investigation of their conduct; and the extent of Lilly's damages, it is highly unlikely that Lilly will be able to obtain and execute a damages judgment that provides full compensation for its financial losses. Indeed, in response to Lilly's scrutiny of the DrugPlace Defendants' rebate claims and operations, the DrugPlace Defendants recently caused DrugPlace and Nakorn to close their facilities, including surrendering Nakorn's wholesale distributor license and liquidating DrugPlace's equipment and assets—an apparent effort to cover their tracks.

252. The DrugPlace Conspiracy's fraud has also caused irreparable non-monetary harm to Lilly. Lilly's relationships with PBMs are important to Lilly's business and to its ability to deliver medicine to patients. To mitigate its losses from the DrugPlace Conspiracy's large-scale

fraud, Lilly has taken and will continue to attempt certain self-help measures, including refusing to honor the most recent rebate claims submitted by DrugPlace and the Galaxy Operation through intermediaries. However, these self-help measures disrupt Lilly's business relationships with the payer intermediaries that submit those rebate claims to Lilly. Moreover, given the DrugPlace Conspiracy's history of pivots, it is highly likely that Defendants will continue to find new pathways by which to submit rebate claims to Lilly. To the extent DrugPlace moves its scheme to different intermediaries in the future, Lilly may be required to take similar action against other payers. This has disrupted and will continue to disrupt Lilly's relationships with some of its business counterparties. That is a detriment to Lilly's business relationships that is difficult or impossible to quantify in monetary terms or rectify through an award of damages.

253. For the above reasons, Lilly is entitled not only to compensation for the losses caused by the DrugPlace Conspiracy's massive fraud, but also to permanent injunctive relief prohibiting Defendants from submitting any further rebate claims for any Lilly product.

## FIRST CLAIM FOR RELIEF

### Common Law Fraud

### (Against Defendants DrugPlace, Galaxy, Community Health, and Individual Defendants Leight, Singer, Smith, Mazei, and Hoffner)

254. Lilly hereby repeats and realleges the allegations in paragraphs 1 to 253 above as if set forth fully herein.

255. DrugPlace, Galaxy, Community Health, and individual Defendants Leight, Singer, Smith, Mazei, and Hoffner (collectively, the "Fraud Defendants") knowingly and intentionally submitted or caused to be submitted, through rebate aggregators and PBMs, hundreds of thousands of false rebate claims to Lilly, as well as false health plan documents and formularies to which those false rebate claims could be attributed. Those submissions falsely misrepresented that

Trulicity had been dispensed to their member patients when in fact they had not. In particular, each false and fabricated rebate claim that Lilly received and paid included, among other things, false statements originating from the Fraud Defendants as to the unique identification number associated with the purported patient's prescription, the date on which Trulicity was purportedly dispensed, and the quantity and number of days' worth of Trulicity purportedly dispensed. In reality, no patient existed and no dispense occurred. The Fraud Defendants knowingly and intentionally caused third-party rebate aggregators and PBMs to submit these fraudulent rebate claims to Lilly for payment.

256. The Fraud Defendants made those false representations, or caused them to be made, with the intent to defraud. Specifically, the Fraud Defendants made those false representations, or caused them to be made, in order to profit from the rebates Lilly pays PBMs pursuant to contract for boxes of Trulicity actually dispensed to and utilized by patients.

257. Defendants Leight, Singer, Smith, Mazei, and Hoffner, as owners, officers, and/or employees of DrugPlace, Galaxy, and Community Health, were personally involved in and approved of the fraudulent schemes. These Defendants had actual knowledge of, and substantially assisted in, the schemes to submit through intermediaries, and receive payment in connection with, fraudulent rebate claims to Lilly, and to create and perpetuate sham health plans to which those fraudulent rebates could be attributed.

258. Lilly reasonably relied on these misrepresentations that the Fraud Defendants submitted to their third-party aggregator and, in doing so, caused to be submitted to third-party PBMs and ultimately to Lilly for payment. Pursuant to its contracts with PBMs, Lilly relied on the PBMs to review and validate pharmacy claim-level information when determining whether to pay the rebate claims. Lilly was unaware of the fraudulent scheme because the Fraud Defendants

took active steps to conceal their activities and evade detection. The challenged claim-level data, representing purported utilizations of Trulicity, originated with DrugPlace or Galaxy, was transmitted to Health Delegates and the PBMs, and directly reached Lilly through the rebate data files. Defendants intended their rebate claims to reach Lilly to induce payment, and Lilly would not have paid if it knew Trulicity was resold rather than dispensed to patients.

259. The Fraud Defendants' fraud was gross, oppressive, and malicious, and as a result of the Fraud Defendants' conduct, Lilly was injured in an amount to be determined at trial.

260. Furthermore, unless and until the Fraud Defendants are permanently enjoined from seeking to submit rebate claims for Lilly medicines, Lilly faces a substantial and material risk of irreparable and monetary harm.

## SECOND CLAIM FOR RELIEF

### Civil Conspiracy to Commit Fraud
### (Against All DrugPlace Defendants)

261. Lilly hereby repeats and realleges the allegations in paragraphs 1 to 260 above as if set forth fully herein.

262. The DrugPlace Defendants unlawfully, knowingly, and willfully combined, conspired, confederated and agreed together to defraud Lilly. The DrugPlace Defendants adopted the goal of furthering and facilitating this conspiracy.

263. The DrugPlace Defendants each committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to achieve the objects thereof, including but not limited to the acts set forth above.

264. The DrugPlace Defendants' scheme depended upon the participation of all Defendants, including, among other things, (a) Community Health and individual Defendants Smith, Jerry Maynard Sr., Jerry Maynard II, and Misha Maynard willingly creating and

perpetuating a sham health plan front to which fraudulent rebates could be attributed; (b) Nakorn, Brightline, and individual Defendants Enriquez, Giscombe, and Hoffner knowingly diverting Lilly's medications that DrugPlace and Galaxy purported to dispense to patients to the secondary market for re-sale; and (c) DrugPlace, Galaxy, and individual Defendants Leight, Singer, Mazei, and Hoffner knowingly submitting or causing to be submitted, through intermediaries, and receiving payment in connection with, fraudulent rebate claims to Lilly for medications that were not actually dispensed to and utilized by DrugPlace or Galaxy to patients.

265. Lilly reasonably relied on the misrepresentations that the DrugPlace Defendants submitted to their third-party aggregator and, in doing so, caused to be submitted to third-party PBMs and ultimately to Lilly for payment. Pursuant to its contracts with PBMs, Lilly relied on the PBMs to review and validate pharmacy claim-level information when determining whether to pay the rebate claims. Lilly was unaware of the DrugPlace Defendants' fraudulent scheme because the DrugPlace Defendants took active steps to conceal their activities and evade detection. The challenged claim-level data, representing utilizations of Trulicity, originated with DrugPlace or Galaxy, was transmitted to Health Delegates and the PBMs, and directly reached Lilly through the rebate data files. The DrugPlace Defendants intended their rebate claims to reach Lilly to induce payment, and Lilly would not have paid if it knew Trulicity was resold rather than dispensed to patients.

266. As a result of the DrugPlace Defendants' conduct, Lilly was injured in an amount to be determined at trial.

## **<u>THIRD CLAIM FOR RELIEF</u>**

**Negligent Misrepresentation**
**(Against the Fraud Defendants)**

267. Lilly hereby repeats and realleges the allegations in paragraphs 1 to 266 above as if set forth fully herein.

268. The Fraud Defendants misrepresented and caused to be misrepresented to Lilly, through intermediaries, that they were dispensing Trulicity to patients, when in fact they were not. These misrepresentations were passed along by third parties to Lilly, directly causing Lilly to pay millions of dollars in fraudulent rebates for medications that were not actually utilized by patients. These material statements of fact were false and misleading.

269. These statements were negligent because the Fraud Defendants did not exercise reasonable care in verifying the accuracy of these statements or in ensuring that they did not fail to make material disclosures, yet represented that they knew the statements to be true. Indeed, the Fraud Defendants made these statements recklessly, without regard to their truth or falsity.

270. The Fraud Defendants did not take any affirmative steps to correct their materially false statements.

271. The Fraud Defendants had a duty to provide accurate information in their rebate claims and utilization data because they knew and intended Lilly would rely on their false representations in making rebate payments.

272. Lilly reasonably relied upon the misrepresentations that the Fraud Defendants submitted to their third-party aggregator and, in doing so, caused to be submitted to third-party PBMs and ultimately to Lilly for payment. Pursuant to its contracts with PBMs, Lilly relied on the PBMs to review and validate pharmacy claim-level information when determining whether to pay the rebate claims. Lilly was unaware that the rebate submissions received from intermediaries were false because Defendants took active steps to conceal their activities and evade detection. The Fraud Defendants fabricated the underlying claim-level data for each prescription of Trulicity

purportedly utilized and dispensed, and transmitted it to Health Delegates and the PBMs, who in turn provided that data to Lilly through the rebate data files. The Fraud Defendants intended that their false representations regarding their Trulicity dispenses to reach Lilly to induce payment, and Lilly would not have paid if it knew Trulicity was resold rather than dispensed to patients as had been represented.

273. As a result of the Fraud Defendants' conduct, Lilly was injured in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment
### (Against DrugPlace Defendants and Relief Defendants)

274. Lilly hereby repeats and realleges the allegations in paragraphs 1 to 273 above as if set forth fully herein.

**DrugPlace Defendants**

275. As set forth above, the DrugPlace Defendants misrepresented, caused to be misrepresented, and/or conspired to misrepresent that they were dispensing Lilly's products—specifically, Trulicity—to patients, when in fact they were not. These misrepresentations were passed along by third parties to Lilly, directly causing Lilly to pay PBMs millions of dollars in fraudulently obtained rebates for medications that were not actually dispensed to and utilized by patients.

276. As a result of these false representations and material omissions, the DrugPlace Defendants wrongfully obtained a monetary benefit to which they were not legally entitled. Specifically, Lilly paid rebates to Ascent or Emisar in accordance with the terms of their contracts. Ascent or Emisar remitted payment to Health Delegates, and then Health Delegates remitted payment to DrugPlace or TPE (for Galaxy rebates). Between 2020 and 2025, DrugPlace received

approximately $533 million of rebate payments from Health Delegates into its primary account. To date, Lilly's ongoing investigation determined that at least $150 million of such payments are related to Lilly rebate claim proceeds. From DrugPlace's primary account, Defendant Paul Leight received approximately $475 million and Kevin Singer received approximately $459 million. Those funds were then transferred to other Leight and Singer controlled accounts and to the Relief Defendants, among other accounts.

277. The DrugPlace primary account also received approximately $1.2 billion directly from other pharmaceutical manufacturers, and approximately $767 million from Defendant Nakorn Wholesalers. The resale business reflected in these payments was not economically viable without the simultaneous collection of fraudulently obtained rebate payments.

278. The DrugPlace Defendants have no right to retain these unjust gains.

279. If the DrugPlace Defendants are permitted to keep this monetary benefit, it would be manifestly unjust.

280. Lilly is therefore entitled to the remedies of disgorgement and restitution in the amount by which the DrugPlace Defendants and Relief Defendants were unjustly enriched, or the imposition of a constructive trust over all Defendants' assets to that extent in order to prevent Defendants' enjoyment of that benefit. Lilly is also entitled to an order temporarily restraining and preliminarily enjoining the DrugPlace Defendants and Relief Defendants from dissipating any profits or benefits heretofore received and which continue to be received from fraudulent adjudications of Lilly products insofar as such profits and benefits are rightfully Lilly's.

**Relief Defendants**

281. The DrugPlace Defendants used the Relief Defendants to disperse, hide, and ultimately enjoy the fruits of their fraudulent scheme. The DrugPlace Defendants transferred

money to each Relief Defendant that is traceable to accounts that received misappropriated Lilly funds or funds commingled with Lilly funds. Given their association with the DrugPlace Defendants, the Relief Defendants knew or should have known of the source of the funds transferred to and through their accounts. The Relief Defendants have no legitimate claim to the funds transferred to or through them by the DrugPlace Defendants and/or the other Relief Defendants. The Relief Defendants did not perform legitimate services in exchange for the compensation received or, to the extent the Relief Defendants did perform any services, they were grossly overcompensated in order to funnel money to the Relief Defendants' owners and benefactors.

282. Lilly is therefore entitled to the remedies of disgorgement and restitution in the amount by which the DrugPlace Defendants and the Relief Defendants were unjustly enriched, or the imposition of a constructive trust over the DrugPlace Defendants and Relief Defendants' assets in that amount, in order to prevent all Defendants' improper enjoyment of that benefit.

## FIFTH CLAIM FOR RELIEF

### Money Had and Received
### (Against DrugPlace Defendants and Relief Defendants)

283. Lilly hereby repeats and realleges the allegations in paragraphs 1 to 282 above as if set forth fully herein.

**DrugPlace Defendants**

284. For the reasons stated above, the DrugPlace Defendants have profited directly and indirectly from the fraudulent misrepresentations that they made and caused to be made, and conspired to make, to Lilly.

285. In equity and good conscience, the DrugPlace Defendants ought not to retain those profits because in justness and fairness they belong to Lilly.

286. Lilly is therefore entitled to the remedies of disgorgement and restitution in the amount of money the DrugPlace Defendants have received at Lilly's expense or the imposition of a constructive trust over Defendants' assets to that extent in order to prevent the DrugPlace Defendants' enjoyment of the money so received. Lilly is also entitled to an order temporarily restraining and preliminarily enjoining the DrugPlace Defendants from dissipating any profits or benefits heretofore received and which continue to be received as a result of fraudulent rebate claims for Lilly products, insofar as such profits and benefits are rightfully Lilly's.

**Relief Defendants**

287. The DrugPlace Defendants used the Relief Defendants to disperse, hide, and ultimately enjoy the fruits of their fraudulent scheme. The DrugPlace Defendants transferred money to each Relief Defendant that is traceable to accounts that received misappropriated Lilly funds or funds commingled with Lilly funds. Given their association with the DrugPlace Defendants, the Relief Defendants knew or should have known of the source of the funds transferred to and through their accounts. The Relief Defendants have no legitimate claim to the funds transferred to or through them by Defendants and/or the other Relief Defendants. The Relief Defendants did not perform legitimate services in exchange for the compensation received or, to the extent the Relief Defendants did perform any services, they were grossly overcompensated in order to funnel money to the Relief Defendants' owners and benefactors.

288. Lilly is therefore entitled to the remedies of disgorgement and restitution in the amount by which the DrugPlace Defendants and the Relief Defendants were unjustly enriched, or the imposition of a constructive trust over the DrugPlace Defendants and Relief Defendants' assets in that amount, in order to prevent all Defendants' improper enjoyment of that benefit.

## SIXTH CLAIM FOR RELIEF

**Civil Theft**
**(Against the DrugPlace Defendants, Except Misha Maynard)**

289. Lilly hereby repeats and realleges the allegations in paragraphs 1 to 288 above as if set forth fully herein.

290. This is a claim for Civil Theft pursuant to Section 772.11 of the Florida Statutes. Lilly has complied with all conditions precedent to asserting this claim, including the requirement that it serve the DrugPlace Defendants with a written demand for repayment.

291. The DrugPlace Defendants operated an interconnected network of entities—including DrugPlace, Inc. (FL), DrugPlace, Inc. (TN), Community Health Initiative, Inc., Nakorn Wholesalers, LLC, Galaxy Med, LLC d/b/a Galaxy Pharmacy, and Brightline Wholesale LLC—through which they have carried out a fraudulent rebate scheme that has stolen more than $200 million from Lilly. The DrugPlace Officers—Paul Leight, Kevin Singer, Readus Smith, Daniel Hoffner, Jerry Maynard Sr., Jerry Maynard II, Misha Maynard, Edgar Enriquez, Lane Mazei, and Danielle Giscombe—each personally supervised, participated in, conspired to participate in, and benefited from this fraudulent scheme.

292. Through this scheme, the DrugPlace Defendants purchased enormous quantities of Trulicity through pharmacies operated by DrugPlace and Galaxy. Rather than dispensing the medicine to patients as represented in their rebate submissions, the DrugPlace Defendants resold the medicine on the secondary market through affiliated wholesalers Nakorn and Brightline. The DrugPlace Defendants then submitted, or caused to be submitted, hundreds of thousands of fraudulent rebate claims to Lilly through a series of intermediaries, falsely representing that the Trulicity had been dispensed to patients covered by prescription cost share programs purportedly

affiliated with two church-affiliated groups, Community Health/COGIC and NHCLC. In reliance on these false representations, Lilly paid rebates on each such claim.

293. Between 2020 and 2024, the DrugPlace operation alone caused Lilly to pay more than $220 million in fraudulent rebates and attempted to cause Lilly to pay more than $30 million more in fraudulent rebates in 2025. The Galaxy operation caused nearly $2 million in additional rebate payments between July and December 2024 alone and attempted to cause nearly $3 million more in 2025. To date, the DrugPlace Defendants have not returned any of the funds stolen and fraudulently obtained through these rebate claims. Instead, the DrugPlace Defendants have kept the proceeds of their scheme for their own benefit.

294. The DrugPlace Defendants have wrongfully asserted dominion over Lilly's funds in a manner inconsistent with Lilly's ownership interest in such funds.

295. The DrugPlace Defendants' conduct constitutes theft as they have knowingly and intentionally obtained Lilly's property with the intent to permanently deprive Lilly of the right to the property and have appropriated the property for their own use to the detriment of Lilly.

296. The DrugPlace Defendants' ongoing retention of Lilly's funds constitutes civil theft under Florida law.

297. As a result of the DrugPlace Defendants' conduct, including their failure to return Lilly's property upon receiving Lilly's written demand, Lilly has been damaged.

298. Lilly is entitled to relief including treble damages and attorney's fees and costs to the fullest extent permitted under Fla. Stat. § 772.11.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Lilly hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Lilly demands judgment against Defendants as follows:

a) an order entering judgment in favor of Lilly against the DrugPlace Defendants, jointly and severally;

b) an order permanently enjoining the DrugPlace Defendants and their subsidiaries, parents, affiliates, agents, servants, employees, members, directors, officers, and attorneys, and those persons in active concert or participation with them from engaging in the unlawful behavior described above and from seeking rebates for Lilly medicines, directly or indirectly;

c) an order awarding Lilly full restitution for the unwarranted rebates it paid as the result of the DrugPlace Defendants' fraud and conspiracy;

d) an order awarding Lilly the profits unlawfully earned by the DrugPlace and Relief Defendants, in an amount to be determined, as restitution, disgorgement, or the imposition of a constructive trust over such profits;

e) an order awarding Lilly the amounts unlawfully received by the Relief Defendants, in an amount to be determined, as restitution, disgorgement, or the imposition of a constructive trust over such profits;

f) an order awarding Lilly actual damages in an amount to be determined;

g) an order awarding Lilly treble damages in an amount to be determined;

h) an order directing the DrugPlace and Relief Defendants to return money fraudulently misappropriated from Lilly;

i) an order awarding Lilly pre-judgment and post-judgment interest;

j) an order awarding Lilly punitive damages;

k) an order awarding Lilly reasonable attorneys' fees and other costs; and

l) such additional relief as the Court finds just, equitable, and appropriate.

DATED: Miami, Florida
August 28, 2026

Respectfully submitted,

**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**

*/s/ Jay B. Shapiro*
Jay B. Shapiro, Esq. (FBN 776361)
Email: jshapiro@stearnsweaver.com
Veronica L. de Zayas, Esq. (FBN 91284)
Email: vdezayas@stearnsweaver.com
Ryan M. Wolis, Esq. (FBN 1019034)
Email: rwolis@stearnsweaver.com
150 W. Flagler St., Suite 2200, Miami, FL 33130
Telephone: 305-789-3200

**PATTERSON BELKNAP WEBB & TYLER LLP**

*/s/ Geoffrey Potter*
Geoffrey Potter, Esq. (Admitted *PHV*)
Email: gpotter@pbwt.com
Aron Fischer, Esq. (Admitted *PHV*)
Email: afischer@pbwt.com
Joshua Kipnees, Esq. (Admitted *PHV*)
Email: jkipnees@pbwt.com
1133 Avenue of the Americas, New York, NY 10036
Telephone: 212-336-2000

*Attorneys for Plaintiff Eli Lilly and Company*